Nos. 22-11133-GG, 22-11143-GG, 22-11144-GG, 22-11145-GG (consolidated)

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

LEAGUE OF WOMEN VOTERS OF FLORIDA, INC., et al.,

*Plaintiffs-Appellees,*

v.

FLORIDA SECRETARY OF STATE, et al.,

*Defendants-Appellants.*

Appeal from the U.S. District Court for the Northern District of Florida,
Nos. 4:21-cv-242, 4:21-cv-186, 4:21-cv-187, 4:21-cv-201 (Walker, C.J.)

## APPELLANTS' INITIAL BRIEF FOR SECRETARY BYRD, ATTORNEY GENERAL MOODY, AND SUPERVISORS HAYS AND DOYLE

Mohammad O. Jazil
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 South Monroe Street, Suite 500
Tallahassee, FL 32301
(850) 274-1690

*Lead Counsel for Secretary Byrd*

Henry C. Whitaker
FLORIDA ATTORNEY
GENERAL OFFICE
PL-01 The Capitol
Tallahassee, FL 3300
(850) 414-3300

*Lead Counsel for Attorney General Moody*

Andy Bardos
GRAYROBINSON, P.A.
301 South Bronough Street,
Suite 600
Tallahassee, FL 32301
(850) 577-9090

*Lead Counsel for Supervisors Hays and Doyle*

No. 22-11133, *Harriet Tubman Freedom Fighters, Corp. v. Fla. Sec'y of State*
No. 22-11143, *League of Women Voters of Fla. v. Fla. Sec'y of State*
No. 22-11144, *Fla. State Conf. of Branches & Youth Units of NAACP v. Fla. Sec'y of State*
No. 22-11145, *Fla. Rising Together v. Fla. Sec'y of State*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Per Rule 26.1 and Circuit Rule 26.1, Appellants certify that the following have

an interest in the outcome of this appeal:

1.   Adkins, Janet, *Defendant*

2.   Abudu, Nancy, *Attorney for Plaintiffs-Appellees*

3.   Advancement Project National Office, *Attorneys for Plaintiffs-Appellees*

4.   Aguilera, Cecilia, *Attorney for Plaintiffs-Appellees*

5.   Alachua County Attorney's Office, *Attorneys for Defendant*

6.   Andersen, Mark, *Defendant*

7.   Anderson, Christopher, *Defendant*

8.   Anderson, Shirley, *Defendant*

9.   Anstaett, David, *Attorney for Plaintiffs-Appellees*

10.   Arnold & Porter, LLP, *Attorneys for Plaintiffs-Appellees*

11.   Arnold, Melissa, *Defendant*

12.   Arrington, Mary, *Defendant*

13.   Baird, Maureen, *Defendant*

14.   Baker McKenzie, LLP, *Attorney for Plaintiffs-Appellees*

15.   Bardos, Andy, *Attorney for Defendants*

16.   Barton, Kim, *Defendant*

17.   Beasley, Bobby, *Defendant*

18.   Beato, Michael, *Attorney for Defendant-Appellant*

19.   Begakis, Steven, *Attorney for Intervenor-Defendants-Appellants*

20.   Bell, Daniel, *Chief Deputy Solicitor General of Florida*

21.   Benda, Kyle, *Attorney for Defendant*

No. 22-11133, *Harriet Tubman Freedom Fighters, Corp. v. Fla. Sec'y of State*
No. 22-11143, *League of Women Voters of Fla. v. Fla. Sec'y of State*
No. 22-11144, *Fla. State Conf. of Branches & Youth Units of NAACP v. Fla. Sec'y of State*
No. 22-11145, *Fla. Rising Together v. Fla. Sec'y of State*

22.  Bennett, Michael, *Defendant*

23.  Bentley and Bruning PA, *Attorney for Defendant*

24.  Bentley, Morgan, *Attorney for Defendant*

25.  Bernstein, Daniel, *Attorney for Plaintiffs-Appellees*

26.  Bishop, Marty, *Defendant*

27.  Black Voters Matter Fund LLC, *Plaintiff-Appellee*

28.  Bledsoe, William, *Attorney for Defendant*

29.  Branch, Aria, *Attorney for Plaintiffs-Appellees*

30.  Brewton Plante PA, *Attorneys for Defendants*

31.  Brigham, Robert, *Plaintiff-Appellee*

32.  Brodeen, Karen, *Attorney for Defendants-Appellants*

33.  Broward County Attorney's Office, *Attorney for Defendant*

34.  Brown, Summer, *Attorney for Defendant*

35.  Brown, Tomi, *Defendant*

36.  Budhu, Ryan, *Attorney for Plaintiffs-Appellees*

37.  Byrd, Cord, *Defendant-Appellant*

38.  Cannon, Starlet, *Defendant*

39.  Case, Andrew, *Attorney for Plaintiffs-Appellees*

40.  Cavataro, Benjamin, *Attorney for Plaintiffs-Appellees*

41.  Chambless, Chris, *Defendant*

42.  Chappell, William, *Attorney for Defendant-Appellant*

43.  Chason, Sharon, *Defendant*

44.  Choi, Ellen, *Attorney for Plaintiffs-Appellees*

45.  Chorba, William, *Attorney for Defendant-Appellant*

46.  City of Jacksonville, Office of General Counsel, *Attorneys for Defendant*

47.  Clark Partington, *Attorneys for Defendant*

No. 22-11133, *Harriet Tubman Freedom Fighters, Corp. v. Fla. Sec'y of State*
No. 22-11143, *League of Women Voters of Fla. v. Fla. Sec'y of State*
No. 22-11144, *Fla. State Conf. of Branches & Youth Units of NAACP v. Fla. Sec'y of State*
No. 22-11145, *Fla. Rising Together v. Fla. Sec'y of State*

48. Common Cause, *Plaintiff-Appellee*

49. Consovoy McCarthy PLLC, *Attorneys for Intervenor-Defendants-Appellants*

50. Conyers, Grant, *Defendant*

51. Corley, Brian, *Defendant*

52. County of Volusia, *Attorneys for Defendant*

53. Covington & Burling LLP, *Attorneys for Plaintiffs-Appellees*

54. Cowles, Bill, *Defendant*

55. Cuffe, Edward, *Attorney for Defendant*

56. Cycon, John, *Attorney for Defendant-Appellant*

57. Daines, Kenneth, *Attorney for Defendant-Appellant*

58. Dandeneau, Debra, *Attorney for Plaintiffs-Appellees*

59. Darrow Everett LLP, *Attorneys for Plaintiffs-Appellees*

60. Davis, Ashley, *Attorney for Defendant-Appellant*

61. Davis, Vicki, *Defendant*

62. De Paul, Romane, *Attorney for Plaintiffs-Appellees*

63. Demos, *Attorneys for Plaintiffs-Appellees*

64. Devaney, William, *Attorney for Plaintiffs-Appellees*

65. Disability Rights Florida, *Plaintiff-Appellee*

66. Doyle, Tommy, *Defendant-Appellant*

67. Driggers, Heath, *Defendant*

68. Duke, P. Benjamin, *Attorney for Plaintiffs-Appellees*

69. Dukkipati, Uttara, *Attorney for Plaintiffs-Appellees*

70. Dunaway, Carol, *Defendant*

71. Earley, Mark, *Defendant*

72. Edwards, Brendalyn, *Attorney for Defendant*

73. Edwards, Jennifer, *Defendant*

No. 22-11133, *Harriet Tubman Freedom Fighters, Corp. v. Fla. Sec'y of State*
No. 22-11143, *League of Women Voters of Fla. v. Fla. Sec'y of State*
No. 22-11144, *Fla. State Conf. of Branches & Youth Units of NAACP v. Fla. Sec'y of State*
No. 22-11145, *Fla. Rising Together v. Fla. Sec'y of State*

74.  Edwards, Lori, *Defendant*

75.  Elias Law Group, *Attorneys for Plaintiffs-Appellees*

76.  Elias, Marc, *Attorney for Plaintiffs-Appellees*

77.  Ellis, Elizabeth, *Attorney for Defendant*

78.  Equal Ground Education Fund, *Plaintiff-Appellee*

79.  Erdelyi, Susan, *Attorney for Defendants*

80.  Escambia County Attorney's Office, *Attorneys for Defendant*

81.  Fair Elections Center, *Attorneys for Plaintiffs-Appellees*

82.  Fajana, Francisca, *Attorney for Plaintiffs-Appellees*

83.  Fajana, Morenike, *Attorney for Plaintiffs-Appellees*

84.  Farnam, Alteris, *Defendant*

85.  Faruqui, Bilal, *Attorney for Defendants-Appellants*

86.  Feiser, Craig, *Attorney for Defendant*

87.  Ferenc, Samuel, *Attorney for Plaintiffs-Appellees*

88.  Fletcher, Michael, *Attorney for Plaintiffs-Appellees*

89.  Florida Alliance for Retired Americans Inc., *Plaintiff-Appellee*

90.  Florida Department of State, *Attorneys for Defendant-Appellant*

91.  Florida Office of the Attorney General, *Attorneys for Defendants-Appellants*

92.  Florida Rising Together, *Plaintiff-Appellee*

93.  Florida State Conference of the NAACP, *Plaintiff-Appellee*

94.  Ford, Christina, *Attorney for Plaintiffs-Appellees*

95.  Fouhey, Elizabeth, *Attorney for Plaintiffs-Appellees*

96.  Fox, David, *Attorney for Plaintiffs-Appellees*

97.  Fram, Robert, *Attorney for Plaintiffs-Appellees*

98.  Freedman, John, *Attorney for Plaintiffs-Appellees*

99.  Frost, Elisabeth, *Attorney for Plaintiffs-Appellees*

No. 22-11133, *Harriet Tubman Freedom Fighters, Corp. v. Fla. Sec'y of State*
No. 22-11143, *League of Women Voters of Fla. v. Fla. Sec'y of State*
No. 22-11144, *Fla. State Conf. of Branches & Youth Units of NAACP v. Fla. Sec'y of State*
No. 22-11145, *Fla. Rising Together v. Fla. Sec'y of State*

100.  Galbraith, Miles, *Attorney for Plaintiffs-Appellees*

101.  Galindo, Emily, *Attorney for Plaintiffs-Appellees*

102.  Gardner Bist Bowden et al, *Attorneys for Defendants*

103.  Genberg, Jack, *Attorney for Plaintiffs-Appellees*

104.  Giannini, Mary, *Attorney for Defendant*

105.  Gibson, Benjamin, *Attorney for Intervenor-Defendants-Appellants*

106.  Gibson, Francesca, *Attorney for Plaintiffs-Appellees*

107.  Gordon, Phillip, *Attorney for Defendant-Appellant*

108.  Gray Robinson PA, *Attorneys for Defendant*

109.  Green, Tyler, *Attorney for Intervenor-Defendants-Appellants*

110.  Griffin, Joyce, *Defendant*

111.  Grimm, Dillon, *Attorney for Plaintiffs-Appellees*

112.  Hanlon, John, *Defendant*

113.  Harriett Tubman Freedom Fighters Corp., *Plaintiff-Appellee*

114.  Hart, Travis, *Defendant*

115.  Hays, Alan, *Defendant-Appellant*

116.  Healy, Karen, *Highlands County Supervisor of Elections*

117.  Heard, Bradley, *Attorney for Plaintiffs-Appellees*

118.  Henderson Franklin Starnes etc., *Attorneys for Defendants*

119.  Hernando County Attorney's Office, *Attorneys for Defendant*

120.  Herron, Mark, *Attorney for Defendant*

121.  Hillsborough County Office of the County Attorney, *Attorneys for Defendant*

122.  Hirschel, Andrew, *Attorney for Plaintiffs-Appellees*

123.  Hispanic Federation, *Plaintiff-Appellee*

124.  Hogan, Mike, *Defendant*

125.  Holt, Dallin, *Attorney for Defendant-Appellant*

No. 22-11133, *Harriet Tubman Freedom Fighters, Corp. v. Fla. Sec'y of State*
No. 22-11143, *League of Women Voters of Fla. v. Fla. Sec'y of State*
No. 22-11144, *Fla. State Conf. of Branches & Youth Units of NAACP v. Fla. Sec'y of State*
No. 22-11145, *Fla. Rising Together v. Fla. Sec'y of State*

126.  Holtzman Vogel Baran, et al., *Attorneys for Defendants-Appellants*

127.  Hoots, Brenda, *Defendant*

128.  Houlihan, Ashley, *Attorney for Defendant*

129.  Hutto, Laura, *Defendant*

130.  Janousek, John, *Attorney for Defendants*

131.  Jarone, Joseph, *Attorney for Defendant*

132.  Jazil, Mohammad, *Attorney for Defendant-Appellant*

133.  Johnson, Diana, *Attorney for Defendant*

134.  Johnson, Kia, *Attorney for Defendant*

135.  Jones, Tammy, *Defendant*

136.  Jouben, Jon, *Attorney for Defendant*

137.  Joyner, Nia, *Attorney for Plaintiffs-Appellees*

138.  Kahn, Jared, *Attorney for Defendant*

139.  Kanter Cohen, Michelle, *Attorney for Plaintiffs-Appellees*

140.  Karpatkin, Jeremy, *Attorney for Plaintiffs-Appellees*

141.  Keen, William, *Defendant*

142.  Khan, Sabrina, *Attorney for Plaintiffs-Appellees*

143.  Khazem, Jad, *Attorney for Plaintiffs-Appellees*

144.  King Blackwell Zehnder, etc PA, *Attorneys for Plaintiffs-Appellees*

145.  King, Nellie, *Attorney for Plaintiffs-Appellees*

146.  Kinsey, Jennifer, *Defendant*

147.  Kirk, Stephen, *Plaintiff-Appellee*

148.  Klitsberg, Nathaniel, *Attorney for Defendant*

149.  Knight, Shirley, *Defendant*

150.  Labasky, Ronald, *Attorney for Defendants*

151.  Latimer, Craig, *Defendant*

No. 22-11133, *Harriet Tubman Freedom Fighters, Corp. v. Fla. Sec'y of State*
No. 22-11143, *League of Women Voters of Fla. v. Fla. Sec'y of State*
No. 22-11144, *Fla. State Conf. of Branches & Youth Units of NAACP v. Fla. Sec'y of State*
No. 22-11145, *Fla. Rising Together v. Fla. Sec'y of State*

152. Latino Justice PRLDEF, *Attorneys for Plaintiffs-Appellees*

153. Lavia, John, *Attorney for Defendants*

154. Law Offices of Nellie King PA, *Attorneys for Plaintiffs-Appellees*

155. League of Women Voters of Florida Education Fund Inc., *Plaintiff-Appellee*

156. League of Women Voters of Florida, *Plaintiff-Appellee*

157. Lenhart, Kaiti, *Defendant*

158. Lewis, Lisa, *Defendant*

159. Link, Wendy, *Defendant*

160. Lopez, Janine, *Attorney for Plaintiffs-Appellees*

161. Lux, Paul, *Defendant*

162. Madduri, Lalitha, *Attorney for Plaintiffs-Appellees*

163. Madison, Alan, *Plaintiff-Appellee*

164. Marcus, Julie, *Defendant*

165. Mari, Frank, *Attorney for Defendants*

166. Marks Gray PA, *Attorneys for Defendant*

167. McNeil, Justin, *Jefferson County Supervisor of Elections*

168. McVay, Bradley, *Attorney for Defendant-Appellant*

169. Meadows, Therisa, *Defendant*

170. Meros, George, *Attorney for Intervenor-Defendants-Appellants*

171. Messer Caparello & Self PA, *Attorneys for Defendant*

172. Miami-Dade County Attorney's Office, *Attorneys for Defendant*

173. Miller, Jeffrey, *Attorney for Plaintiff-Appellees*

174. Milton, Chris, *Defendant*

175. Mood, Kirsten, *Attorney for Defendant*

176. Moody, Ashley, *Defendant-Appellant*

177. Moore, James, *Attorney for Defendants*

No. 22-11133, *Harriet Tubman Freedom Fighters, Corp. v. Fla. Sec'y of State*
No. 22-11143, *League of Women Voters of Fla. v. Fla. Sec'y of State*
No. 22-11144, *Fla. State Conf. of Branches & Youth Units of NAACP v. Fla. Sec'y of State*
No. 22-11145, *Fla. Rising Together v. Fla. Sec'y of State*

178.  Morgan, Joseph, *Defendant*

179.  Morris, John, *Attorney for Plaintiffs-Appellees*

180.  NAACP Legal Defense & Education Fund, Inc., *Attorneys for Plaintiffs-Appellees*

181.  Nabors Giblin, & Nickerson PA, *Attorneys for Defendant*

182.  Nasseri, Cyrus, *Attorney for Plaintiffs-Appellees*

183.  National Center for Law and Economic Justice, *Attorneys for Plaintiffs-Appellees*

184.  National Republican Senatorial Committee, *Intervenor-Defendant-Appellant*

185.  Negley, Mark, *Defendant*

186.  Nordby, Daniel, *Attorney for Intervenor-Defendants-Appellants*

187.  Norris, Cameron, *Attorney for Intervenor-Defendants-Appellants*

188.  Nunnally, Amber, *Attorney for Intervenor-Defendants-Appellants*

189.  Oakes, Vicky, *Defendant*

190.  O'Brien, Colleen, *Attorney for Defendant-Appellant*

191.  O'Bryant, Patrick, *Attorney for Defendant*

192.  O'Callaghan, Brendan, *Attorney for Plaintiffs-Appellees*

193.  Ogg, Penny, *Defendant*

194.  Olivo, Geraldo, *Attorney for Defendants*

195.  Osborne, Deborah, *Defendant*

196.  Ott, London, *Attorney for Defendant*

197.  Overturf, Charles, *Defendant*

198.  Palm Beach County Supervisor of Elections, *Attorneys for Defendant*

199.  Paralyzed Veterans of America Central Florida Chapter, *Plaintiff-Appellee*

200.  Paralyzed Veterans of America Florida Chapter, *Plaintiff-Appellee*

201.  Perkins Coie LLP, *Attorneys for Plaintiffs-Appellees*

202.  Perko, Gary, *Attorney for Defendant-Appellant*

203.  Pinellas County Attorney's Office, *Attorneys for Defendant*

No. 22-11133, *Harriet Tubman Freedom Fighters, Corp. v. Fla. Sec'y of State*
No. 22-11143, *League of Women Voters of Fla. v. Fla. Sec'y of State*
No. 22-11144, *Fla. State Conf. of Branches & Youth Units of NAACP v. Fla. Sec'y of State*
No. 22-11145, *Fla. Rising Together v. Fla. Sec'y of State*

204.    Poder Latinx, *Plaintiff-Appellee*

205.    Poliak, Shira, *Attorney for Plaintiffs-Appellees*

206.    Price, Tara, *Attorney for Intervenor-Defendant-Appellants*

207.    Republican National Committee, *Intervenor-Defendant-Appellant*

208.    Riley, Heathers, *Defendant*

209.    Rogers, Susan, *Plaintiff-Appellee*

210.    Romero-Craft, Kira, *Attorney for Plaintiffs-Appellees*

211.    Roper PA, *Attorneys for Defendants*

212.    Rosenthal, Oren, *Attorney for Defendant*

213.    Rudd, Carol, *Defendant*

214.    Salzillo, Benjamin, *Attorney for Defendant*

215.    Sanchez, Connie, *Defendant*

216.    Scoon, Cecile, *Plaintiff-Appellee*

217.    Scott, Dale, *Attorney for Defendant*

218.    Scott, Joe, *Defendant,*

219.    Scott, Lori, *Defendant*

220.    Scott, Sharion, *Attorney for Plaintiffs-Appellees*

221.    Segarra, Esperanza, *Attorney for Plaintiffs-Appellees*

222.    Seyfang, Amanda, *Defendant*

223.    Shannin Law Firm PA, *Attorneys for Defendants*

224.    Shannin, Nicholas, *Attorney for Defendant*

225.    Shapiro, Daniel, *Attorney for Intervenor-Defendants-Appellants*

226.    Shapiro, Peter, *Attorney for Plaintiffs-Appellees*

227.    Shaud, Matthew, *Attorney for Defendant*

228.    Shearman, Robert, *Attorney for Defendants*

229.    Sherman, Jonathan, *Attorney for Plaintiffs-Appellees*

No. 22-11133, *Harriet Tubman Freedom Fighters, Corp. v. Fla. Sec'y of State*
No. 22-11143, *League of Women Voters of Fla. v. Fla. Sec'y of State*
No. 22-11144, *Fla. State Conf. of Branches & Youth Units of NAACP v. Fla. Sec'y of State*
No. 22-11145, *Fla. Rising Together v. Fla. Sec'y of State*

230.  Shutts & Bowen LLP, *Attorneys for Intervenor-Defendants-Appellants*

231.  Siegel, Rachel, *Attorney for Defendant-Appellant*

232.  Sivalingam, Danielle, *Attorney for Plaintiffs-Appellees*

233.  Smith, Diane, *Defendant*

234.  Southerland, Dana, *Defendant*

235.  Southern Poverty Law Center, *Attorneys for Plaintiffs-Appellees*

236.  Stafford, David, *Defendant*

237.  Stafford, William, *Attorney for Defendants-Appellants*

238.  Stamoulis, Paula, *Defendant*

239.  Stewart, Gregory, *Attorney for Defendant*

240.  Stiefel, Aaron, *Attorney for Plaintiffs-Appellees*

241.  Swain, Robert, *Attorney for Defendant*

242.  Swan, Leslie, *Defendant*

243.  Tarpley, Carlton, *Attorney for Plaintiffs-Appellees*

244.  Theodore, Elisabeth, *Attorney for Plaintiffs-Appellees*

245.  Todd, Stephen, *Attorney for Defendant*

246.  Trigg, Amia, *Attorney for Plaintiffs-Appellees*

247.  Tuetken, Adam, *Attorney for Amicus*

248.  Turner, Ron, *Defendant*

249.  UnidosUS, *Plaintiff-Appellee*

250.  Valdes, Michael, *Attorney for Defendant*

251.  Vicari, Kelly, *Attorney for Defendant*

252.  Vigil, Angela, *Attorney for Plaintiffs-Appellees*

253.  Villane, Tappie, *Defendant*

254.  Volusia County Attorney, *Attorneys for Defendant*

255.  Walker, Gertrude, *Defendant*

No. 22-11133, *Harriet Tubman Freedom Fighters, Corp. v. Fla. Sec'y of State*

No. 22-11143, *League of Women Voters of Fla. v. Fla. Sec'y of State*

No. 22-11144, *Fla. State Conf. of Branches & Youth Units of NAACP v. Fla. Sec'y of State*

No. 22-11145, *Fla. Rising Together v. Fla. Sec'y of State*

256.    Walker, Mark, *District Court Judge*

257.    Washington, D.C., Office of the Attorney General, *Attorneys for Amicus*

258.    Wermuth, Frederick, *Attorney for Plaintiffs-Appellees*

259.    Whitaker, Henry C., *Solicitor General of Florida*

260.    White, Christina, *Defendant*

261.    Wilcox, Wesley, *Defendant*

262.    Wright, Brenda, *Attorney for Plaintiffs-Appellees*

263.    Zacherl, Frank, *Attorney for Intervenor-Defendants-Appellants*

264.    Zender, Thomas, *Attorney for Plaintiffs-Appellees*

Dated: July 11, 2022

 /s/ Mohammad O. Jazil                              /s/ Henry C. Whitaker
Counsel for Secretary Byrd                    Counsel for Attorney General Moody

 /s/ Andy Bardos
Counsel for Supervisors Hays and Doyle

**STATEMENT REGARDING ORAL ARGUMENT**

This appeal concerns important constitutional questions. This Court must address when a State's facially neutral election laws have a discriminatory effect *and* invidious purpose in violation of the Fourteenth and Fifteenth Amendments to the U.S. Constitution, and when those laws violate section 2 of the Voting Rights Act. This Court must also consider the First and Fourteenth Amendments' limitations on the State's right to maintain a safe space around polling places. And this Court must decide when, if ever, a district court can mandate a sovereign State to submit its election laws to a federal court for approval *before* those laws can take effect. Appellants submit that this Court would benefit from oral argument on these important constitutional and federal statutory questions.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT.................................................................... C1

STATEMENT REGARDING ORAL ARGUMENT ................................................. i

TABLE OF AUTHORITIES ............................................................................ iv

INTRODUCTION.......................................................................................... 1

JURISDICTIONAL STATEMENT..................................................................... 2

STATEMENT OF THE ISSUES ........................................................................ 3

STATEMENT OF THE CASE ........................................................................... 4

   I.  Factual Background ................................................................................ 4

     A.  Florida Makes It Easy to Register and Vote. ...................................... 4

     B.  Florida Enacts SB90 with Input from All Stakeholders. ..................... 6

   II.  Prior Proceedings................................................................................ 10

     A.  Plaintiffs Challenge Provisions of SB90, and the District Court Declares Four
     Provisions Violate Federal Law. ......................................................... 10

     B.  This Court Issues a Stay and Deems Moot the Challenge to SB90's
     Registration-Disclaimer Provision.......................................................14

STANDARD OF REVIEW.............................................................................. 15

SUMMARY OF THE ARGUMENT .................................................................. 16

ARGUMENT ............................................................................................... 16

   I. The District Court's Fourteenth and Fifteenth Amendment Analysis Relies on a
   Demonstrably Flawed Assessment of Discriminatory Intent and Effect............. 16

     A.  The District Court Presumed Bad Faith.............................................. 17

     B.  The District Court's Inquiry in Search of Intent................................. 20

     C.  There's Been No Showing of Discriminatory Effect........................... 38

   II.  The District Court Erred in Concluding that the State Violated Section 2 of the
     VRA. ................................................................................................. 39

   III.  Preclearance Is Not and Cannot Be an Appropriate Remedy Under the
     Circumstances..................................................................................... 40

IV. The Solicitation Provision's Protection of Voters in Line Satisfies the Requirements of the First Amendment. ................................................................ 44

V. *Munsingwear* Vacatur Is Appropriate for the District Court's Judgment Concerning the Registration-Disclaimer Provision that, All Parties Agree, Is Now Moot. ........................................................................................................... 44

CONCLUSION ............................................................................................................ 44

CERTIFICATE OF COMPLIANCE ........................................................................ 46

CERTIFICATE OF SERVICE .................................................................................. 46

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez,*

    138 S. Ct. 2305 (2018) ..................................................................14, 17

*Arizona Democratic Party v. Hobbs,*

    18 F.4th 1179 (9th Cir. 2021) ...............................................................37

*Askew v. City of Rome,*

    127 F.3d 1355 (11th Cir. 1997) ...........................................................39

*Barber v. Thomas,*

    560 U.S. 474 (2010) ....................................................................... 19-20

*Brnovich v. DNC,*

    141 S. Ct. 2321 (2021) ..................................................................*passim*

*Burton v. Belle Glade,*

    178 F.3d 1175 (11th Cir. 1999) ...........................................................38

*Butler v. Dexter,*

    425 U.S. 262 (1976) ..............................................................................2

*Butts v. NYC,*

    779 F.2d 141 (2d Cir. 1985)................................................................20

*Citizens for Police Accountability Political Committee v. Browning,*

    572 F.3d 1213 (11th Cir. 2009) .....................................................28, 29

*Common Cause/Georgia v. Billups,*

    554 F.3d 1340 (11th Cir. 2009) ...........................................................17

*Conway School District v. Wilhoit,*

    854 F. Supp. 1430 (E.D. Ark. 1994)....................................................43

*Crawford v. Marion County Election Board,*

    553 U.S. 181 (2008) ............................................................................22

*Davis v. FEC,*

    554 U.S. 724 (2008) ..............................................................................2

*DNC v. Wisconsin State Legislature,*
   141 S. Ct. 28 (2020) ..................................................................................... 6

*Dobbs v. Jackson Women's Health Organization,*
   2022 WL 2276808 (2022).................................................................... 18-19

*Florida State Conference of NAACP v. Browning,*
   569 F. Supp. 2d 1237 (N.D. Fla. 2008) ...................................................... 9

*\*Greater Birmingham Ministries v. Secretary of Alabama,*
   992 F.3d 1299 (11th Cir. 2021) .....................................................*passim*

*Hand v. Scott,*
   888 F.3d 1206 (11th Cir. 2018) ...........................................................17, 38

*In re Protest of Election Returns & Absentee Ballots in November 4, 1997 Election for City of Miami,*
   707 So. 2d 1170 (Fla. 3d DCA 1998) ......................................................9, 10

*Jacobson v. Florida Secretary of State,*
   974 F.3d 1236 (11th Cir. 2020) .............................................................1, 2

*Joel v. City of Orlando,*
   232 F.3d 1353 (11th Cir. 2000) ................................................................. 17

*Jones v. Governor of Florida,*
   15 F.4th 1062 (11th Cir. 2021) .................................................................. 17

*Jeffers v. Clinton,*
   740 F. Supp. 585 (E.D. Ark. 1990).......................................................... 13

*KH Outdoor, LLC v. City of Trussville,*
   458 F.3d 1261 (11th Cir. 2006) ................................................................. 15

*League of Women Voters of Florida v. Florida Secretary of State,*
   32 F.4th 1363 (11th Cir. 2022) .................................................................. 14

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ......................................................................................2

*McPherson v. Blacker*,

    146 U.S. 1 (1892) ................................................................................ 41

*Mercantile Texas Corp. v. Board of Governors of Federal Reserve System*,

    638 F.2d 1255 (5th Cir. Unit A Feb. 1981) ........................................ 20

*Minnesota Voters Alliance v. Mansky*,

    138 S. Ct. 1876 (2018) ...................................................................... 28

*Nielsen v. DeSantis*,

    469 F. Supp. 3d 1261(N.D. Fla. 2020) ............................................... 6

*New Georgia Project v. Raffensperger*,

    976 F.3d 1278 (11th Cir. 2020) .................................................... 6, 16

*North Carolina State Conference of NAACP v. McCrory*,

    831 F.3d 204 (4th Cir. 2016) ............................................................ 43

*North Carolina State Conference of the NAACP v. Raymond*,

    981 F.3d 295 (4th Cir. 2020) ............................................................ 17

*Northwest Austin Municipal Utility District Number One v. Holder*,

    557 U.S. 193 (2009) .......................................................................... 42

*Perez v. Abbott*,

    390 F. Supp. 3d 803 (W.D. Tex. 2019) ........................................40, 41

*\*Personnel Administrator of Massachusetts v. Feeney*,

    442 U.S. 256 (1979) ............................................................. 20, 22, 30

*Printz v. United States*,

    521 U.S. 898 (1997) .......................................................................... 41

*Republican Party of Pennsylvania v. Degraffenreid*,

    141 S. Ct. 732 (2021) ......................................................................... 6

*Rizzo v. Goode*,

    423 U.S. 362 (1976) .......................................................................... 41

*Shelby County v. Holder,

 570 U.S. 529 (2013) .......................................................... 13, 40, 41, 42

South Carolina v. Katzenbach,

 383 U.S. 301 (1966) ..................................................................... 41, 42

Thomas v. Bryant,

 614 F.3d 1288 (11th Cir. 2010) ............................................................ 15

Thornburg v. Gingles,

 478 U.S. 30 (1986) ............................................................................... 39

United States v. Ballinger,

 395 F.3d 1218 (11th Cir. 2005) ............................................................ 15

United States v. Crawford,

 407 F.3d 1174 (11th Cir. 2005) ............................................................ 15

Veasey v. Abbott,

 888 F.3d 792 (5th Cir. 2018) ............................................................... 40

*Village of Arlington Heights v. Metropolitan Housing Development Corp.,

 429 U.S. 252 (1977) ....................................................................... 14, 21

**Constitutional Provisions**

U.S. Const. art. I, § 4 ............................................................................. 1, 13

**Statutes, Regulations, and Legislation**

28 U.S.C. § 1291 ......................................................................................... 2

28 U.S.C. § 1331 ......................................................................................... 2

52 U.S.C. § 10301 ..................................................................................... 39

52 U.S.C. § 10302 ..................................................................................... 40

52 U.S.C. § 10304 ..................................................................................... 40

H.R. Rep. No. 89-439 (1965) ................................................................... 41

Fla. Admin. Code R. 1S-2.032 ................................................................. 24

Fla. Stat. § 97.052 ...................................................................................... 4

Fla. Stat. § 97.0525 ................................................................. 4

Fla. Stat. § 97.053 ................................................................... 4

Fla. Stat. § 97.057 ................................................................... 4

Fla. Stat. § 97.0575 .......................................................... *passim*

Fla. Stat. § 97.058 ................................................................... 4

Fla. Stat. § 97.0583 ................................................................. 4

Fla. Stat. § 97.05831 ............................................................... 4

Fla. Stat. § 98.0981 ................................................................. 8

Fla. Stat. § 101.62 .................................................................. 4

Fla. Stat. § 101.64 .................................................................. 5

Fla. Stat. § 101.657 ................................................................ 5

Fla. Stat. § 101.69 .......................................................... *passim*

Fla. Stat. § 102.031 ........................................................ *passim*

Laws of Fla., Chpt. 1996-57 ..................................................... 5

Laws of Fla., Chpt. 2001-40 ..................................................... 5

Laws of Fla., Chpt. 2004-232 ................................................... 5

Laws of Fla., Chpt. 2004-252 ................................................... 5

Laws of Fla., Chpt. 2011-40 ..................................................... 5

Laws of Fla., Chpt. 2013-57 ..................................................... 5

Laws of Fla., Chpt. 2019-162 ................................................. 5, 6

Laws of Fla., Chpt. 2021-11 .................................................. 6-7

## Other Authorities

*Jurisdictions Previously Covered by Section 5*, DOJ, bit.ly/3Obni3o ............................. 1

Peter Schorsch, *Sunburn*, https://bit.ly/3nSkOeo ................................ 10

*Table 4b, Reported Voting & Registration, by Sex, Race and Hispanic Origin, for States: November 2020*, Census Bureau, bit.ly/37qgCgA ...................................... 41

## STATEMENT REGARDING ADOPTION OF
## BRIEFS OF OTHER PARTIES

The Secretary joins the Brief of the Intervenor-Defendant-Appellants Republican National Committee and National Republican Senatorial Committee in full. The Supervisors join that brief on the Solicitation Provision issue. The Attorney General joins that brief on the *Munsingwear* vacatur issue.

## INTRODUCTION

"Our founding charter never contemplated that federal courts would dictate the manner of conducting elections." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1269 (11th Cir. 2020). Yet the district court's order subjects the entire State of Florida to preclearance—something that, even before *Shelby County*, the Voting Rights Act didn't do. *See Jurisdictions Previously Covered by Section 5*, DOJ, bit.ly/3Obni3o (VRA covered only five Florida counties). Why? Because Chief Judge Walker decided that a handful of the thirty-two sections in Senate Bill 90 had a disparate impact on black Floridians in a select few counties and the bill simply had to be intended to discriminate against them. The district court got it wrong.

Facially neutral laws regulating drop boxes for vote-by-mail ballots, the return of voter registration forms, and activity at or near a polling place fall squarely within the State's power to manage "[t]he Time, Places and Manner of holding Elections." U.S. Const. art. I, § 4. In concluding otherwise, the district court focused on the distant past and disparities rooted in evidence that was "limited," "unclear," "not necessarily representative," and "not statistically significant." Op.97-98, 100-12.[1] It conflated partisanship with race. It disregarded the legislative presumption of good faith and the

---

[1] All "Doc." citations refer to the docket entries for *League of Women Voters of Florida, Inc. v. Byrd*, No. 4:21-cv-186-MW-MAF (N.D. Fla.). All "Op." citations refer to the district court's final order, Doc. 665. Exhibits entered into evidence begin with "Exh." References to the trial transcript begin with "Tr." Note, however, that some exhibits include transcripts from the legislative proceedings related to SB90; these exhibits begin with an 'Exh."and include a "Tr."

1

principles of equal sovereignty. And it ultimately "usurp[ed] the authority of state legis-latures to regulate elections" for the next decade. *Jacobson*, 974 F.3d at 1269.

The district court's decision can't bear the weight of precedent—*Brnovich* and *Greater Birmingham*, *Feeney* and *Shelby County*. Nor can its factual findings find support in *this* record. The State of Florida asks this Court to reverse.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. This Court has juris-diction to review the district court's final order and judgment under 28 U.S.C. § 1291. That final order and judgment disposed of all claims on March 31, 2022. Timely notices of appeal were filed in all consolidated cases on April 7, 2022.

A note about Article III standing: There are five individual Plaintiffs and fifteen organizational Plaintiffs in these four consolidated cases. Plaintiffs seemingly proceed under the assumption that quantity has a quality all its own. But each Plaintiff group must establish that at least one person or entity within its group has standing to pursue claims against each of the challenged provisions in *its* case. *See Davis v. FEC*, 554 U.S. 724, 734 (2008). Relying on the standing of parties in the other consolidated cases isn't enough. *See Butler v. Dexter*, 425 U.S. 262, 267 n.12 (1976). Presumably, each answer brief will address each group's standing to sue over each of the challenged provisions; it's neither this Court's job nor the State's job to connect the dots for Plaintiffs because "[t]he party invoking federal jurisdiction bears the burden" from inception to the con-clusion of the case. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). For example, it's

2

for the *Florida Rising* Plaintiffs to explain why Poder Latinx—which is a fiscally-sponsored project of Tides Advocacy, and not a legal entity itself—can even file a lawsuit. *See* Tr.225:14-226:18.

## STATEMENT OF THE ISSUES

Plaintiffs challenged a few of the thirty-two provisions of Senate Bill 90 ("SB90"). Relevant here are (1) the provision regulating the use of drop boxes for collecting vote-by-mail ballots (the "**Drop-Box Provision**"), Fla. Stat. § 101.69(2)-(3); (2) the provision requiring third-party voter registration organizations to deliver voter-registration applications to the county where an applicant resides within a certain period of time (the "**Registration-Delivery Provision**"), and specifying the information that the third parties must provide to registrants (the "**Registration-Disclaimer Provision**"), *id.* § 97.0575(3)(a); and (3) the provision prohibiting the solicitation of voters within 150 feet of a polling place (the "**Solicitation Provision**"), *id.* § 102.031(4)(a)-(b). This Court must decide:

1.     Whether the district court erred when it held that the State of Florida intentionally discriminated against black voters through the Drop-Box Provision, Registration-Delivery Provision, and the Solicitation Provision.

2.     Whether the district court erred by subjecting the State of Florida to preclearance under section 3(c) of the VRA in light of *Shelby County*'s exceptional-conditions test and the record in this case and the record in this case.

3

3.      Whether the district court erred in concluding that the Solicitation Provision is unconstitutionally vague and overbroad.

4.      Whether this Court should vacate the district court's judgment concerning the Registration-Disclaimer Provision that, all Parties agree, is now moot.

## STATEMENT OF THE CASE

### I.      **Factual Background**

#### A.      *Florida Makes It Easy to Register and Vote.*

This case concerns Florida's system for registering voters and the State's methods for voting. It's easy to both register and vote in Florida.

Eligible Floridians can register online, in English or Spanish, using the following website: registertovoteflorida.gov. Fla. Stat. § 97.0525. They can also register using a paper application available through the Department of State, their local Supervisor of Elections, their local tax collector, their local libraries and schools, third-party voter-registration organizations, and even their neighborhood Walmart. *Id.* §§ 97.052(1)(b), 97.052(5), 97.053, 97.057, 97.0575, 97.058, 97.0583, 97.05831.

Floridians can cast their ballots in any one of three ways. They can vote in person on election day at their designated precinct—the only method available for most of our nation's history. *See Brnovich v. DNC*, 141 S. Ct. 2321, 2339 (2021). They can vote by mail for more than thirty days before an election, returning completed ballots through the US Mail, commercial carriers like FedEx and UPS, their chosen designees, or a drop box. *See* Fla. Stat. § 101.62(1), (4)(b). Voters need no excuse, witness, or notary to vote

4

by mail. And Floridians can vote early for eight to fourteen days at *any* early voting site within their county. *Id.* § 101.657(1)(b), (d) (mandating that sites remain open for a minimum of eight days and allowing sites to remain open for up to fourteen days for a minimum of eight hours a day and for up to twelve hours a day).

Voting wasn't always so easy. In 1982, the last time Congress amended the VRA, there was no early voting in Florida. Voting by mail wasn't generally available either; only those who qualified for a few, narrow excuses could vote without travelling to the polls. *See id.* § 101.64 (1982) (allowing absentee voting for those (1) unable to vote "without another's assistance," (2) traveling, (3) serving as poll workers, (4) with religious commitments, (5) who changed their residence after the close of the voter registration deadline, and (6) who moved to another state after the close of registration).

Much has changed since 1982. The Florida Legislature made no-excuse early voting available statewide in 2004. *See* Laws of Fla., Chpt. 2004-252, § 13. And over the years, the Legislature has amended its early voting provision to add possible locations, adjust hours, and ensure adequate parking. *See* Laws of Fla., Chpt. 2019-162, § 10; Laws of Fla., Chpt. 2013-57, § 13; Laws of Fla., Chpt. 2011-40, § 39. In 1996, the Legislature also did away with the requirement that vote-by-mail ballots be notarized and include an attestation that the voter met one of the statutorily recognized excuses; that same year, the Legislature reduced the number of witnesses needed to vote-by-mail from two to one. *See* Laws of Fla., Chpt. 1996-57, § 4. In 2001, Florida eliminated the excuse and witness requirements altogether. *See* Laws of Fla., Chpt. 2001-40, § 53. *See* Laws of Fla.,

Chpt. 2004-232, § 1. And, in 2019, the State *mandated* that Supervisors of Elections in each of Florida's sixty-seven counties make drop boxes available for voters to return their vote-by-mail ballots. *See* Laws of Fla., Chpt. 2019-162, § 20.

Yet the 2020 elections still presented new challenges. Administered during a global pandemic, 2020 saw an unprecedented surge voting by mail. *See* Op.66. Before the election, a record number of lawsuits were filed across the country, charging States that enforced their written laws with "disenfranchise[ment]." *E.g.*, *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020); *Nielsen v. DeSantis*, 469 F. Supp. 3d 1261, 1264 (N.D. Fla. 2020) (discussing consolidated proceedings). The few that succeeded, and the many that failed, collectively took a toll on voter confidence. *See Republican Party of Penn. v. Degraffenreid*, 141 S. Ct. 732, 735, 737 (2021) (Thomas, J., dissental); *DNC v. Wis. State Leg.*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurral); Tr.3101.

In response to the 2020 elections, many States reformed their election laws. Despite overheated rhetoric from some opponents, these States were reacting to a once-in-a-generation election cycle and operating out of a shared desire to restore voter confidence, articulate clear rules, and preserve election integrity. *See generally Brnovich*, 141 S. Ct. at 2348 ("Fraud is a real risk that accompanies mail-in voting.").

## B.    *Florida Enacts SB90 with Input from All Stakeholders.*

Florida was no different. The State enacted and the Governor signed into law SB90. This bill's thirty-two substantive sections addressed everything from load and stress testing of the State's online voter registration system, *see* Laws of Fla., Chpt. 2021-

11, § 4, to vote-by-mail reforms, *id.* §§ 6 and 25, to the adoption of a uniform set of rules for drop boxes used statewide for the first time in 2020. *Id.* § 28.

These reforms were the product of robust debate during the legislative process. The Florida Legislature spent over twenty-six hours during its sixty-day session listening to stakeholders in public meetings and otherwise debating the bill. *See* Doc.648-1 (showing legislative stops and time spent). Legislators also heard from outside groups in private meetings. Some meetings were with litigants and counsel in these consolidated cases. Tr.1472:5-20; 1571:10-1573:14 (discussing interactions with NAACP, League of Women Voters of Florida, LatinoJustice, ACLU, and the Democratic Party).

The State's sixty-seven Supervisors of Elections participated through their trade organization, the Florida Supervisors of Elections Association, and successfully lobbied for the Registration-Delivery Provision, an Association priority. *E.g.*, Op.77. The Association's Chair, former State House and State Senate member, Alan Hays, was the "coach." Tr.3085:16-19. The Association's lead lobbyist, David Ramba, was the "quarterback." *Id.* Both agreed that there was nothing unusual about the legislative process, Doc.549-2 at Tr.189:6-190:10 and Tr.3101:19-3102:4, except for the COVID-related protocols that applied to all bills under consideration during that session. Doc.481-1, 481-3 (relevant protocols); Doc.523 (judicially noticing same); Tr.1582:4-7, 3092:3-3094:18, 3095:22-3096:4, 3099:21-3100:20 (various witnesses agreeing that the Legislature followed protocols).

Importantly, the Supervisors of Elections answered survey questions posed by Chair Erin Grall of the Florida House's Public Integrity and Elections Committee. *E.g.*, Exh.137, 148, 177. These questions asked for details about the in-person and vote-by-mail process. They asked, for instance, about the number of ballots returned as undeliverable, staffing at drop boxes, and referrals of suspected fraud to the various State Attorneys. Party affiliation was relevant only to determine whether such affiliation could be determined from the outer, visible portion of the vote-by-mail envelope (something SB90 subsequently prohibited). None of the survey questions or the subsequent legislative discussions about the survey addressed race, gender, or ethnicity. *E.g.*, Exh.426 at Tr.62:22-63:2 (Chair Grall stating that she noticed "from the survey, about 78,000 ballots were returned as undeliverable" from "54 counties," which was "[a]nother reason to go to the two years" for frequency of vote-by-mail ballot requests).

The Secretary of State's Office also served as "a resource to the legislature." Tr.3395:1-2. It shared with legislators the questions posed to the Office, concerns about "uniformity and security," and general "uncertainty" that pervaded among Supervisors of Elections about the 2019 drop-box law. Tr.3400:3-8, 3411:7-21. It discussed proposals to "ensur[e] the authenticity of vote-by-mail ballot requests." Tr.3400:9-11; *see also* 3400:16-3401:9, 3402:4-15. 3406:22-3407:4, 3409:17-25. It relayed election fraud complaints received by the Office. Tr.3413:15-22, 3458:20-3459:21. And it provided statutorily mandated post-election data files to the whole Florida Legislature, Republican and Democrat alike, *see* Fla. Stat. § 98.0981(5), but no race-related summaries or

statistics were asked for or given to the Florida Legislature. Tr.2795:2-12, 2827:3-2828:16, Tr.2830:21-2831:8, 3408:2-3409:15; *see also* Tr.2791:2-7; Exh.318.

Then-Secretary Lee testified before legislative committees. Among other things, she discussed how the local implementation of the drop-box statute varied and how the vote-by-mail process generally works from the initial request to the return of ballots. Exh.445 at Tr.2:13-36:17; Exh.1596 at Tr.5:5-52:23. She didn't discuss race.

Concerns about fraud were debated as well. For example, SB90's House sponsor, Representative Blaise Ingoglia, discussed a 2012 Miami Dade Grand Jury Report concerning vote-by-mail fraud and Florida's well-documented history of the same. Exh.508 at Tr.23:1-9; *see also Fla. State Conf. of NAACP v. Browning*, 569 F. Supp. 2d 1237, 1251 (N.D. Fla. 2008) (discussing Florida's "rich history of absentee-ballot fraud"); *In re Protest of Election Returns & Absentee Ballots in Nov. 4, 1997 Election for City of Miami*, 707 So. 2d 1170, 1174 (Fla. 3d DCA 1998) ("We expressly hold that substantial evidence supported the trial court's finding that extensive absentee fraud affected the outcome of the November 4, 1997, City of Miami Mayoral election."); Doc.462-29 at Tr.70:1-24.

Chair Grall and others raised the possibility of fraud in the future. She explained that "[r]ight now anyone on Facebook can change your party, your address, even your name in the voter records if they pick your birthday up from a Facebook account," citing changes to Governor DeSantis's voter information before the 2020 election and justifying the broader need for reform. Exh.528 at Tr.86:16-87:2; *cf.* Tr. 3477:13-3478:11; Exh.1557 (compiling vote-by-mail-related issues).

With input from many—including some of the litigants in these cases—the bill evolved during the legislative process. Exh.427 at Tr.55:8-11. Security and integrity were balanced against access, with the balance tilting in favor of access. *See infra*. Democratic legislators thanked their Republican colleagues for working with them in good faith on the changes. Democratic Representative Ben Diamond said, for example: "I appreciate the changes, Representative [Ingoglia], that you made as a result of the strike all." *Id.* Tr.51:11-13. Democratic Representative Tracie Davis, a member of the black caucus, agreed. She said: "I would like to put on the record that I know the sponsor of this bill [Ingoglia] has been working with all the stakeholders, and I appreciate that." *Id.* Tr.55:8-11. She added: "This bill changed from the last time I have seen it and witnessed it and it's going into a decent direction." *Id.*

Nevertheless, Florida was sued. The first lawsuit was filed nine minutes after the bill became law. Peter Schorsch, *Sunburn* (May 7, 2021) ("@marceelias: We sued Florida 9 minutes after DeSantis signed the Florida law."), https://bit.ly/3nSkOeo.

## II. Prior Proceedings

### A. *Plaintiffs Challenge Provisions of SB90, and the District Court Declares Four Provisions Violate Federal Law.*

Plaintiffs filed four separate complaints challenging six distinct aspects of SB90. After a fourteen-day bench trial, the district court permanently enjoined four provisions:

1. Drop-Box Provision, § 101.69(2)-(3): Prohibiting the use of drop boxes outside of regular voting hours and requiring drop boxes to be continuously monitored by an employee of the Supervisor of Elections during those hours.

2. Registration-Delivery Provision, § 97.0575(3)(a): Requiring third-party voter registration organizations ("3PVROs") to deliver voter-registration applications to the Supervisor of Elections in the county where an applicant resides within fourteen days or before registration closes.

3. Registration-Disclaimer Provision, § 97.0575(3)(a): Requiring 3PVROs to inform would-be registrants that their applications might not be delivered on time and that they can register themselves in person, online, or by mail.

4. Solicitation Provision, § 102.031(4)(a)-(b): Prohibiting solicitation of voters within 150 feet of a drop box or polling place.[2]

Notably, none of the Plaintiffs alleged that the Registration-Disclaimer Provision or the Registration-Delivery Provision was intentionally discriminatory. Op.12, 113. The *NAACP* and *Florida Rising* Plaintiffs alleged that the other two provisions were intentionally discriminatory. The *League of Women Voters* and *Harriet Tubman* Plaintiffs brought no intentional discrimination claims, brought no VRA claims, and did not seek preclearance under the VRA.

The district court ruled that the Drop-Box, Solicitation, and Registration-Delivery provisions intentionally discriminate against black voters, and thus violate the Fourteenth Amendment, Fifteenth Amendment, and VRA. Op.134-36. Applying the multifactor test from *Arlington Heights*, the court began by surveying Florida's "history of

---

[2] The district court dismissed challenges to SB90's restrictions on third-party ballot collection for lack of standing, *League* Doc.274, and upheld on the merits two provisions concerning requests for vote-by-mail ballots. Op.105-08.

racial discrimination" starting with the Civil War. Op.42-45. It then asserted that Florida has repeatedly "target[ed] Black voters because of their affiliation with the Democratic party," mostly citing lawsuits where courts found that Florida *didn't* engage in intentional discrimination. *E.g.*, Op.52, 60, 64. The court also found that the procedures used to pass SB90 didn't cut "one way or the other," Op.83, while dismissing concerns over "voter confidence" and "fraud" as unpersuasive, Op.70-75. In terms of legislators' statements, the court largely dismissed their relevance. Op.84-88, 129.

Crucially to the court, it thought that the challenged provisions had disparate impacts on black voters because it believed that those voters are currently more likely to use drop boxes, register through 3PVROs, and wait in long lines. Op.116. The court relied on Plaintiffs' experts, though it acknowledged the significant limitations in their methods and findings. Op.90-104, 109-15. The court further speculated that the Legislature—all of it—knew about these disparate impacts based on the State election director's "face and body language" at a Zoom trial, a floor statement where one Republican *denied* that SB90 would have disparate impacts, and the criticisms of Democratic legislators. Op.88-89, 116-21. It also faulted the Legislature for rejecting "less discriminatory alternatives" offered by Democrats, including "doing nothing." Op.122-25.

Based on its intentional-discrimination ruling, Chief Judge Walker not only permanently enjoined the challenged provisions, but also invoked section 3(c) of the VRA. Specifically, he barred Florida from "enacting" any law "governing 3PVROs, drop boxes, or 'line warming' activities" without preclearing it with him first. Op.281. The

court admitted that "[t]he parties treat[ed] [preclearance] as an afterthought," giving it less than 6 total pages of briefing. Op.270. But the court failed to note that, despite asking the parties for supplemental briefing on countless topics, it never once asked for more briefing on preclearance. *E.g.*, *League* Docs.471, 542, 543, 554, 630, 636, 657, 659. Nor did it conduct a remedial hearing. The court instead applied the multi-factor test from *Jeffers v. Clinton*, 740 F. Supp. 585 (E.D. Ark. 1990). It didn't apply *Shelby County v. Holder*, 570 U.S. 529 (2013), though it did criticize that opinion as wrong. Op.44, 273-74. The court stressed that section 3(c) of the VRA allows courts to order preclearance, and it held that preclearance was plainly constitutional under Congress's authority to "'make or alter'" States' regulations of federal congressional elections. Op.280 (quoting U.S. Const. art. I, § 4, cl. 1).

As for the Registration-Disclaimer Provision, the district court ruled that it compelled speech in violation of the First Amendment. Op.218. The court acknowledged that the Florida Legislature had since passed SB524—a bill that, once signed by the Governor, would "moot Plaintiffs' claims challenging the registration disclaimer" by repealing that provision and replacing it with a different disclaimer. Op.190, 258. In fact, it cited SB524 *against* the State, contending that its less restrictive alternative proved that the Registration-Disclaimer Provision "is not narrowly tailored." Op.215-16. But instead of staying its hand, the court enjoined the Registration-Disclaimer Provision. Its preclearance order meant that SB524's repeal of the Registration-Disclaimer *couldn't* come into force without the court's blessing. In other words, the court invalidated a

provision that "[a]ll agree" would "likely become moot soon," and then blocked enforcement of the legislation that would moot it. Op.190.

Finally, as an alternative ground for invalidating SB90's Solicitation Provision, the district court deemed that provision vague and overbroad. According to Plaintiffs, this provision regulates speech to the extent it prevents them from giving voters in line food, water, and other tangible items. Op.182-83. The district court not only agreed, but held that this defect made the provision *facially* unconstitutional. Op.157-87.

The district court then denied a stay pending appeal. Op.268-69. It criticized the "all-powerful" *Purcell* principle as "wholly judge-made" and accused certain Justices of applying it hypocritically. Op.261-68.

### B.   This Court Issues a Stay and Deems Moot the Challenge to SB90's Registration-Disclaimer Provision.

This Court granted a stay after concluding that the case "easily falls within the time period that trigger[s] *Purcell*." *League of Women Voters of Fla. v. Fla. Sec'y of State*, 32 F.4th 1363, 1371 n.6 (11th Cir. 2022). It also found that "[t]he district court's determination regarding the legislature's intentional discrimination suffers from at least two flaws, either of which justifie[d] a stay." *Id.* at 1372. It explained that the district court failed to "properly account" for "the presumption of legislative good faith." *Id.* at 1373 (citing *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018)). And it explained that the district court misapplied the test for intentional discrimination. *Id.* (citing *Village of Arlington Heights v. Metro. Housing Develop. Corp.*, 429 U.S. 252, 266-68 (1977), and *Greater*

*Birmingham Ministries v. Sec'y of Ala.*, 992 F.3d 1299, 1322 (11th Cir. 2021)). As for the Solicitation Provision, this Court said that "the state has a substantial argument that the statute passes constitutional muster." *Id.* at 1374.

Because of the stay, SB524 also went into effect, the Registration-Disclaimer Provision was repealed, and issues concerning the provision became moot. *Id.* at 1372 n.9. The Defendants then filed a motion to dismiss the issue and sought *Munsingwear* vacatur of the district court's opinion and judgment concerning the provision. Mot. Partial Dismissal & Vacatur (May 24, 2022). Plaintiffs didn't oppose dismissal but did oppose vacatur. Resp. to Mot. Partial Dismissal & Vacatur (June 3, 2022). This Court issued an order deferring the matter to the merits panel. Order (June 9, 2022).

## STANDARD OF REVIEW

Plaintiffs "must establish actual success on the merits, as opposed to a likelihood of success," before obtaining a permanent injunction. *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1268 (11th Cir. 2006). While this Court "review[s] the district court's entry of a permanent injunction for an abuse of discretion, the district court's underlying legal conclusion"—that four provisions of Florida law violate the Constitution and VRA—"is reviewed *de novo.*" *Thomas v. Bryant*, 614 F.3d 1288, 1303 (11th Cir. 2010); *see also United States v. Ballinger*, 395 F.3d 1218, 1225 (11th Cir. 2005). Factual findings are reviewed for clear error. *Thomas*, 614 F.3d at 1307. Though the clear-error standard requires deference to the district court, some district courts clearly err. *See United States v. Crawford*, 407 F.3d 1174, 1177 (11th Cir. 2005).

15

## SUMMARY OF THE ARGUMENT

Federal injunctions of Florida's election laws cause the "serious[] and irreparabl[e] harm" of preventing the State from "conducting [its] elections pursuant to a statute enacted by the Legislature." *New Ga. Project*, 976 F.3d at 1283. The injunction in this case rests on: (1) a complete disregard of the legislative presumption of good faith, an inquiry concerning intentional discrimination that ignores all recent precedent, and a highly suspect case for discriminatory impact; (2) contempt for the standards that govern claims under section 2 of the VRA; (3) a decade-long intrusion on the State's sovereignty through judicial preclearance without any application of *Shelby County* and its "exceptional condition" test for preclearance; and (4) an overzealous application of the cases concerning vagueness and overbreadth that turns a time for choosing for voters into a time for campaigning. Issues concerning the Registration-Disclaimer Provision are now moot with SB524 becoming law. As such, (5) *Munsingwear*-vacatur is appropriate for portions of the order concerning the disclaimer.

## ARGUMENT

### I.    The District Court's Fourteenth and Fifteenth Amendment Analysis Relies on a Demonstrably Flawed Assessment of Discriminatory Intent and Effect.

All must concede—as Plaintiffs' expert Dr. Austin did concede—that the challenged provisions are facially neutral. Tr.903:23-904:2. "[A] law neutral on its face, yet having a disproportionate effect on [a] group will be deemed to violate the [Fourteenth Amendment's] Equal Protection Clause only if a discriminatory purpose can be

16

proven." *Joel v. City of Orlando*, 232 F.3d 1353, 1359 (11th Cir. 2000). The same is true under the Fifteenth Amendment. *See Jones v. Gov. of Fla.*, 15 F.4th 1062, 1068 (11th Cir. 2021). So discriminatory effect and intent must *both* be proven. *Id.*; *see also Hand v. Scott*, 888 F.3d 1206, 1207 (11th Cir. 2018). And the inquiry begins with "the presumption of legislative good faith" being accorded to the State. *Abbott*, 138 S. Ct. at 2324.

## A.    The District Court Presumed Bad Faith.

The district court's errors began at the beginning. The court "failed to apply—or even mention—the presumption of legislative good faith to which the [Florida Legislature] was entitled." *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 303 (4th Cir. 2020). The words "good faith" don't even appear in the 288-page opinion.

The district court instead presumed bad faith. It assumed that SB90's proponents intended to impose disparate impacts on black Floridians, instead of crediting their denials that any such impacts would occur. Op.88. And although the law doesn't require legislators to justify election laws with specific evidence, *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1353 (11th Cir. 2009), the court used the supposed lack of record evidence to discredit the legislators' concerns with voter confidence and fraud as pretextual shams. Op.131. It also found that Florida would continue discriminating in the future based solely on the fact that "the Governor's Mansion and the Legislature are controlled by [the Republican] party." Op.277.

Worse still, one statement from one legislator became the fulcrum around which much of the district court's intentional discrimination analysis turned. That "most

17

important" statement came from Senator Dennis Baxley when responding to a question posed to him by a Democratic colleague. Op.88. As the district court put it:

> In an exchange, Senator Berman asked Senator Baxley, "[a]re you aware that the restrictions in this legislation including those related to drop box and access to voter assistance will have a disparate impact on black voters?" To which Senator Baxley responded, after *denying SB 90 would disenfranchise anyone*, "[n]ow to look at patterns of use and say, well, you may have to go about it a little different way. There's a learning curve."

Op.88 (quoting Doc.461-98 at 100) (emphasis added). From this one statement—where Senator Baxley accepted the premise of the question to answer it—the district court inferred that (1) the Senator had in fact looked at "patterns of use," (2) knew from that patterns those black voters would be disparately impacted (even though Plaintiffs' many experts didn't come close to showing such impact), and that (3) this "candid[]" admission of "harm [to] Blacks" extended to every legislator who voted for SB90. Op.89.[3]

The district court "return[ed] to this statement" from Senator Baxley again and again for the otherwise unsupported proposition that the entire Legislature knew that SB90 would harm black voters. Op.89. Such reliance was in error.

The Supreme Court has "long disfavored arguments based on alleged legislative motives," and recently reiterated that "it is quite a leap" to use "statements made by a few supporters" to "attribute these motives to all the legislators." *Dobbs v. Jackson*

---

[3] Plucked from over twenty-six hours of formal legislative proceedings, this one statement is a microcosm of the bad faith the district court employed. A presumption of good faith would dictate that the comment about a "learning curve" spoke to the need for all voters, regardless of race, to familiarize themselves with the new election laws and nothing more.

*Women's Health Org.*, 2022 WL 2276808, at *18 (U.S. June 24, 2022) (cleaned up). And the district court knew better; it rejected other statements from individual legislators precisely because they did "not tell [the district] [c]ourt much about the Legislature's motivations as a whole." Op.87.

Of course, nothing in the record supports the supposition that the entire Florida Legislature shared in what the district court erroneously thought to be Senator Baxley's admission of invidious purpose. The district court grasped at two straws to conclude otherwise. First, it focused on the "face and body language" of the State's longstanding election director, as she testified over Zoom, and then disregarded her actual testimony that the Legislature simply asked her office "how many people were using the drop boxes," and not about the race of those individuals. *Id.* 117-19 (citing Tr.3412:1-3413:3).[4] Second, the court credited the testimony of Senator Gary Farmer, a Democrat, who said at trial that the legislative majority wasn't interested in the impact-related data he obtained from litigants in this case like "the Legal Defense Fund, NAACP, and League of Women Voters." *Id.* at 120. In other words, the first witness said that the Legislature didn't ask for race-related data; the second witness said that the legislators responsible for shaping SB90 didn't care to see the data he had independently obtained.

---

[4] The district court seemingly called the election director a liar. Op.117-19. And at one point during the trial, the court *directed* Plaintiffs to impeach her with her deposition testimony from months before. Tr.3461:1-4. Yet, that attempted impeachment only bolstered the election director's credibility because the testimony was nearly identical. Even the district court grudgingly acknowledged that the testimony did not change—that her testimony on the "shaping" SB90 was unimpeachable. Tr.3462:6-8.

*Cf. Barber v. Thomas*, 560 U.S. 474, 486 (2010) (cautioning against the use of "statements, such as those of the individual legislators, made *after* the bill in question has become law"); *Butts v. NYC*, 779 F.2d 141, 147 (2d Cir. 1985) ("The Supreme Court has" "repeatedly cautioned" "against placing too much emphasis on the *contemporaneous* views of the bill's *opponents*." (emphasis added) (collecting citations)); *Mercantile Tex. Corp. v. Bd. of Governors of Fed. Reserve Sys.*, 638 F.2d 1255, 1263 (5th Cir. Unit A Feb. 1981) (same).

And even if everyone in the Legislature who voted for SB90 did know about the "pattern of use," for which there's no credible evidence, it still doesn't matter. All it demonstrates is an "awareness of consequence," which isn't enough to establish discriminatory intent. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) ("'Discriminatory purpose'" "implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.").

### B.    The District Court's Inquiry in Search of Intent.

At a more granular level, the district court applied *Arlington Heights*' test for circumstantial evidence of intent without honoring the precedents that have refined it—most notably, this Court's decision in *Greater Birmingham Ministries v. Secretary of Alabama*, 992 F.3d at 1299, and the Supreme Court's decision in *Brnovich v. DNC*, 141 S. Ct. at 2321. This "eight-factor" test looks to:

1. "the impact of the challenged law,"

2. "the historical background,"

3. "the specific sequence of events leading up to its passage,"

4. "procedural and substantive departures,"

5. "the contemporary statements and actions of key legislators,"

6. "the foreseeability of the disparate impact,"

7. "knowledge of that impact," and

8. "the availability of less discriminatory alternatives."

*LWVF*, 32 F.4th at 1373 (citing *Arlington Heights*, 429 U.S. at 266-68, and *Greater Birmingham*, 992 F.3d at 1322). Errors of law, errors of fact, and errors concerning the misapplication of law to facts abound in the district court's 288-page opinion.

### 1.   *Historical Background*

The district court discussed the historical background first. *See* Op.45-65. It began with an analysis tracing Florida's "grotesque history of racial discrimination" from the Civil War to acts of "terrorism" and "racial violence" in the early and mid-1900s. Op.42-45. It then criticized the majority in *Shelby County* for suggesting that our country has changed for the better since the mid-1900s. Op.44. And, among other things, it discussed socio-economic data, the tendency of black voters to associate with the Democratic Party, statutory changes to Florida's voting laws, and past court cases. Op.45-65. The court concluded that "Florida has a horrendous history of racial discrimination," which cuts against SB90. Op.64. The problems with this approach are fourfold.

First, *Greater Birmingham* holds that the relevant "historical background" is the "precise circumstances surrounding the passing of the [challenged] law." 992 F.3d at

1325. It calls for a "focus[ed]" and "[]limited" inquiry, not one that "taint[s]" the State of Florida with "the old, outdated intentions of previous generations," as the district court did here. *Id.*; *accord Brnovich*, 141 S. Ct. at 2335.

Second, the district court's discussion about socio-economic data and the association of black voters with the Democratic Party proves little. Plaintiffs alleged discrimination on account of race—not income. Courts have also cautioned against conflating race with partisanship because "partisan motives are not the same as racial motives." *Brnovich*, 141 S. Ct. at 2349 (citing *Cooper v. Harris*, 137 S. Ct. 1455, 1466 (2017)). And the court have said that neutral "justifications should not be disregarded simply because partisan interests may have" played a role in passing a law. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 204 (2008) (plurality). Regardless, the conflation of other issues with race runs headlong into yet another problem: it fails to establish that the Florida Legislature "selected" a "course of action" "because of," not "in spite of," race. *Feeney*, 442 U.S. at 279.

Third, the district court's recounting of statutory changes and past cases is both selective and wrong. The district court states that "Florida has a history of maintaining its voter rolls in a discriminatory manner"—of "purging" black voters from the rolls "one after another" "for the past 20 years." Op.52-58. As support, the district court cites material referenced in the Plaintiffs' expert reports—material from 2000, news reports and law review articles from the early 2000s, and a law review article from 2013—as well as a court case from 2012. Op.53-56. Even if this stack of hearsay upon

22

hearsay funneled through an expert establishes that Florida erred in its past work to maintain accurate voter rolls, there's nothing to suggest that Florida's efforts over the *last decade* were either flawed or improper. And reliance on past cases makes little sense because, as the district court itself acknowledged, "[s]killed and well-respected judges from multiple courts examined [changes to Florida's election laws], and they all found that the Florida Legislature did *not* enact them with the intent to discriminate based on race." Op.64 (emphasis added). Indeed, from time to time, the State even took cues from Chief Judge Walker in "chang[ing] the law to conform with [his] orders." Op.7 n.4. Surely past acquiescence cuts *for*, not *against*, the State.

Finally, the district court's recitation of Florida's grotesque but distant past is inconsistent with the State's more recent history. Since 1982, the State has seen greater participation and representation for Florida's minority voters. Plaintiffs' expert on "the history of Florida elections and the government's response to Black and Latino participation in those elections" "essentially since reconstruction" seemingly conceded as much. Tr.840:18-20. Dr. Austin noted that though black Floridians were elected to Congress and the State Legislature during reconstruction, Tr.853:14-17, none held any congressional or statewide office from the end of reconstruction until 1990. Tr.913:18-19, 914:1-3. Yet, since 1990, Florida has elected nine black members of Congress, both Democrats and Republicans, Tr.913:20-25, and a black lieutenant governor in 2010 who happened to be a Republican. Tr.914:4-10. And the State twice voted for President Obama when he was on the statewide ballot in 2008 and 2012. Tr.914:11-13. Moreover,

in 2019, then-Secretary Lee approved a rule that made Spanish-language ballots available everywhere in the State—improving access to Florida's sizeable black, Spanish-speaking population. *See* Fla. Admin. Code R. 1S-2.032. Thus, when asked whether Florida's recent history meant that "compared to 1982, it has become easier for Blacks to register and vote in Florida," Dr. Austin said "I would say yes," before hesitating, changing her answer to "no," and then saying "that it's hard to answer those questions with a yes or no answer." Tr.914:14-25. She had it right the first time.

### 2. *Sequence of Events Leading to Passage*

Next, the district court considered the sequence of events leading up to SB90's passage. Op.65-78. The court appreciated that the 2020 election cycle was challenging and the events surrounding that election undercut voter confidence. Op.68-69. Yet it then suggested that the voters of Florida were somehow immune from the broader crisis of confidence and that the State could justify no reforms on this basis—a conclusion that makes little sense. Op.70. The court also rejected concerns about attempting to "prophylactically" respond to fraud as unproven and illegitimate pretexts, and seemingly erected a standard whereby the State had to match evidence of fraud with what "SB 90 *might* prevent." Op.72. Here too the district court erred.

As an initial matter, the district court ignored binding precedent when erecting new hurdles for the State to clear. *Greater Birmingham* and *Brnovich* emphasize that "combatting voter fraud" and "increasing confidence in elections" are "valid neutral justifications" that dispel an inference of discrimination, "even in the absence of any record

24

evidence." *Greater Birmingham*, 992 F.3d at 1327, 1334; *accord Brnovich*, 141 S. Ct. at 2348 ("And it should go without saying that a State may take action to prevent election fraud without waiting for it to occur and be detected within its own borders.").

Moreover, the record is replete with valid neutral justifications and record evidence though the latter is not required. Among other things, during the fourteen-day trial, the State submitted a forty-minute video excerpt highlighting contemporaneous justifications from members of the Florida Legislature. Exh.1604. Broadly speaking, the excerpt and accompanying transcripts make clear that the State chose to act on the heels of "one of the most secure [elections] we've seen in Florida" so that it could "continue to be the leader in election security"—to guard against the threats "in the future" that could "impact our elections." Exh.528 at Tr.10:16-12:11. Survey results from forty-five of the State's sixty-seven counties supported the Legislature's concerns about the need for clear, consistent standards. *E.g.*, Exh.426 at Tr.62:22-63:2 (Chair Grall's referencing results from "54 counties"); Exh.137, 148, 177. And information concerning fraud from the State's election director added to the need for reform. *See* Tr.3413:15-22 (sharing "vote-by-mail fraud" complaints), 3457:1-9 (recalling that she was asked about "[i]ssues of voter fraud"); *cf.* Exh.1557 (summarizing vote-by-mail issues).

For the Drop-Box Provision specifically, the record shows that the 2020 election cycle was the first time that drop boxes were used statewide. *See* Fla. Stat. § 101.69(2) (2019). The statute then in effect prompted endless questions about its meaning. Tr.3438:19-25; *see also* Tr.3105:1-25; Exh.1576. The State was also aware of acts of

25

vandalism with drop boxes in the run-up to the 2020 general election—of drop boxes being burned for instance. Tr.3439:6-9. This confluence of questions and concerns prompted the State to issue guidance concerning its interpretation of the statute. Tr.3438:2-3. Not all of the Supervisors followed the resulting guidance. Tr.3439:1-3. SB90's sponsor in the Florida House voiced his frustrations about this lack of "uniformity." Exh.429 at Tr.9:24-10:5; *see also* Exh.426 at Tr.68:7-22. And even Democratic House Member, Allison Tant, when speaking of her home county, said that she "love[d] the fact that our lockboxes were manned," because that "go[es] a lot to some of the concerns about ballot harvesting," "security overnight," and assisting voters at the point at which the ballot was cast. Exh.1596 at Tr.116:14-117:2, 117:18-20. She encouraged reform that would require other Supervisors to do the same. *See id.*

The need for uniformity and security thus animated the State's interest in the Drop-Box Provision. The State's election director testified to this effect. Tr.3400:18-3401:9. Supervisor Doyle echoed the security concerns when discussing why he discontinued the use of unmanned, twenty-four-hour drop boxes. Tr.3202:23-25, 3203:6-21. Supervisor Christina White of Miami-Dade County, whose office followed the State's guidance, now codified in the Drop-Box Provision, summed up the benefits. She explained that its requirements (1) serve as "an added layer of security" either to deter incidents or ensure there are witnesses to any incident, Tr.3154:2-15; (2) "aid in voter confidence" because her constituents appreciate handing their ballots to an actual person, Tr.3154:16-20; and (3) ensure that her staff can remind voters to sign the outer

envelope of their ballot, which contributed to a decrease in the rejection rate for ballots. Tr.3155:15-21; Exh.390. And, given the State's 7 pm election-day deadline for receipt of ballots, "staff is instructed" to approach those waiting to deposit their ballots and to take "the ballots of all of those voters that are waiting in line." Tr.3156:23-3157:6.

The district court was unpersuaded by the security rationale, calling it "nonsensical." Op.74. It concluded that there was no evidence of tampering with drop boxes in Florida, *id.*, though precedent doesn't require a state to wait for such fraud to "be detected within its own borders." *Brnovich*, 141 S. Ct. at 2348. And because Florida was mandating that Supervisors monitor drop boxes that contained ballots, but the U.S. Postal Service had no similar mandate for mailboxes, the district court found the requirement "ridiculous." Op.75 (quoting Tr.3105:16). Here the court ignored common sense. A handful of drop boxes specifically marked as containing *only* ballots—positioned at widely advertised locations—are different than mailboxes scattered across a county. Bad actors targeting the former can get more bang for their buck. *Cf.* Doc.549-2 at Tr.206:6-8 (acknowledging that "firecrackers" and "TNT bombs" would fit through a drop box slot but not "cherry bombs"); *see also id.* Tr.204:12-206:23.

For the Registration-Delivery Provision, the district court briefly mentioned but otherwise ignored that this was a "priority" of the State's Supervisors of Elections. *Compare* Op.77, *with* Tr.3120:6-18. The provision spreads the burden of processing voter registration forms among the Supervisors rather than putting it squarely on a handful of Supervisors in "high metro areas where a voter drive [might be] conducted," or

where "people [are] coming in from all over the State" to attend an event. Tr.3426:13-20. The need for timely delivery of registration forms didn't originate in a vacuum either. There had been numerous complaints of 3PVROs missing the book closing deadline. *E.g.*, Tr.3421:14-21, 3421:25-3422:4; Exh.1556 at 7-24, 45-46, 51-52, 57-62, 73-74, 123-24; *see also* Tr.3164:18-25; *cf.* Exh.1562 (binder compiling summary of voter registration issue); Exh.1561 (summarizing same); Exh.1556 (binder compiling 3PVRO complaints); Exh.1555 (summarizing same).

And, finally, the Solicitation Provision was meant to maintain a safe space around polling places. Tr.3439:22-3440:2. "Aggressive and intrusive behavior" outside of polling places is not uncommon; campaigners, bullhorns, loud music, fights, food trucks, and reporters compete for the attention of voters. Tr.1387:15-1391:2, 3440:3-8; *see also* Exh.382. But polling places are one of the few where "[m]embers of the public are brought together," "at the end of what may have been a divisive election season," so that they can together "reach considered decisions about their government and laws." *Min. Voters All. v. Mansky*, 138 S. Ct. 1876, 1887-88 (2018). Florida thus has a valid, evidence-based, neutral justification for prohibiting the solicitation of voters within 150 feet of a drop box or a polling place. *See* Fla. Stat. § 102.031; *Citizens for Police Accountability Pol. Comm. v. Browning*, 572 F.3d 1213 (11th Cir. 2009) (recognizing Florida's compelling interest in a 150-feet no-solicitation zone around polling locations). The district court didn't disagree except to say that "voting is 'very often a communitarian act'—especially in the Black community." Op.75 (quoting Plaintiffs' expert Dr. Kousser).

### 3.    *Procedural or Substantive Departures*

Procedural and substantive departures from legislative procedures were also considered. Op.78-83. Trial testimony came from legislators who opposed SB90. Op.79-82. They complained that Supervisors of Elections did not have adequate time to address issues, that the legislative majority moved too quickly in shepherding SB90 through, and that it was unusual for the Legislature to use strike-all amendments to make multiple changes to the bill rather than section-by-section changes. Op.79-82. Mr. Ramba—the Supervisors' quarterback—generally disagreed. Op.82-83. Supervisor Hays—the Supervisors' coach—did too; he "didn't see anything in the mechanical stuff of the passing of Senate Bill 90 that was anything out of the ordinary." Doc.549-2 at Tr.189:1-5; *see also id.* at Tr.189:6-190:10. After considering the evidence, the district court concluded that "this factor does not strongly weigh one way or the other," Op.83, because "the procedure used to pass SB90 was unusual writ large, but not necessarily so for a hyper-partisan bill such as SB90." Op.83.

### 4.    *Statements of Key Legislators*

But, as discussed above, one statement from one legislator did weigh heavily against the State in the district court's analysis. Op.88. Other statements didn't. Op.87-88. That said, the court did reproduce a text exchange between two Republican legislators that "d[id] not show a *racially* discriminatory intent" but "d[id] suggest that the Legislature passed SB90 with partisan purpose," even though the Legislature *rejected* the so-called "partisan" proposal being discussed. Op.84-85 (emphasis in the original).

29

Elsewhere in its order, the court found that the "real purpose behind SB 90" was "to favor the Republican Party over the Democratic Party," Op.129, with the smoking gun being a *failed* "partisan" proposal. *Id.*; *see also* Op.132.

To repeat: the court's overreliance on Senator Baxley's statement was in error. Even if that one statement had a discriminatory tone, which it didn't, *Greater Birmingham* rejects the relevance of statements from single legislators. 992 F.3d at 1324-25. And "partisan motives are not the same as racial motives," *Brnovich*, 141 S. Ct. at 2349, though the court assumed that because "nine in every ten Black voters" votes for the Democrats, impacts on Democrats are the same as impacts on blacks. Op.127. Finally, conflating party with race also fails to establish that the Legislature "selected" a "course of action" "because of," not "in spite of," race. *Feeney*, 442 U.S. at 279.

### 5.    *Disparate Impacts (Measure, Foreseeability, & Knowledge)*

The district court's discussion of disparate impacts compounded the errors made elsewhere in its analysis. To prove intent, *Greater Birmingham* says that the impacts must be so "stark" that they reveal a pattern "unexplainable on grounds other than race." 992 F.3d at 1322. The district court found nothing like that. Data from Plaintiffs' experts suggested, at best, a miniscule difference in how black and non-black Floridians voted before SB90. Op.90-116. And the data was admittedly "limited," "unclear," "not necessarily representative," and "not statistically significant." Op.97-98, 100-12.

**A.** Take the analysis concerning the Drop-Box Provision. The district court concluded that "[b]lack voters favor drop boxes more than other racial groups," "relying on Plaintiffs' expert, Dr. Herron." Op.97. Dr. Herron looked at drop-box usage in three ways: (1) by looking at data provided by forty-six of the State's sixty-seven Supervisors of Elections; (2) by reviewing "lists of individuals who cast drop box ballots" that were provided by five of the State's sixty-seven counties; and (3) by guessing where Supervisors might place drop boxes in light of SB90. Op.97-104. None of these three approaches works.

First, there were problems with Dr. Herron's decision to rely on self-reported data from forty-six of the sixty-seven counties. Op.97. To state the obvious, this data didn't include information from Florida's fourth (Hillsborough) and seventh (Duval) most populous counties, home to the cities of Tampa and Jacksonville. *See* Doc.467-5 at 46, Tb.10. Dr. Herron also failed in his stated goal of "identify[ing] any relationships between race and drop-box usage." Op.97. All he found was "suggestive evidence" of a correlation. Op.97. (quoting testimony). This correlation was "not statistically significant," meaning that any observed correlation could have been the result of chance alone. Op.97.

Second, relying on voter-usage records from five of the sixty-seven counties was improper. The only counties with such records were Sarasota, Santa Rosa, Columbia, Madison, and Franklin. Op.98. Dr. Herron himself recognized that these counties were "not among the largest and most racially diverse counties in Florida." Doc.467-5 at 49.

31

Two (Madison and Franklin) produced records for only the general election in 2020. *Id.* at 50. Data from one (Columbia) didn't have "consistent results regarding Black and White drop box rates." *Id.* at 52. Data from another (Santa Rosa) showed that white voters favored drop boxes *more* than black voters—a conclusion that contradicts the district court's ultimate conclusion regarding drop boxes. *Id.* at 52.

Still, the district court relied on the resulting conclusions. Or as the district court explained it, the positive coefficient estimates generated from logistical regressions establish that, on average, there were "14% greater odds" that a black voter "in Columbia, Santa Rosa, and Sarasota Counties" would return a vote-by-mail ballot using a drop box. Op.99. That's so, according to the district court, because "*e*," roughly equivalent to 2.71828, "to the 0.131 power equals roughly 1.14," "[t]hen 1.14 − 1 = 0.14," and "0.14 x 100 = 14." Op.99 at n.36.

To recap: the district court relied on data from a small handful of counties—one of which said the opposite of what the court said—and mixed it together with statistical argle-bargle to conclude that black voters *throughout* the State favor drop boxes more than voters of other races. That's precisely the kind of "misleading" "use of statistics" for which the Supreme Court admonished the Ninth Circuit in *Brnovich*. 141 S. Ct. at 2345. It proves only that "a distorted picture can be created by dividing one percentage by another"—or in this case using logarithmic regressions—especially when the data is limited. *Id.*; *accord Greater Birmingham*, 992 F.3d at 1330 (citations omitted). And *nothing*

suggests that the Florida Legislature was aware of, let alone motivated by, the sophisticated math the district court found persuasive.

Third, even the district court recognized that Dr. Herron's guesses about where Supervisors would place drop boxes didn't account "for the universe of possible drop box locations." Op.100. It didn't, for example, account for Supervisors adding early voting sites (and thus drop box locations) or permanent branch offices (and thus drop box locations that extended to election day itself). *See* Fla. Stat. § 101.69(2)(a). Yet the court still credited this approach because it was substantiated by another expert's conclusion that black voters "use drop boxes more heavily outside early voting hours than other voters." Op.101.

**B.** That other expert was Dr. Smith. He looked at lists of drop-box usage from only *two* counties (Columbia and Manatee) for his conclusion that black voters prefer to use drop boxes outside the early voting window. Op.101. That's it.

Even that limited data had problems. Dr. Smith specifically said that there were "data-entry errors" in the report provided by Columbia County. Doc.467-7 at 96 n.68 & 69. In Manatee County, as the district court explained, Dr. Smith "found that 13.5% of Black voters and 13.4% of Latino voters deposited their [vote-by-mail] ballots outside of normal business hours, compared to 11.4% of White voters," Op.103; however, the court failed to note the aggregate numbers underlying the percentages. Those numbers show that only small percentages of ballots deposited in Manatee County's drop boxes were time-stamped: only 350 of 2,240 ballots cast by black voters, only 375 of

2,418 ballots cast by Latino voters, and only 4,903 of 38,038 ballots cast by white voters. Doc.467-7 at 102. In other words, the aggregate numbers show two things: (1) Manatee County's record keeping (like that in Columbia County) likely wasn't very good on this issue (and so drawing conclusions from it is suspect), and (2) white voters in Manatee County seemingly favored the use of drop boxes *more* than black voters (which undercuts Dr. Herron's conclusion). *Id.* Again, this is a "misleading" and improper "use of statistics" to establish a disparate impact. *Brnovich.* 141 S. Ct. at 2345; *accord Greater Birmingham*, 992 F.3d at 1330.

**C.** For the Solicitation Provision, misleading statistics gave way to obvious cherry-picking. "[T]o *measure* whether this provision will have a disparate impact on Black or Latino voters," the district court looked to "whether Black and Latino voters are disproportionately likely to wait in line to vote." Op.109 (emphasis added).

The district court relied on Dr. Smith's assessment of data from Miami-Dade County over "five days," Op.110, with the remaining data being "skewed" or otherwise "limited." Op.111. The court then used studies from 2012 to substantiate the theory that minority voters face long lines and thus a disparate impact from the Solicitation Provision. Op.109; *see also* Tr.2589:2-16. This despite reforms made since 2012 to specifically address long lines, *see* Tr.3440:11-15, 3441:11-24, which make reliance on decade-old data unreliable, and despite the Stanford-MIT Healthy Elections Project's assessment, favorably quoted elsewhere in the court's opinion and in Plaintiffs' expert

reports, that the 2020 elections in Florida saw "few lines at polling places, except at the start of early voting." Tr.2587:20-2588:9; *see also* Op.68 (quoting favorably from same).

Relying on *five* days from Miami-Dade County also ignored the more complete and unrebutted evidence from the county itself. That evidence shows that the county "posted wait times online every hour to assist voters in selecting a location most convenient for them" during the "14-day Early Voting period." Exh.390 at 1. Average wait times during the *entire* early-voting period were "under 15 minutes," and the county saw lines only "during the morning hours on the first day of Early Voting" when "eager" voters queued to be "among the first" to cast a ballot. *Id.* "For Election Day, data showed the average wait time was less than 15 minutes," with the county "proud to report that it achieved its aspirational goal that *no voter waits more than one hour to vote.*" *Id.* (emphasis in the original).

More fundamentally, the long-line argument for establishing discriminatory intent requires a series of logical leaps. It assumes that the Florida Legislature knew about the lines being long; knew that black voters were more likely to wait in line; and knew that blocking black voters from accepting food and water from third parties within 150 feet of a polling place—so right outside a polling place—would deter them from voting. What's more, the Legislature would have had to assume that black voters were less likely to bring food and water from home or accept it from election workers. Nothing in the record comes close to establishing these assumptions.

35

**D.** The district court's analysis for the Registration-Delivery Provision was flimsier still. "[A]lthough not challenged in Plaintiffs' intentional race discrimination counts," Op.113, the court still assessed the provision as part of the analysis. Op.113-15. The court found that "3PVROs overwhelmingly serve minority communities," so "by restricting their reach, the registration delivery provision disproportionately harms Black and Latino voters." Op.115.

The only support for the district court's conclusion was what the court called the "not perfect" information in Dr. Herron's report. Op.114. And all Dr. Herron concluded was that there's some "cost of voting" associated with the provision and that the "burdens associated with these costs will fall more heavily on Black registered voters." Doc.467-5 at 92-108. No costs or burdens were ever identified or quantified by Dr. Herron, *id.*, or even Dr. Smith. *See* Tr.2592:1-6. Nor were they weighed against the benefits of requiring these organizations to return applications in a timely fashion.

**E.** While the disparate impacts were based on statistical sophistry, judicial cherry-picking, and *ipse dixit*, the district court still concluded that the Florida Legislature should have foreseen these impacts and it otherwise had knowledge of the impacts. Op.116-25. This conclusion was based on Senator Baxley's singular statement viewed in the worst possible light —as supported by the "face and body language," but not the words, of the State's election director, Op.118, and the *post-hoc* testimony of one of SB90's opponents. Op.120-21. As discussed in the good-faith section above, the court erred in its analysis. *See supra.*

36

### 6.    *Less Discriminatory Alternatives*

This final factor in the *Arlington Heights* analysis looks at whether the Legislature "failed to consider" "alternatives that would lessen any potentially discriminatory impact." *Greater Birmingham*, 992 F.3d at 1327. The district court concluded that this factor "weighs in Plaintiffs' favor" for the challenged provisions. Op.125. That's because "less discriminatory alternatives to each challenged provision [as provided by Plaintiffs and Democratic-legislators] not only were available but were presented to and rejected by the Legislature," with the exception of the vote-by-mail request provision. Op.125.

But *Greater Birmingham* doesn't fault the Legislature for rejecting "the alternative option that Plaintiffs would have preferred." 992 F.3d at 1327. It was wrong of the district court to weigh against the State the amendments proposed by opponents of SB90 and their outright attempts to kill the bill. *See id.* That the opponents' "preferred rule did not prevail" "does not suggest that the resulting rule violates the Constitution." *Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179, 1193 n.8 (9th Cir. 2021).

The record shows the Florida Legislature attempting to balance integrity with access to improve voter confidence, provide clear rules, and address issues before they affected Florida's election. *See supra.* As Mr. Ramba said, "80 percent of the provisions" in the bill "have a tweak." Tr.3122:16-18. Among other things, earlier versions of the bill would have banned all drop boxes altogether, Tr.1578:6-11; required specific forms of identification or a signed attestation for those using this convenience, Tr.1578:12-17; canceled all existing vote-by-mail requests, Tr.3117:17-3118:3, Tr.3157:15-3160:5; and

imposed other requirements for the sake of security. *E.g.*, Tr.1578:23-1579:5, 3118:17-3119:7. In the end, even opponents of the bill grudgingly said that they "appreciate[ed]" the bill's evolution, Exh.427 at Tr.51:11-13, calling it a "decent" product. *Id.* at Tr.52:16-20. Yet the district court accused the Legislature of "target[ing] Black voters." Op.134.

In sum, the district court mangled the test for circumstantial evidence of intent from start to finish. "Thus," just as in *Greater Birmingham*, "'there is no basis for shifting the burden to the State to determine whether, by a preponderance of the evidence, [the Legislature] would have made the same decision notwithstanding its racial motivation.'" 992 F.3d at 1327-28 (quoting *Burton v. Belle Glade*, 178 F.3d 1175, 1195 (11th Cir. 1999)).

### C.    There's Been No Showing of Discriminatory Effect.

The disparate impact discussion above also underscores a separate, fatal flaw in the district court's Fourteenth and Fifteenth Amendment analysis: Plaintiffs' failure to prove a discriminatory effect on black voters. *See supra.* A state law violates the Fourteenth and Fifteenth Amendments only "if it had *both* the purpose and effect of invidious discrimination." *Hand*, 888 F.3d at 1207. In the district court's own words, and as explained earlier, the analysis of the effect of SB90 on black voters was based on "limited," "unclear," "not necessarily representative," and "not statistically significant" data. Op.97-98, 100-12. Therefore, Plaintiffs come nowhere close to establishing that SB90 even has a discriminatory effect, and the district court was wrong to conclude otherwise.

## II.  The District Court Erred in Concluding that the State Violated Section 2 of the VRA.

The district court also found that the State violated section 2 of the VRA because "the Legislature passed the challenged provisions with a discriminatory intent." Op.40 (citing *Askew v. City of Rome*, 127 F.3d 1355, 1373 (11th Cir. 1997)). As discussed above, there was no discriminatory intent and so the district court erred here as well. *See supra*.

Section 2's text further underscores the district court's error. That provision prohibits the imposition of any law "which results in a denial or abridgement of the right of any citizen of the United States to vote *on account of race or color*"—not party affiliation—after considering the "totality of circumstances." 52 U.S.C. § 10301(a)-(b) (emphasis added). Yet the district court segued between race and party affiliation because "politics in Florida are racially polarized" for black voters in the State. Op.127. The district court's discussion of race and partisanship looks very much like the racial polarization analysis conducted as part of the inquiry under *Thornburg v. Gingles*, 478 U.S. 30 (1986). The *Gingles* test, however, applies only to vote dilution cases. *Greater Birmingham* and *Brnovich* both direct courts not to apply this test outside of a vote-dilution context. *Greater Birmingham*, 992 F.3d at 1331-32; *accord Brnovich*, 141 S. Ct. at 2340.

To state the obvious, this is not a vote-dilution case. This case concerns a challenge to a facially neutral law. And voting in Florida remains "equally open," 52 U.S.C. § 10301(b), because, as Dr. Austin agreed, the challenged provisions apply to all voters regardless of race, Tr.903:23-904:2, especially when compared to 1982, when section 2

39

was last amended in any meaningful way. *See Brnovich*, 141 S. Ct. at 2337-38. Arguments to the contrary rely on an assessment of disparities that are difficult to measure in isolation, or as part of the State's broader framework for registering and voting. *Id.* at 2339. These contrary arguments also can't overcome the State's strong, legitimate, and well-recognized interests, *id.* at 2340, for which it need not provide evidence, *id.* at 2343, but for which the record in this case provides reams of evidence. *See supra.*

### III. Preclearance Is Not and Cannot Be an Appropriate Remedy Under the Circumstances.

Because the district court erred in finding intentional discrimination, its preclearance remedy necessarily falls. Section 3(c) does not apply unless "violations of the fourteenth or fifteenth amendment" have occurred, 52 U.S.C. § 10302(c)—meaning violations of the "protections against *intentional racial discrimination* in voting." *Perez v. Abbott*, 390 F. Supp. 3d 803, 814-18 (W.D. Tex. 2019) (emphasis added); *accord Veasey v. Abbott*, 888 F.3d 792, 801 (5th Cir. 2018). This Court agreed when issuing a stay of the district court's decision. *LWVF*, 32 F.4th at 1372 n.9. But apart from being unsupported by a legitimate finding of liability, the district court's imposition of preclearance has independent flaws.

**A.** When deciding whether to impose that drastic remedy, the district court applied the wrong standard. It followed the Eastern District of Arkansas's decades-old decision in *Jeffers*. But this Court must follow *Shelby County*, which made clear that preclearance is "a drastic departure" from federalism and equal sovereignty. 570 U.S. at

535.[5] Whether through Congress or the courts, the "Federal Government does not" "have a general right to review and veto state enactments before they go into effect." *Id.* at 542; *see also Rizzo v. Goode*, 423 U.S. 362, 379 (1976) (federal courts must give "appropriate consideration" "to principles of federalism in determining the availability and scope of equitable relief"). Under *Shelby County*, preclearance is unconstitutional absent "exceptional conditions." 570 U.S. at 545, 556-57; *see Perez*, 390 F. Supp. 3d at 819 ("In the wake of *Shelby County*, courts have been hesitant to grant § 3(c) relief.").

The district court never attempted to find "exceptional conditions" of the kind referenced in *Shelby County*. They don't exist. *See Shelby Cnty.*, 570 U.S. at 551, 554. Indeed, they've long been gone in Florida, which has never been subject to statewide preclearance—even in 1965. And today, black Floridians register and vote at rates of 58% and 52%—comparable to Oregon and far exceeding States like Colorado, Massachusetts, Minnesota, and Washington. *See Table 4b, Reported Voting & Registration, by Sex, Race and Hispanic Origin, for States: November 2020*, Census Bureau, bit.ly/37qgCgA.

**B.** Nor could the district court sidestep preclearance's constitutional problems by pointing to Congress's authority over congressional elections. Op.279-80. Congress

---

[5] The texts of sections 3(c) and 5 are substantially the same, in that preclearance requires prior review of any "voting qualification or prerequisite to voting" to be assessed for whether it will have "the purpose" or "the effect" of "denying or abridging the right to vote on account of race or color." 52 U.S.C. §§ 10302(c), 10304(a). Where section 5, through its now unconstitutional coverage formula, was intended to include jurisdictions within its ambit, section 3(c) was intended to trigger coverage in "pockets of discrimination" that section 5's formula missed. H.R. Rep. No. 89-439 at 13 (1965) *reprinted in* 1965 U.S.C.C.A.N. 2437, 2444.

didn't use that power to enact the VRA, that power does not reach state elections or presidential elections, and no congressional power can be used to violate basic principles of federalism. *See South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966); *McPherson v. Blacker*, 146 U.S. 1, 35 (1892); *Printz v. United States*, 521 U.S. 898, 923-24 (1997).

Congress enacted the VRA using its powers under the Reconstruction Amendments. The amendments give "Congress" the "power to enforce, by appropriate legislation"—not the courts. U.S. Const., amend. 14, § 5; U.S. Const., amend. 15, § 2. And the Supreme Court said in upholding the constitutionality of the VRA in *Katzenbach* and then in *Shelby County* that only "*exceptional conditions* can justify *legislative measures* not otherwise appropriate.'" 570 U.S. at 535 (quoting *Katzenbach*, 383 U.S. at 334 (1966)) (emphasis added). So, if Congress appropriately delegated its powers to the courts through section 3(c), the same exceptional-conditions standard must apply before the courts can infringe on the sovereign rights of states and treat those states disparately. *Id.* There must be evidence of the State engaging in "pervasive," "flagrant," "widespread," and "rampant" discrimination before that State is forced to "beseech" some federal authority "for permission to implement laws that they would otherwise have the right to enact and execute on their own." *Id.* at 544. Otherwise, section 3(c) is unconstitutional, *see id.*, for "[a] record of scattered infringement of the right to vote is not a constitutionally acceptable substitute." *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 228 (2009) (Thomas, J., concurring in the judgment in part and dissenting in part). Yet the district court still failed to apply *Shelby County*'s test.

42

**C.** Finally, under any standard, preclearance was inappropriate here. SB90 is not the kind of law that could trigger preclearance: Plaintiffs didn't challenge most of the bill, only two groups even alleged intentional discrimination, and the district court *rejected* many of those allegations. Nor is Florida a repeat offender: The best the district court could muster was a string of cases where courts held that Florida *didn't* engage in racial discrimination. Op.52-65. At worst, the district court should have held that preclearance is "not necessary here in light of [its] injunction." *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 241 (4th Cir. 2016). Florida has no history of evading court orders. The district court stressed Florida's past compliance. Op.6-7 & n.4. And its one supposed counterexample—SB524—is hardly "a mockery of the rule of law." Op.279. It outright repeals one of the challenged provisions, a registration disclaimer that Plaintiffs never alleged was racially discriminatory to begin with, *see* Op.12. And forcing these parties to litigate preclearance issues saves no more time or money than ordinary litigation. *Cf.* Op.278-89. If anything, it *increases* the costs since provisions of law must be precleared that otherwise would not have been challenged.

Far from a "rarely used" remedy for the most "'systematic and deliberate'" cases of discrimination, the district court's reasoning would make preclearance the norm in voting-rights cases. *Conway Sch. Dist. v. Wilhoit*, 854 F. Supp. 1430, 1442 (E.D. Ark. 1994). That the court reached for this blunderbuss remedy—effectively putting Florida in a decade-long federal receivership—highlights the problems with the entire order.

43

## IV.    The Solicitation Provision's Protection of Voters in Line Satisfies the Requirements of the First Amendment.

For the sake of brevity and judicial economy, the Secretary and Supervisors join in the Intervenor-Defendant-Appellants' brief on this issue.

## V.    *Munsingwear* Vacatur Is Appropriate for the District Court's Judgment Concerning the Registration-Disclaimer Provision that, All Parties Agree, Is Now Moot.

For the sake of brevity and judicial economy, the Secretary and Attorney General join in the Intervenor-Defendant-Appellants' brief on this issue.

## CONCLUSION

The district court got it wrong. The presumption of legislative *bad* faith, the unfocused historical inquiry, and the limited and statistically insignificant conclusions—to name a few errors—can't prove intentional discrimination and don't warrant preclearance. *Brnovich*, *Greater Birmingham*, *Feeney*, and *Shelby County* say so. SB90 is what it always was: a facially neutral and commonsense election law. Accordingly, this Court should reverse the district court's conclusions to the contrary.

44

Respectfully submitted,

/s/ Mohammad O. Jazil
Mohammad O. Jazil
Gary V. Perko
Michael Beato
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 South Monroe Street, Suite 500
Tallahassee, FL 32301
(850) 274-1690 / (540) 341-8809 (fax)
mjazil@holtzmanvogel.com
gperko@holtzmanvogel.com
mbeato@hotlzmanvogel.com

Phillip M. Gordon
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
15405 John Marshall Hwy
Haymarket, VA 20169
(540) 341-8808 / (540) 341-8809 (fax)
pgordon@holtzmanvogel.com

Bradley R. McVay
  General Counsel
Ashley E. Davis
  Deputy General Counsel
William Chappell
  Assistant General Counsel
FLORIDA DEPARTMENT OF STATE
R.A. Gray Building Suite 100
500 South Bronough Street
Tallahassee, Florida 32399-0250
(850) 245-6536 / (850) 245-6127 (fax)
brad.mcvay@dos.myflorida.com
ashley.davis@dos.myflorida.com
David.chappell@dos.myflorida.com

*Counsel for Secretary Byrd*

/s/ Henry C. Whitaker
Henry C. Whitaker
  *Solicitor General*
Daniel W. Bell
  *Chief Deputy Solicitor General*
Bilal Ahmed Faruqui
  *Senior Assistant Attorney General*
Karen Ann Brodeen
  *Special Counsel*
William Edward Chorba
  *Senior Assistant Attorney General*
William Henry Stafford, III
  *Senior Assistant Attorney General*
FLORIDA ATTORNEY GENERAL OFFICE
PL-01 The Capitol
Tallahassee, FL 32399
(850) 414-3300
henry.whitaker@myfloridalegal.com
daniel.bell@myfloridalegal.com
bilal.faruqui@myfloridalegal.com
karen.brodeen@myfloridalegal.com
william.chorba@myfloridalegal.com
william.stafford@myfloridalegal.com

*Counsel for Attorney General Moody*

*/s/ Andy Bardos*
Andy Bardos
GRAYROBINSON, P.A.
301 South Bronough Street, Suite 600
Tallahassee, FL 32301
(850) 577-9090
(850) 577-3311 (fax)
andy.bardos@gray-robinson.com

*Counsel for Supervisors Hays and Doyle*

## CERTIFICATE OF COMPLIANCE

This brief contains 10, 758 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) because it's prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Garamond font.

Dated: July 11, 2022                    */s/ Mohammad O. Jazil*

## CERTIFICATE OF SERVICE

I e-filed this brief on ECF, which will email everyone requiring notice.

Dated: July 11, 2022                    */s/ Mohammad O. Jazil*

46