No. 22-11143 (Lead)
Consolidated with Nos. 22-11133, 22-11144, 22-11145

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

LEAGUE OF WOMEN VOTERS OF FLORIDA, INC., et al.
*Plaintiffs-Appellees*,

v.

FLORIDA SECRETARY OF STATE, et al.
*Defendants-Appellants*,

and

NATIONAL REPUBLICAN SENATORIAL COMMITTEE, et al.
*Intervenor-Defendants–Appellants*.

---

On Appeal from the United States District Court
for the Northern District of Florida
No. 4:21-cv-186 (Walker, C.J.)

---

### *League* Plaintiffs-Appellees' Answer Brief

---

| | |
|---|---|
| Frederick S. Wermuth | Marc E. Elias |
| KING, BLACKWELL, ZEHNDER & | Elisabeth C. Frost |
| WERMUTH, P.A. | David R. Fox |
| P.O. Box 1631 | Christina A. Ford |
| Orlando, FL 32802-1631 | ELIAS LAW GROUP LLP |
| Telephone: (407) 422-2472 | 10 G St NE, Suite 600 |
| | Washington, DC 20002 |
| | Telephone: (202) 968-4490 |

*Counsel for Plaintiffs-Appellees in No. 22-11143*

*No. 22-11143, League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*

## CERTIFICATE OF INTERESTED PERSONS

Under Eleventh Circuit Rule 26.1, *League* Plaintiffs-Appellees certify that the CIP contained in the brief of Defendant-Appellant Florida Secretary of State is complete and correct except for the following additions:

1.  Alabama Center for Law and Liberty, *Amicus*

2.  American Constitutional Rights Union, *Amicus*

3.  Bartolomucci, H. Christopher, *Attorney for Amicus*

4.  Clark, Matthew J., *Attorney for Amicus*

5.  Crosland, Edward Stewart, *Attorney for Amicus*

6.  Field, Brian J., *Attorney for Amicus*

7.  The Foundation for Government Accountability, *Amicus*

8.  Honest Elections Project, *Amicus*

9.  Gore, John M., *Attorney for Amicus*

10. Jaffee, Erik S., *Attorney for Amicus*

11. Jones Day, *Attorney for Amicus*

12. Lawyers Democracy Fund, *Amicus*

13. Mills, Christopher, *Attorney for Amicus*

14. Phillips, Kaylan, *Attorney for Amicus*

15. Prince, Joshua J., *Attorney for Amicus*

16. Public Interest Legal Foundation, *Amicus*

*No. 22-11143, League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*

17. Redmond, Caleb P., *Attorney for Amicus*

18. Restoring Integrity and Trust in Elections, Inc., *Amicus*

19. Schaerr, Gene C., *Attorney for Amicus*

20. Spero Law LLC, *Attorney for Amicus*

21. Van Bogart, Joseph S., *Attorney for Amicus*


/s/ David R. Fox
David R. Fox


# CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1, *League* Plaintiffs-Appellees certify that the League of Women Voters of Florida, Inc.; the League of Women Voters of Florida Education Fund, Inc.; Black Voters Matter Fund, Inc.; and the Florida Alliance of Retired Americans, Inc. each has no parent corporation, and no publicly held corporation owns 10% or more of any of those entities' stock. The remaining *League* Plaintiffs-Appellees are individual persons.

s/ David R. Fox

*Counsel to Plaintiffs-Appellees in No. 22-11143*

## STATEMENT REGARDING ORAL ARGUMENT

These consolidated cases are scheduled for Oral Argument on September 15. The *League* Plaintiffs agree that the appeals warrant argument, as they present important constitutional questions that are of great significance to voters and civic organizations across Florida, including the *League* Plaintiffs themselves, and involve a large and extraordinarily detailed trial record.

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

JURISDICTIONAL STATEMENT ........................................................................2

STATEMENT OF THE ISSUES .............................................................................3

STATEMENT OF THE CASE .................................................................................4

    A. The Solicitation Definition ...........................................................................5

    B. The Registration Disclaimer Provision.........................................................8

    C. The Repeal of the Legislative Disclaimer....................................................9

SUMMARY OF THE ARGUMENT .....................................................................10

ARGUMENT .........................................................................................................13

    I.    Appellants have no standing to appeal the judgment regarding
         vagueness and overbreadth challenges to the Solicitation Definition........13

    A. Appellants are not bound by the judgment regarding vagueness and
        overbreadth challenges to the Solicitation Definition.............................13

    B. Appellants' arguments for standing are unavailing. ...............................16

        1.  *People First* does not help Appellants because the State of
            Florida is not a party and did not appeal.............................................16

        2.  There is no record evidence supporting the Republican
            Intervenors' standing. .........................................................................19

    II.   The Solicitation Definition is unconstitutionally vague and
          overbroad. ................................................................................................20

    A. The Solicitation Definition regulates a substantial amount of
        protected expression.................................................................................21

    B. The Solicitation Definition is unconstitutionally vague. ........................25

        1.  Appellants themselves cannot decide what constitutes
            "influencing a voter."..........................................................................28

        2.  The Solicitation Definition's criminalizes conduct based solely
            on its psychic effects on third parties..................................................30

        3.  The Solicitation Definition causes arbitrary and overbroad
            enforcement. .......................................................................................31

        4.  Context does not clarify the Solicitation Definition. ..........................34

    C. The Solicitation Definition is unconstitutionally overbroad...................36

III.  The Court should not vacate the District Court's judgment regarding the Registration Disclaimer Provision. ........................................................42

IV.  The Court should reject the Governmental Defendants' undeveloped challenge to Plaintiffs' standing..................................................................49

CONCLUSION .........................................................................................................54

# TABLE OF CITATIONS

**Page(s)**

**Cases**

*A.I.G. Uru. Compania de Seguros, S.A. v. AAA Cooper Transp.*,
334 F.3d 997 (11th Cir. 2003)..............................................................21

*ACLU v. The Fla. Bar*,
999 F.2d 1486 (11th Cir. 1993).........................................................52

*Arcia v. Florida Sec'y of State*,
772 F.3d 1335 (11th Cir. 2014).........................................................51

*Azar v. Garza*,
138 S. Ct. 1790 (2018) (per curiam) ................................................43

*Baggett v. Bullitt*,
377 U.S. 360 (1964) ...........................................................................26

*Bd. of Airport Comm'rs of City of L.A. v. Jews for Jesus, Inc.*,
482 U.S. 569 (1987) ...........................................................................37

*Boos v. Barry*,
485 U.S. 312 (1988) ...........................................................................31

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973) ...........................................................................39

*\*Burns v. Town of Palm Beach*,
999 F.3d 1317 (11th Cir. 2021).............................................6, 22–23

*\*Burson v. Freeman*,
504 U.S. 191 (1992) .....................................................22, 25, 38, 40

*Butler v. Dexter*,
425 U.S. 262 (1976) ...........................................................................14

*City of Chi. v. Morales*,
527 U.S. 41 (1999) .............................................................................37

*\*Coates v. City of Cincinnati*,
402 U.S. 611 (1971) ...........................................................................30

iv

*Daniels-Hall v. Nat'l Educ. Ass'n*,
  629 F.3d 992 (9th Cir. 2010)................................................................44

*Democratic Exec. Comm. of Fla. v. NRSC*,
  950 F.3d 790 (11th Cir. 2020)............................................................20

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
  901 F.3d 1235 (11th Cir. 2018)..........................................................6

*Fund for Animals v. Mainella*,
  335 F. Supp. 2d 19 (D.D.C. 2004) ....................................................49

*Gooding v. Wilson*,
  405 U.S. 518 (1972) ............................................................................36

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) ............................................................................26

*Green v. Mansour*,
  474 U.S. 64 (1985) ..............................................................................17

*Hall v. Louisiana*,
  884 F.3d 546 (5th Cir. 2018)..............................................................44

*Harrell v. The Fla. Bar*,
  608 F.3d 1241 (11th Cir. 2010)..........................................................50

*Hartford Cas. Ins. Co. v. Crum & Forster Specialty Ins. Co.*,
  828 F.3d 1331 (11th Cir. 2016)..........................................................43

*High Ol' Times, Inc. v. Busbee*,
  673 F.2d 1225 (11th Cir. 1982)..........................................................26

*Indigo Room, Inc. v. City of Fort Myers*,
  710 F.3d 1294 (11th Cir. 2013)..........................................................26

*\*Jacobson v. Fla. Sec'y of State*,
  974 F.3d 1236 (11th Cir. 2020)...........................................15, 19–20

*Konikov v. Orange Cnty.*,
  410 F.3d 1317 (11th Cir. 2005)..........................................................26

v

*Lapides v. Bd. of Regents of Univ. Sys. of Ga.*,
    535 U.S. 613 (2002) .......................................................... 17

*Larson v. Valente*,
    456 U.S. 228 (1982) .......................................................... 54

*Mahoney v. Babbit*,
    113 F.3d 219 (D.D.C. 1997) ............................................. 49

*McIntyre v. Ohio Elecs. Comm'n*,
    514 U.S. 334 (1995) .......................................................... 41

*\*Minn. Voters All. v. Mansky*,
    138 S. Ct. 1876 (2018) ....................................... 22, 27, 29, 38–41

*\*Nat'l Black Police Ass'n v. D.C.*,
    108 F.3d 346 (D.C. Cir. 1997) ...................................... 44–45

*NIFLA v. Becerra*,
    138 S. Ct. 2361 (2018) ...................................................... 45

*U.S. ex rel. Osheroff v. Humana Inc.*,
    776 F.3d 805 (11th Cir. 2015)........................................... 44

*Papachristou v. City of Jacksonville*,
    405 U.S. 159 (1972) .......................................................... 34

*People First of Ala. v. Merrill*,
    815 F. App'x 505 (11th Cir.), *stay granted*, 141 S. Ct. 190 (2020) ............. 16–17

*R.S.B. Ventures, Inc. v. F.D.I.C.*,
    514 F. App'x 853 (11th Cir. 2013) .................................. 44

*\*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ..................................................... 38, 40

*Rothenberg v. Sec. Mgmt. Co.*,
    667 F.2d 958 (11th Cir. 1982)........................................... 44

*Sessions v. Dimaya*,
    138 S. Ct. 1204 (2018) ...................................................... 26

*Smith v. Goguen*,
　415 U.S. 566 (1974) ...........................................................................26

*In re Smith v. State Farm Mut. Auto. Ins. Co.*,
　964 F.2d 636 (7th Cir. 1992)..............................................................49

*Staley v. Harris Cnty. Tex.*,
　485 F.3d 305 (5th Cir. 2007)..............................................................48

*Timson v. Sampson*,
　518 F.3d 870 (11th Cir. 2008)............................................................50

*\*U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*,
　513 U.S. 18 (1994) ...........................................43, 44–45, 48–49

*United States v. Munsingwear, Inc.*,
　340 U.S. 36 (1950) ............................................................................42

*United States v. O'Brien*,
　391 U.S. 367 (1968) ..........................................................................40

*United States v. Powell*,
　423 U.S. 87 (1975) ............................................................................26

*United States v. Sepulveda*,
　115 F.3d 882 (11th Cir. 1997)............................................................26

*United States v. Woods*,
　684 F.3d 1045 (11th Cir. 2012)..........................................................21

*\*Va. House of Delegates v. Bethune-Hill*,
　139 S. Ct. 1945 (2019) ...................................................13, 15–16, 20

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
　455 U.S. 489 (1982) ....................................................................21, 25

*Ward v. Rock Against Racism*,
　491 U.S. 781 (1989) .....................................................................39–40

*Wollschlaeger v. Governor*,
　848 F.3d 1293 (11th Cir. 2017).................................................26, 30, 51

**Statutes**

28 U.S.C. § 1331 ................................................................................. 2

Fla. Stat. § 16.01 .............................................................................. 18

Fla. Stat. § 97.0575 ........................................................................ 4, 8

Fla. Stat. § 102.031 ..........................2, 4, 5, 11, 22, 27, 31, 37, 38, 52, 53

Fla. Stat. § 104.41 ............................................................................. 53

## INTRODUCTION

This brief, like the judgment in the *League* Plaintiffs' case, narrowly focuses on just two of the claims in these consolidated cases: (1) that the Solicitation Definition, Florida's newly-broadened definition of what activity is criminalized as "solicitation" when conducted near a polling place is unconstitutionally vague and overbroad, and (2) that the Registration Disclaimer Provision, which required third parties who collect voter registration forms to express a misleading government-mandated warning, violated the First Amendment. The Governmental Defendants do not address these claims in their own brief; rather, they join wholesale in the arguments advanced by the Republican Party Defendants, who intervened to similarly defend the challenged provisions. Gov. Br. 44.[1]

The District Court correctly held that the Solicitation Definition is unconstitutionally vague and overbroad. But as a threshold matter, none of the Appellants have standing to appeal that judgment because none is bound by it. In the *League* Plaintiffs' case, only a single Supervisor of Elections was enjoined on those grounds, and he did not appeal. Nor did the eight other Supervisors who were subjected to similar judgments in the consolidated cases.

---

[1] Citations to "Gov. Br." are to Appellants' Initial Brief for Secretary Byrd, Attorney General Moody, and Supervisors Hays and Doyle. Citations to "GOP Br." are to the Brief of Appellants Republican National Committee and National Republican Senatorial Committee.

If the Court nevertheless reaches the merits, it should affirm. The Solicitation Definition is astonishingly broad: it prohibits "any activity with the intent to influence or effect of influencing a voter" near a polling place. Fla. Stat. § 102.031(4)(b). Defendants themselves cannot agree on what it prohibits, including whether it reaches Plaintiffs' line-warming activities, in which they provide food, water, and encouragement to voters outside polling places to encourage them to vote. And there is no justification for the Definition's extraordinary breadth, which far exceeds the governmental interests that it purportedly serves.

The District Court also correctly held that the Registration Disclaimer Provision unconstitutionally compelled Plaintiffs to speak in violation of the First Amendment. But Appellants' appeal of that judgment is now moot, because the Florida Legislature repealed the provision shortly after the District Court's judgment. The Court should not, however, vacate the District Court's judgment, because the circumstances of the repeal involve clear gamesmanship.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. § 1331 because Plaintiffs alleged violations of the U.S. Constitution. The Governmental Defendants, in passing, question Plaintiffs' standing. Gov. Br. 2. Plaintiffs address that issue below. *Infra* Part IV.

This Court does *not* have jurisdiction over the appeal in the *League* Plaintiffs' case, No. 22-11143, except for purposes of addressing Appellants' motion to vacate. Jurisdiction would be under § 1291, as a timely appeal from a final, post-trial judgment disposing of all claims. Judgment was entered on March 31 and notices of appeal were filed on April 7.

The parties agree, however, that the appeal of the judgment regarding the Registration Disclaimer Provision is now moot. And as explained below, there is no appellant with standing to appeal the judgment regarding the Solicitation Definition in No. 22-11143. *Infra* Part I.

## STATEMENT OF THE ISSUES

I. Whether Appellants have standing to appeal the District Court's judgment regarding the Solicitation Definition, which does not bind any of them.

II. If Appellants have standing, whether Senate Bill 90's amendment to Florida Law's definition of prohibited "solicitation" outside polling places is unconstitutionally vague and overbroad.

III. Whether the Court should vacate the District Court's judgment enjoining the flagrantly unconstitutional Registration Disclaimer Provision, which the Florida Legislature voted to repeal only after the end of trial and the submission to post-trial briefing, and which was submitted to the Governor and signed only after the District

Court had entered judgment, Appellants had appealed and moved to stay, and Plaintiffs had opposed the stay motion.

## STATEMENT OF THE CASE

This is an appeal from the consolidated trial of four challenges to Florida's Senate Bill 90, an omnibus election law enacted in May 2021. After a fourteen-day bench trial that included hundreds of exhibits and testimony from forty-two witnesses, the District Court entered a 288-page final order. The District Court then entered separate judgments in each of the four cases. *See* Doc. 665 at 284–88.[2] Appellants—including some, but not all, of the Defendants against whom judgment was entered—filed a notice of appeal one week later. Doc. 667.

Much of the District Court's order addressed the claims that several provisions of SB90 intentionally discriminate against Black voters. The *League* Plaintiffs did not bring such claims, and the judgment in their case does not depend on any finding of intentional race discrimination. Doc. 666.

The District Court entered judgment for the *League* Plaintiffs on two claims: the Solicitation Definition, Fla. Stat. § 102.031(4)(b), and the Registration Disclaimer Provision, Fla. Stat. § 97.0575(3)(a). Doc. 666. That judgment turned

---

[2] Citations to "Doc." are to the docket entries in *League of Women Voters of Florida, Inc. v. Byrd*, No. 4:21-cv-186-MW-MAF (N.D. Fla.). For all such citations, including citations to trial transcript, the page numbers refer to the page numbers in the ECF headers.

exclusively on rights to free expression and due process under the First and Fourteenth Amendments. *Id.*

### A.    The Solicitation Definition

The "Solicitation Definition" is SB90's amendment to Florida's statutory definition of "solicitation" as that term is used to describe activity that is prohibited, as a *criminal* violation, within 150-feet of a polling place or ballot drop box. SB90 broadened the definition of prohibited "solicitation" by adding the following underlined text:[3]

> (b) For the purpose of this subsection, the terms 'solicit' or 'solicitation' shall include, but not be limited to, seeking or attempting to seek any vote, fact, opinion, or contribution; distributing or attempting to distribute any political or campaign material, leaflet, or handout; conducting a poll except as specified in this paragraph; seeking or attempting to seek a signature on any petition; selling or attempting to sell any item; **and engaging in any activity with the intent to influence or effect of influencing a voter**. The terms 'solicit' or 'solicitation' may not be construed to prohibit an employee of, or a volunteer with, the supervisor from providing nonpartisan assistance to voters within the no-solicitation zone such as, but not limited to, giving items to voters, or to prohibit exit polling.

Fla. Stat. § 102.031(4)(b) (emphasis added). The District Court held that the underlined text was unconstitutionally vague and overbroad. Doc. 665 at 157–87.

---

[3] SB90 also added the proviso that the definition "not be construed to prohibit an employee of, or a volunteer with, the supervisor from providing nonpartisan assistance to voters within the no-solicitation zone such as, but not limited to, giving items to voters," but the *League* Plaintiffs did not challenge that addition.

The District Court first held that the Solicitation Definition implicates the First Amendment because it regulates Plaintiffs' expressive conduct near polling places. *Id.* at 160–67. The District Court applied the test this Court articulated in *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1336 (11th Cir. 2021), and *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235 (11th Cir. 2018). Doc. 665 at 160–67. In doing so, the District Court found that reasonable persons would interpret Plaintiffs' activities near polling places as expressive, based on "uncontradicted testimony" that Plaintiffs' activities at polling places are accompanied by banners and educational materials, relate to matters of public concern, and are in fact understood by voters as communicating a message of support for the important act of voting. *Id.*

Next, the District Court held the Solicitation Definition impermissibly vague. *Id.* at 167–81. The District Court explained that "the question is whether a person of ordinary intelligence can understand what the statute prohibits," and it concluded that such a person could not understand the Solicitation Definition. *Id.* at 171–81. The District Court explained that "the statutory text is clear that 'any activity' is illegal if one either (1) engages in it within the 150-foot buffer zone with the specific 'intent to influence' a voter, or (2) such activity occurs within the 150-foot buffer zone and has the 'effect of influencing a voter,' regardless of one's intent." *Id.* at 173. This provision was "akin to other statutes that the Supreme Court has struck

down for tying criminal culpability to whether the defendant's conduct was unacceptable based on 'wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings.'" *Id.* at 176–77 (quoting *United States v. Williams*, 553 U.S. 285, 306 (2008)).

Moreover, testimony from Supervisors of Elections—the officials tasked with enforcing the Solicitation Definition—showed no "clear consensus as to what this new definition means or how it should apply." *Id.* at 178. One Supervisor agreed that the new language was "vague" and interpreted it to prohibit *all* contact with voters in line to vote; another interpreted the definition to prohibit only encouraging someone to vote in a particular way but said it "would depend on the situation" to determine what conduct qualified. *Id.* at 178–79. The District Court therefore concluded that the Solicitation Definition "both fails to put Floridians of ordinary intelligence on notice of what acts it criminalizes and encourages arbitrary and discriminatory enforcement." *Id.* at 180.

The District Court also held the Solicitation Definition unconstitutionally overbroad. *Id.* at 181–85. It explained that the Solicitation Definition's vagueness "consumes vast swaths of core First Amendment speech." *Id.* at 183. "Instead of tailoring the ban on solicitation to activities that pose a risk of confusing or intimidating voters around the polls, Florida has outlawed all activities that 'influence' voters in some unidentified way." *Id.* at 184.

7

Finally, the District Court held that the challenged text—"engaging in any activity with the intent to influence or effect of influencing a voter"—was severable from the rest of Florida's prohibition of solicitation outside polling places, such that enforcement of the challenged text could be enjoined while leaving "the remainder of that definition provision and the overall statute governing order at the polls intact." *Id.* at 185–87. The District Court therefore enjoined certain Supervisors of Elections from enforcing the challenged portion of the definition, while emphasizing that they "still maintain authority to define the no-solicitation zone, enforce its prohibitions, and remove 'disruptive and unruly persons' from the zone." *Id.* at 186–87. In the *League* Plaintiffs' case, the only Supervisor subject to the injunction is Supervisor Mark Andersen of Bay County. Doc. 666. Supervisor Andersen did not appeal. Doc. 667.

### B.     The Registration Disclaimer Provision

The Registration Disclaimer Provision requires private organizations collecting voter registration forms to warn potential voters that the organization may not turn in their form on time for the voter to be registered, and to inform those potential voters of other ways to register to vote. Fla. Stat. § 97.0575(3)(a). The District Court held that the Provision compels private organizations to engage in expression in violation of the First Amendment. Doc. 665 at 202–18.

8

The District Court subjected the Registration Disclaimer Provision to strict scrutiny because it compels private speakers to deliver a government-drafted message. *Id.* at 204–19 (citing *NIFLA v. Becerra*, 138 S. Ct. 2361 (2018), and *McClendon v. Long*, 22 F.4th 1330 (11th Cir. 2022)). And the District Court found that the Disclaimer Provision could not survive strict scrutiny because it neither served a compelling interest nor was narrowly tailored. Doc. 665 at 202–18. Based on these findings, the District Court enjoined Defendants Lee and Moody from enforcing the Solicitation Definition. Doc. 666.

### C.    The Repeal of the Legislative Disclaimer

On March 2, 2022—after the conclusion of trial and the submission of post-trial briefing—an amendment was introduced to Senate Bill 524, an elections bill then-pending in the Florida Legislature, to repeal the Registration Disclaimer and replace it with the less-restrictive alternative that Plaintiffs themselves proposed. *See infra* Part V. The amendment was adopted, and the Legislature passed SB524, including the repeal, on March 9. *Id.* The Legislature then sat on the bill and did not send it to the Governor for signature for nearly seven weeks. Only on April 25, after the District Court had entered judgment and Defendants had appealed, did the Registration Disclaimer become law. *Id.*

## SUMMARY OF THE ARGUMENT

**I.** The Court lacks jurisdiction over the appeal from the judgment enjoining the Solicitation Definition as unconstitutionally vague and overbroad because Appellants are not subject to that judgment and do not have standing to appeal it. The District Court enjoined only one Supervisor of Elections in the *League* Plaintiffs' case and only nine Supervisors across all consolidated cases based on this claim, none of whom appealed. Appellants argue that *Florida itself* could have appealed, but it did not, and the Secretary of State is not a stand-in for the sovereign State. Appellants also argue that the Republican Intervenors have standing to appeal, but there is no record evidence supporting their asserted injury-in-fact.

**II.** If the Court reaches the merits, the Court should affirm the judgment finding the Solicitation Definition unconstitutionally vague and overbroad.

**A.** The Solicitation Definition is subject to heightened vagueness and overbreadth scrutiny because it regulates a substantial amount of protected expression. The face of the Definition prohibits all actions that are intended to or have the effect of "influencing" a voter in any way, regardless of how. It therefore prohibits a great deal of expression and expressive conduct, which is one obvious way in which voters might be influenced. And by its terms it reaches Plaintiffs' line-warming activities, in which Plaintiffs influence voters to persist and exercise their

fundamental rights. The record shows that voters understand the message being conveyed.

**B.** The Solicitation Definition is unconstitutionally vague. Appellants argue that the Definition is unambiguous, but they cannot decide what it prohibits. The Secretary of State has completely reversed his position on the Definition's scope between his July 2021 motion to dismiss and this appeal. Previously, he argued that the Definition's text and the surrounding context "unambiguous[ly]" showed that it prohibited only partisan campaigning and "does not in any way prohibit innocent, nonpartisan assistance such as the provision of food or water to voters waiting in line." Doc. 175-1 at 31–35. Now, he argues that the very same text and context unambiguously *does* "ban[] distributing food and water to voters in line," along with anything else that might affect "whether [voters] vote." GOP Br. 36, 39; *see also* Gov. Br. ix.

The inability of the parties defending the Solicitation Definition to settle on a reading of it and stick with it is understandable: the Solicitation Definition prohibits "any activity with the intent to influence or effect of influencing a voter" without explaining *in what respect* a voter must be influenced. Fla. Stat. 102.031(4)(b). The Definition also bans activities with the effect of influencing a voter regardless of the actor's intent, making it impossible for Plaintiffs to know whether their activities will be considered "solicitation." And the record shows that the Supervisors tasked

11

with enforcing the Solicitation Definition are equally perplexed, leading to precisely the arbitrary and overbroad enforcement that the vagueness doctrine is supposed to prevent.

**C.** The Solicitation Definition is unconstitutionally overbroad. It prohibits a vast swath of expressive activity at polling places, even though the more tailored prohibitions that existed before its enactment were fully adequate to ensure order at polling places and protect voters from electioneering in their immediate vicinity.

**III.** The appeal of the District Court's judgment against enforcing the Registration Disclaimer Provision was mooted by the Legislature's repeal of the Provision. But the Court should not vacate the District Court's judgment. The Registration Disclaimer Provision was blatantly unconstitutional, yet Defendants insisted on defending it through motions to dismiss, summary judgment, and a 14-day trial. An amendment was introduced to repeal the Provision just days after post-trial briefing was filed, and even after the Legislature passed the bill, it held onto it for almost seven weeks and did not send it to the Governor for signature until after the District Court's judgment and the commencement of Appellants' appeal. The Governor's signing statement all but acknowledged that he was signing the legislation to moot the appeal. Vacatur is unwarranted under those circumstances.

## ARGUMENT

I.    **Appellants have no standing to appeal the judgment regarding vagueness and overbreadth challenges to the Solicitation Definition.**

The Court lacks jurisdiction to consider Appellants' appeal of the District Court's judgment against enforcing the Solicitation Definition on vagueness and overbreadth grounds because none of the Appellants has Article III standing to challenge that judgment.[4] "The standing requirement . . . 'must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance.'" *Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1951 (2019). Appellants have the burden to show their standing, and they "must do more than simply allege a nonobvious harm"—they "must explain how the elements essential to standing are met." *Id.*

### A.    **Appellants are not bound by the judgment regarding vagueness and overbreadth challenges to the Solicitation Definition.**

The District Court's judgment in the *League* Plaintiffs' case enjoined only one defendant from enforcing the Solicitation Definition: Bay County Supervisor of Elections Mark Andersen. Doc. 666. The District Court did not enjoin the Secretary of State or the Attorney General from enforcing the Solicitation Definition because it had previously dismissed claims against them involving that provision as neither

---

[4] The *League* Plaintiffs made this argument in their April 21 opposition to Appellants' stay motion, but the Court's May 6 Order did not address it.

has any role in enforcing it. Doc. 274 at 24–25. And the District Court found that the *League* Plaintiffs lacked standing to sue any of the other county Supervisors regarding the Definition. Doc. 665 at 143–46. Of course, the Republican Intervenors were not enjoined at all. Doc. 666. Judgment regarding the Solicitation Definition in the *League* Plaintiffs' case was therefore entered against Supervisor Andersen alone. *Id.* Supervisor Andersen did not appeal. Doc. 667.

Even across all the consolidated cases, the District Court found standing to bring vagueness and overbreadth claims challenging the Solicitation Definition only against the Supervisors of Elections for Bay, Volusia, Broward, Palm Beach, Duval, Orange, Osceola, Pinellas, and Seminole Counties. Doc. 665 at 156–57. None of those Supervisors appealed either. Thus, no one who is subject to a judgment against enforcing the Solicitation Definition on vagueness and overbreadth grounds has appealed that judgment, in any case.[5]

---

[5] In two of the consolidated cases, although not in the *League* Plaintiffs' case, the District Court enjoined *all* county Supervisors, including Appellants Lee and Hays, from enforcing the Solicitation Definition, but that injunction was based solely on the intentional race-discrimination claims, not on the vagueness and overbreadth claims. Doc. 665 at 35. The District Court found that no one, in any case, had standing to seek a judgment against Appellants Lee and Hays on vagueness and overbreadth grounds. Doc. 665 at 156–57 (not listing Lake and Lee Counties as counties in which plaintiffs had standing for their vagueness and overbreadth challenge). Regardless, as Appellants themselves emphasize, Gov. Br. 2, standing must be separately assessed in each of the consolidated cases. *Butler v. Dexter*, 425 U.S. 262, 267 n.12 (1976). And Appellants were not enjoined from enforcing the Solicitation Definition on any basis in the *League* Plaintiffs' case. Doc. 666.

14

Appellants therefore "are not 'obliged . . . in any binding sense'" to follow the District Court's judgment that the Solicitation Definition is unconstitutionally vague and overbroad. *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1254 (11th Cir. 2020). As far as the vagueness and overbreadth challenges are concerned, Supervisors Hays and Doyle "remain lawfully entitled to" enforce the Solicitation Definition, unless and until a judgment is entered against *them*. *Id.* And the other Appellants *never* enforced the Solicitation Definition, Doc. 274 at 24–25, so they are equally unaffected by the Court's judgment.

It makes no difference that the Secretary of State and the Republican Intervenors intervened as defendants to defend the Solicitation Definition. When the Secretary of State and the Republican Intervenors intervened, there were primary parties with standing—the 67 Supervisors of Elections, against whom Plaintiffs sought injunctive relief. So "it was not previously incumbent on [Appellants] to demonstrate [their] standing." *Bethune-Hill*, 139 S. Ct. at 1951. "That situation changed" when the parties who are subject to the District Court's vagueness and overbreadth judgment did not appeal it. *Id.* "As the [Supreme] Court has repeatedly recognized, to appeal a decision that the primary party does not challenge, an intervenor must independently demonstrate standing." *Id.* Appellants cannot do so.

## B.    Appellants' arguments for standing are unavailing.

Appellants ignore this issue in their opening briefs, despite their affirmative burden to show their standing. *Bethune-Hill*, 139 S. Ct. at 1951. But when the *League* Plaintiffs previously raised the issue in opposing a stay, Appellants offered two responses. *See* Stay Reply at 14–16. Neither survives scrutiny.

### 1.    *People First* does not help Appellants because the State of Florida is not a party and did not appeal.

Appellants first relied on the Supreme Court's unexplained grant of a stay in *People First of Alabama v. Merrill*, 815 F. App'x 505, 511 (11th Cir.), *stay granted*, 141 S. Ct. 190 (2020). But in *People First*, the State of Alabama itself was a party and appealed the judgment. *See id.* at 505 (Rosenbaum and Jill Pryor, JJ., concurring). In support of its standing, Alabama focused on its own standing, arguing that "'a State'—whether directly enjoined or not—'clearly has a legitimate interest in the continued enforceability of its own statutes.'" Emergency App. for Stay at 5, *Merrill v. People First of Ala.*, No. 19A1063 (June 29, 2020), https://www.supremecourt.gov/DocketPDF/19/19A1063/146540/20200629122601 323_Motion%20for%20Stay%206-29%20FINAL.pdf ("*People First* Stay App."). The Supreme Court apparently agreed. *See also Bethune-Hill*, 139 S. Ct. at 1951 ("Of course, 'a State has standing to defend the constitutionality of its statute.'" (quoting *Diamond v. Charles*, 476 U.S. 54, 62 (1986))).

Here, however, unlike in *People First*, the State itself was not a party below and did not appeal. Appellants argue that the Secretary of State "represents the State" for standing purposes. Stay Reply 15. But Plaintiffs did not, and could not, sue the State of Florida. They sued the Secretary under *Ex parte Young*. Such suits are *not* suits against the state—if they were, they would be barred by the Eleventh Amendment. Rather, *Ex parte Young* is based on the conclusion "that a suit challenging the constitutionality of a state official's action in enforcing state law *is not one against the State*." *Green v. Mansour*, 474 U.S. 64, 68 (1985) (emphasis added). Appellants cite no case in which an *Ex parte Young* defendant, as opposed to a State, was found to have standing to appeal a judgment that did not bind him, and Plaintiffs are aware of none. Notably, in *People First*, the Secretary of State had also appealed, yet Alabama's standing arguments focused entirely on the State itself. *People First* Stay App. 4–5.

After securing dismissal of the Solicitation Definition claim against him, the Secretary of State then intervened as a defendant to defend the Definition. But only the Secretary intervened; the *State of Florida* did not. Florida itself could have intervened if it wanted to. Doing so, however, would have waived Florida's Eleventh Amendment immunity and allowed Plaintiffs to seek a statewide injunction against Florida itself, instead of proceeding against the 67 county Supervisors. *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 619 (2002) ("[A] State's voluntary

appearance in federal court amount[s] to a waiver of its Eleventh Amendment immunity."). No surprise, then, that the sovereign State preferred to remain a non-party and speak only through its official.

Moreover, in intervening, the Secretary never suggested—and the District Court never ordered—that the Secretary would participate as an intervenor in a different capacity from his participation as a defendant under *Ex parte Young* with respect to other pending claims against him. And while the Secretary is the state's "Chief Elections Officer," he has no statutory authority to litigate on the sovereign State's behalf. Florida law authorizes the Attorney General, not the Secretary of State, to "appear in and attend to" matters "in which the state may be a party, or in anywise interested," and even that statute expressly does not "authorize the joinder of the Attorney General as a party in . . . suits" in federal court. Fla. Stat. § 16.01(4), (5).

Thus, the Secretary intervened and appealed only on his own behalf, not on behalf of Florida itself. Appellants rely on the Secretary's ability to stand in for the State; they do not appear to argue he has standing to appeal on his own behalf. Stay Reply at 14–16. That is no surprise. While this Court has said (in a non-precedential decision) that the Secretary of State is a proper defendant under *Ex parte Young* in challenges to county-administered election procedures, it has *also* held that the Secretary's connection to those procedures is too weak to support Article III standing

against him, a "[s]eparate[] issue[]." *Jacobson*, 974 F.3d at 1256. Here, it is the Article III issue that matters. As the District Court explained, the Secretary has no role in enforcing the Solicitation Definition, Doc. 274 at 24–25, and the record shows that the Secretary has never issued any interpretations of the Solicitation Definition, Doc. 665 at 179–80. The Secretary himself is entirely unaffected by the District Court's injunction, which does not legally bind him, so he has no standing to appeal it.

### 2. There is no record evidence supporting the Republican Intervenors' standing.

At the stay stage, Appellants also argued that the Republican Intervenors have standing because the District Court's order requires them to "adjust their campaign strategy and divert personnel and time to educating voters about the district court's order." Stay Reply at 16. But there is no record evidence of that. The District Court's vagueness and overbreadth judgment affects the enforceability of one part of the definition of prohibited solicitation outside polling places in a single county in the *League* Plaintiffs case, and a total of nine counties across the consolidated cases. No one from the Republican Intervenors testified at trial, and there is nothing in the record suggesting that the Republican Intervenors—national Republican Party organizations—do *any* voter outreach related to solicitation at polling places in those nine Florida counties, or anywhere else. Moreover, to establish diversion-of-resources injury, a party must offer evidence of "what activities [it] would divert

resources away *from* in order to spend additional resources" in response to the challenged conduct. *Jacobson*, 974 F.3d at 1250. The Republican Intervenors offered no such evidence. And any alleged harm to the Republican Intervenors' "mission of electing [Republicans]" "is not a cognizable injury." *Id.* The Republican Intervenors' generalized, unsworn statements about their "interest in protecting their members, candidates, voters, and resources from Plaintiffs' attempt to upend Florida's duly enacted rules" may have sufficed to support intervention, Doc. 26 at 3, but they do not pass muster under Article III. *Bethune-Hill*, 139 S. Ct. at 1951.

Rather than citing evidence, Appellants rely on *Democratic Executive Committee of Florida v. NRSC*, 950 F.3d 790, 794 (11th Cir. 2020). But that case found standing to appeal where the record showed that a Republican candidate's election victory was threatened by the District Court's order, causing a specific and documented diversion of resources. Here, in contrast, there is no evidence—no testimony, no declarations, no documents, nothing—suggesting that the non-enforcement of the Solicitation Definition in nine Florida counties will have any effect whatsoever on the Republican Intervenors' preferred candidates, expenditures of resources, or campaign strategy.

## II.    The Solicitation Definition is unconstitutionally vague and overbroad.

If the Court reaches the issue despite Appellants' lack of standing, it should affirm the District Court's judgment that the Solicitation Definition is

unconstitutionally vague and overbroad in violation of the First and Fourteenth Amendments. The Solicitation Definition regulates a substantial amount of protected expression, so it is subject to facial vagueness and overbreadth analysis. It is facially vague because it provides no reasonable guidance on what it proscribes. And it is substantially overbroad, prohibiting large categories of protected expression for no adequate reason.

### A.    The Solicitation Definition regulates a substantial amount of protected expression.

"In a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 (1982). The District Court found, based on an extensive factual record, that the Solicitation Definition does so. Doc. 665 at 160–67. That finding was not reversible error.[6]

---

[6] Appellants argue that the standard of review is *de novo*. But the case they rely on arose in the context of criminal prosecutions where the defendant argued as a matter of law that the statute at issue was unconstitutional. *See United States v. Woods*, 684 F.3d 1045, 1057 (11th Cir. 2012) (citing *United States v. Waymer*, 55 F.3d 564, 568 (11th Cir. 1995)). Here, in contrast, significant aspects of the District Court's judgment were based on factual findings. Those factual findings are reviewed only for clear error. *A.I.G. Uru. Compania de Seguros, S.A. v. AAA Cooper Transp.*, 334 F.3d 997, 1003 (11th Cir. 2003). Appellants do not argue that any of those findings were clearly erroneous.

To determine whether conduct is expressive, the Court asks "(1) whether an intent to convey a particularized message was present, and (2) whether the likelihood was great that the message would be understood by those who viewed it." *Burns*, 999 F.3d at 1336 (cleaned up). The Solicitation Definition's text itself makes plain that the Definition regulates a substantial amount of expression and expressive conduct. The Definition proscribes "any activity with the intent to influence or effect of influencing a voter." Fla. Stat. § 102.031(4)(b). An especially straightforward way to influence a voter is to intentionally convey a message that is likely to be understood. No surprise, then, that the Supreme Court has repeatedly held that analogous but narrower prohibitions in and around polling places "plainly restrict[] a form of expression within the protection of the First Amendment." *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018) (addressing ban on "wearing any 'political badge, political button, or other political insignia'"); *see also Burson v. Freeman*, 504 U.S. 191, 193 (1992) (plurality op.) (holding that ban on "the solicitation of votes and the display or distribution of campaign materials within 100 feet of the entrance to a polling place" "obviously [restricts] political speech").

If the text leaves any doubt, the record confirms that the Solicitation Definition regulates expression. The evidence at trial focused on the Plaintiffs' line-warming activities. Defendants conceded, and the "overwhelming evidence at trial establishe[d]," Doc. 665 at 162 n.53, that these activities were intended to convey a

message. Plaintiff Cecile Scoon testified that Plaintiff League of Women Voters'
line-warming activities are intended to "provid[e] a little bit of a shield and a vitamin
so they feel that, you know, their voice is going to be heard; they're going to be
given every consideration. And for those people I think it's education for them and
it's also emotional support." Doc. 513 at 61. Plaintiff Black Voters Matter's
Executive Director Clifford Albright testified that the organization's "voter comfort"
activities are directed to "sending a message about celebrating the voting experience.
. . . [P]art of the purpose is to communicate to voters that they matter, even as they
are waiting in long lines." Doc. 624 at 122–25. A representative of the NAACP
testified that the organization engages in line-warming activities to "to show [voters]
the importance of staying in line to cast their most precious and priceless right, and
that's their vote." Doc. 516 at 168. There was no contrary evidence.

The record also overwhelmingly supports the District Court's finding that "a
reasonable person would interpret [Plaintiffs'] 'line warming' activities to
communicate an identifiable message." Doc. 665 at 162–63. Applying the factors
enunciated by this Court in *Burns*, the District Court explained that Plaintiffs'
activities were accompanied by signs, T-shirts, and banners; that the line-warming
assistance was open to all; that it related to voting and democracy, a matter of public
concern; and—most significantly—that "voters who receive assistance have
expressed an understanding of and gratitude for the emotional support that the

League volunteers offer to voters waiting in lines outside of the polls." Doc. 665 at 163.

Appellants do not argue that these findings were clearly erroneous, and they were not. Plaintiff Scoon testified that voters have responded to her line-warming activities by being "[s]o grateful, just like, I am so glad you're here. . . . I'm so glad you're here. Thank you. I was really nervous about this, and I feel much better"—a response that reflects an understanding of the League's message of support, not merely its concrete assistance. Doc. 513 at 62. Mr. Albright testified that he "heard directly from voters saying, you know, that [Black Voters Matters' voter comfort activities] helped them to be able to stay in line or – or, if not even in necessarily helping them to stay in line, *encouraging* them to stay in line." Doc. 624 at 125 (emphasis added). This reaction from voters, too, directly confirms that they understood the message that these activities were meant to convey. Appellants ignore this evidence and the District Court's findings to mischaracterize Plaintiffs' activities as "unilaterally giving voters items" and "giving voters gifts." GOP Br. 45. That is not what the evidence showed or what the District Court found.

Appellants also argue that Plaintiffs' activities are exceptional and that the statute mostly regulates conduct. GOP Br. 19–20, 22–23. They brainstorm a few bizarre examples of nonexpressive conduct that the Solicitation Definition might prohibit, such as "pulling a fire alarm to make voters flee" and "handing out food

24

laced with laxatives to voters." *Id.* at 19–20. But nothing in the record suggests that Florida had any problem with those sorts of activities outside polling places. To the contrary, Appellants' own description of the asserted problem that the Solicitation Definition was supposed to solve confirms that it mostly regulates expression. *Id.* at 7. They complain that without the Solicitation Definition, it was "difficult for election officials to tell whether a given interaction between third parties and voters involved improper electioneering, fraud, or undue influence," because people would just "start talking to voters" or "leave campaign materials everywhere." *Id.* "Talking to voters" and distributing "campaign materials" are undeniably expressive. *Burson*, 504 U.S. at 193. Thus, even if the Solicitation Definition might conceivably *also* prohibit bizarre issues like voter poisoning and false fire alarms, the record makes plain that it is at least substantially targeted at the more obvious approach expressing a message that potential voters are likely to understand. It is therefore subject to heightened vagueness and overbreadth scrutiny under the First Amendment. *Vill. of Hoffman Ests.*, 455 U.S. at 494.

**B.    The Solicitation Definition is unconstitutionally vague.**

The District Court correctly held that the Solicitation Definition is unconstitutionally vague because it both fails to provide notice of what it prohibits and lends itself to arbitrary and discriminatory enforcement. Doc. 665 at 167–81. "It is a basic principle of due process that an enactment is void for vagueness if its

25

prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A law is impermissibly vague in violation of the Due Process Clause "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," or "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Wollschlaeger v. Governor*, 848 F.3d 1293, 1319 (11th Cir. 2017) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). This analysis is conducted with a particularly skeptical eye when a law "abut[s] upon sensitive areas of basic First Amendment freedoms." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964). The "Constitution demands a high level of clarity from a law if it threatens to inhibit the exercise of a constitutionally protected right, such as the right of free speech." *Konikov v. Orange Cnty.*, 410 F.3d 1317, 1329 (11th Cir. 2005) (citing *Vill. of Hoffman Ests.*, 455 U.S. at 499).[7]

---

[7] The cases Appellants cite imposing a lower standard are distinguishable because they did not involve laws directly regulating First Amendment expression. *See Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (definition of "crime of violence"); *United States v. Powell*, 423 U.S. 87, 90, 92 (1975) (prohibition on sawed-off shotguns; emphasizing that it was applying the standard applicable to "challenges to statutes which do not involve First Amendment freedoms"); *Indigo Room, Inc. v. City of Fort Myers*, 710 F.3d 1294, 1300 (11th Cir. 2013) (prohibition on underage entry into bars that did "not even incidentally infringe upon protected expression"); *United States v. Sepulveda*, 115 F.3d 882 (11th Cir. 1997) (prohibition on possession of unauthorized "access devices"); *High Ol' Times, Inc. v. Busbee*, 673 F.2d 1225, 1227 (11th Cir. 1982) (prohibition on "drug related objects"); *see also Smith v. Goguen*, 415 U.S. 566, 573 (1974) ("Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts.").

The Supreme Court has been especially sensitive to this issue in the electoral context. In *Mansky*, the Supreme Court held that a ban on wearing a "political badge, political button, or other political insignia" inside a polling place was unconstitutionally indeterminate, because it lacked any clear definition of what "political" meant, a "a serious matter when the whole point of the exercise is to prohibit the expression of political views." 138 S. Ct. at 1888, 1891. The same problem is present to an even greater extent here.

The Solicitation Definition prohibits "engaging in any activity with the intent to influence or effect of influencing a voter." Fla. Stat. § 102.031(4)(b). This raises two issues. *First*, "influencing a voter" in what respect? Does the Solicitation Definition prohibit only influencing a voter's electoral choices—who and what to vote for? Or does the Solicitation Definition also prohibit "influencing a voter" *to vote*, such as by encouraging them to stay in line or helping them to do so? The Solicitation Definition does not say. *Second*, by prohibiting not only activities that intentionally influence voters but also those that have the "effect of influencing a voter," regardless of the actor's intent, the Definition criminalizes conduct based on third parties' subjective reactions to it, making it impossible for anyone to know when they might be violating the law.

### 1. Appellants themselves cannot decide what constitutes "influencing a voter."

From the start of this case, *Appellants themselves* have been unable to agree on what forms of "influencing a voter" it prohibits. The Secretary of State has argued from the outset it is obvious what that phrase means, but he has now completely reversed his position on what the obvious meaning is.

In moving to dismiss Plaintiffs' claims, the Secretary said it was "apparent that the non-solicitation provision does not in any way prohibit innocent, nonpartisan assistance such as the provision of food or water to voters waiting in line." Doc. 175-1 at 31. That, he explained, was because the Definition "unambiguous[ly]" prohibits only "*partisan* efforts of individuals or campaigns to pressure or influence voters' decisions within the no-solicitation zone." *Id.*

At trial, however, the Director of the Department of State's Elections Division changed her tune. Asked whether "a nonpartisan group can encourage voters to stay in line without discussing any candidate or issue as long as they are not harassing or soliciting the voter," she equivocated, stating that "[t]he problem is enforcement and people following it," that "you would have to look at the facts and circumstances," and that "you can't draw, you know, a straight line on that." Doc. 600 at 95–96. The Definition's once "unambiguous" limitation to "partisan efforts" suddenly might apply to non-partisan assistance, depending on the "facts and circumstances" and problems of "enforcement." *Id.*

28

On appeal, the Secretary now completes his change of position. He joins a brief arguing that the Solicitation Definition "*does* cover non-officials' 'giving items to voters'" and thus that "it bans distributing food and water to voters in line," GOP Br. 39—precisely what the Secretary previously argued it was "apparent that the non-solicitation provision d[id] not in any way prohibit," at least from non-partisan groups. Doc. 175-1 at 31. Moreover, where previously the Secretary said the Definition was "unambiguous" in prohibiting only "partisan efforts . . . of individuals or campaigns to pressure or influence voters' decisions within the no-solicitation zone," *id.*, the Secretary now argues that that influencing "whether [voters] vote," in addition to *how* they vote, is prohibited by the Definition. GOP Br. 36. Under that reading, wearing "a button or T-shirt merely imploring others to 'Vote!'" would apparently be proscribed—a prohibition that the Supreme Court saw as clearly impermissible even *inside* polling places in *Mansky*, 138 S. Ct. at 1888.

The Secretary confusion is understandable, because the Definition does not say what it means by "influencing a voter." But his changing positions relate not to some obscure edge case but specifically to the Solicitation Definition's application to Plaintiffs' own line-warming activities. Providing non-partisan assistance and encouragement to make it more likely that voters vote is precisely what Plaintiffs have historically done and wish to continue doing. Plaintiffs can hardly be expected to understand whether they may do so when the Secretary has argued within a single

case first that those activities are "unambiguous[ly]" permissible, then that they are subject to a facts-and-circumstances analysis, and now that they are flatly proscribed. The law therefore provides no "reasonable opportunity to understand what conduct it prohibits," so it is void for vagueness under the First and Fourteenth Amendments. *Wollschlaeger*, 848 F.3d at 1319.

## 2. The Solicitation Definition's criminalizes conduct based solely on its psychic effects on third parties.

The second problem with the Solicitation Definition is that, by prohibiting activities that have the "effect of influencing a voter," regardless of the actor's intent, the Definition criminalizes conduct based on third parties' subjective reactions to it, making it impossible for anyone to know when they might be violating the law. It is therefore akin to the law the Supreme Court invalidated in *Coates v. City of Cincinnati*, which made it unlawful for individuals to assemble on public property and engage in conduct that was "annoying to persons passing by." 402 U.S. 611 (1971). The Supreme Court explained that because "[c]onduct that annoys some people does not annoy others," it was impossible for someone to determine whether they were violating the law. *Id.* at 612, 614. Likewise here, where the law prohibits conduct based on its subjective effect on potentially any voter who witnesses it, Plaintiffs have no way of determining whether their activities will be considered "solicitation."

Have no fear, Appellants say: "Though the phrase 'effect of influencing' does not contain a scienter requirement, courts would read one in." GOP Br. 41. But the statute's text is unmistakable: it prohibits "engaging in any activity *with the intent to influence or effect of influencing* a voter." Fla. Stat. § 102.031(4)(b) (emphasis added). It therefore expressly provides that the prohibition covers *either* intent *or* effect. Appellants' construction would eliminate the latter prong. And because this is a state statute, "federal courts are without power to adopt a narrowing construction . . . unless such a construction is reasonable and readily apparent." *Boos v. Barry*, 485 U.S. 312, 330 (1988). It is not "readily apparent" that Florida courts would discard statutory text that expressly prohibits solicitation based on "effect" alone.

### 3. The Solicitation Definition causes arbitrary and overbroad enforcement.

Testimony from the Supervisors—the officials tasked with enforcing the Solicitation Definition—confirms that the Definition is unworkably vague and leads to arbitrary and overbroad enforcement in practice. Supervisor White testified that "in Miami-Dade . . . it can be impossible to discern what is solicitation, what is not solicitation. . . . [I]t is so impossible with the volume of sites and the volume of people that we are dealing with out there to discern who is engaging in activity to influence, who is not, you know, who is providing nonpartisan assistance, who is not." Doc. 562 at 57–58. "[T]o put this type of interpretation on my essential poll workers who have . . . been to training for less than a day I think is something that

can be handled wildly inconsistent in those locations." *Id* at 58. Supervisor Earley's staff's immediate reaction to the new definition was that it "is very vague. What does 'intent to influence' mean?" Doc. 634-20 at 2. Supervisor Earley himself "would tend it agree it's somewhat vague." Doc. 631 at 133–34.

As a result, many Supervisors did precisely what the vagueness doctrine is intended to prohibit: they enforced an overbroad prohibition, banning *any* voter contact near polling places. Supervisor White confirmed that "the reason or part of the reason why [she] prohibit[s] any activity within the 150 feet is that [the Solicitation Definition] would be so difficult to apply consistently to individual incidents." Doc. 562 at 58–59 ("Yes, I can agree with that. . . . I don't know if I would agree with that the definition is hard to interpret, but I think it's hard to administer. It is difficult for my staff to know what exactly it is that you are doing, what your intentions are to be able to apply it consistently."). Similarly, Supervisor Latimer acknowledged that he does not believe the Solicitation Definition prohibits giving food or water to voters in line, but he still would prohibit a nonpartisan volunteer from doing so, because "'I don't have any idea what that person is talking to the voter about." Doc. 549-3 at 48, 170–71, 191.[8]

_____

[8] Some Supervisors testified that they already prohibited all contact with voters in line to vote under other legal provisions, even before the Solicitation Definition was enacted. But the District Court found that not all Supervisors did so, Doc. 665 at 32–33, and as the District Court explained, the "the unchallenged provisions" under

Given this testimony from those tasked with enforcing the Solicitation Definition, it is no surprise that Plaintiffs and other groups are uncertain about what the Definition prohibits. Plaintiff Scoon testified that in her experience, "the understanding of the individual deputies, Supervisors of Elections of what the law requires and the paperwork that needs to be done varies fairly significantly." Doc. 513 at 63. This creates an unacceptable risk that "someone says you're doing something wrong, and then there could be a disagreement or . . . you're called out, and that would be very negative for our League members and very hurtful, just very scary. And it's possible that a Supervisor of Elections person could call the law enforcement." *Id.* To avoid that problem, now that the Solicitation Definition has been enacted, the League has curtailed its line warming activities: "[w]e're just not going to do" that kind of activity within the buffer zone anymore. *Id.* at 64; *see also, e.g.*, Doc. 536 at 76 (Hispanic Federation does not know what is allowed under the new definition, and as a result, it has "veteran canvassers that have been with us a long time that have already said that they are fearful of being sent to do line-warming activities.").

---

which some Supervisors previously prohibited such conduct "do not carry the same penalty as the expanded solicitation ban," "a first-degree misdemeanor"; "instead, they simply authorize government actors, including the Supervisors of Elections, to maintain order at the polls," *id* at 33–34. Appellants do not challenge these conclusions.

The factual record thus confirms what was already clear from the Solicitation Definition's text: it is a vague provision that provides too little notice of what is and is not prohibited. The Secretary of State cannot consistently say what it prohibits, the Supervisors tasked with enforcing it find it impossible to apply consistently, and the Plaintiffs who are subject to it have been forced to cut back their activities due to uncertainty regarding the provision's scope. The Solicitation Definition thus "permits and encourages an arbitrary and discriminatory enforcement of the law"— precisely what the vagueness doctrine prohibits. *Papachristou v. City of Jacksonville*, 405 U.S. 159, 170 (1972).

### 4.    Context does not clarify the Solicitation Definition.

Appellants argue that the meaning of the Solicitation Definition is clarified by statutory context, including the plain meaning of the word "solicit," the "list of examples of prohibited solicitation," and the exception for Supervisors distributing food and water. But Appellants have used this same context to reach entirely contradictory conclusions about what the Solicitation Definition means.

In moving to dismiss, the Secretary argued that the "the context of the surrounding text" "unambiguous[ly]" showed that the Definition prohibited only "*partisan efforts* of individuals or campaigns to pressure or influence voters' decisions within the no-solicitation zone" and that considering "the series of prohibited activities immediately preceding the provision . . . manifests an

34

unmistakable purpose of prohibiting *partisan* solicitation near polling locations." Doc. 175-1 at 31, 33. The Secretary argued that the ordinary meaning and dictionary definitions of the word "solicit" would not "ordinarily include aiding or assisting someone as Plaintiffs allege, unless such assistance is intended or reasonably has the effect of influencing voters to change their vote." *Id.* at 33. And the Secretary argued that "the carveout for supervisors' volunteers and employees" giving items to voters confirmed that nonpartisan groups could do so too, because "it confirms the exact kinds of activities the statute permits and thus does not aim to restrict: 'providing nonpartisan assistance to voters within the no-solicitation zone such as, but not limited to, giving items to voters.'" *Id.* at 34.

Now, though, the Secretary and the other Appellants cite *exactly the same textual evidence* to argue for *exactly the opposite interpretation*. GOP Br. 37–39. Unlike before, the plain meaning of "solicit" now does *not* restrict the provision to efforts to "influenc[e] voters to change their vote," Doc. 175-1 at 33; it merely precludes application to "small talk between voters," "spontaneous kindnesses," or "uninitiated interactions," GOP Br. 37. The listed examples no longer show a limitation to partisan solicitation, Doc. 175-1 at 33–34; rather they show a statutory focus on either "asking a voter to provide something" or "giving something to a voter," and thus show that line-warming activities are prohibited, GOP Br. 37. And the carveout for Supervisors giving items to voters no longer shows that non-partisan

groups may do so too, Doc. 175-1 at 34–35; now, it shows that such groups may *not* do so, GOP Br. 39.

The statutory context can hardly clarify the meaning of the Solicitation Definition for an average citizen when the Secretary has now relied upon exactly the same context to argue for two completely contradictory interpretations, one of which allowed Plaintiffs' activities and the other of which prohibits them entirely.

**C.     The Solicitation Definition is unconstitutionally overbroad.**

The District Court also correctly found that the Solicitation Definition is unconstitutionally overbroad because it prohibits far more protected expression than the limited set of activities that pose a risk of confusing or intimidating voters— Appellants' asserted justification for the provision. Doc. 665 at 184–85.

The overbreadth doctrine is premised on the notion that free-speech "freedoms need breathing space to survive" because "persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions provided by a statute susceptible of application to protected expression." *Gooding v. Wilson*, 405 U.S. 518, 521-22 (1972) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)). As a result, the "government may regulate in the area only with narrow specificity," and speech regulations must "be carefully drawn or be authoritatively construed to punish only unprotected speech and not be susceptible of application to protected expression." *Id*. at 522. "[T]he overbreadth

36

doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep.'" *City of Chi. v. Morales*, 527 U.S. 41, 52 (1999) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612-15 (1973)).

The Solicitation Definition is overbroad precisely because it is vague, prohibiting all activities with the intent or effect of influencing a voter, apparently in any respect. Fla. Stat. § 102.031(4)(b). Almost any expression could conceivably "infuenc[e] a voter" in *some* respect, so the Solicitation Definition nearly "reaches the universe of expressive activity" outside polling places rather than "merely regulat[ing] expressive activity . . . that might create problems." *Bd. of Airport Comm'rs of City of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987).

Appellants offer no justification for the Solicitation Definition's extraordinary breadth. The Definition goes far beyond creating "a buffer zone where no one can electioneer, campaign, or make other verbal attempts to persuade voters how to vote," which Appellants rightly say Florida was entitled to do. GOP Br. 20. Electioneering and campaigning were already prohibited by the existing definition of solicitation, which included "seeking or attempting to seek any vote, fact, opinion, or contribution" and "distributing or attempting to distribute any political or campaign material," and which Plaintiffs did not challenge and the District Court

did not enjoin. Fla. Stat. § 102.031(4)(b). Similarly, at trial, Elections Division Director Matthews testified that the Solicitation Definition was needed to address complaints "about harassment, not just an abstraction but a harassment in terms of people – loud noises, being approached, that sort of thing." Doc. 631 at 95. Harassment, however, was already separately addressed, including by the provision allowing for the removal of "disruptive and unruly persons" from the areas around polling places. Fla. Stat. § 102.031(4)(c). Nothing in the record suggests that Supervisors' authority under those existing provisions was not up to the task. Indeed, the District Court found that the Supervisors did not ask for the Solicitation Definition or support its enactment. Doc. 665 at 78 n.26.

The Solicitation Definition's breadth is particularly problematic because the Solicitation Definition is a content-based restriction in a traditional public forum. It prohibits activities depending on whether they are engaged in "with the intent to influence or effect of influenc[e] a voter," Fla. Stat. § 102.031(4)(b), a determination that depends on the content of the message expressed. *Reed v. Town of Gilbert*, 576 U.S. 155, 163–64 (2015). And it prohibits those activities in a public forum. *Mansky* makes clear that "parks, streets, sidewalks, and the like" are classic examples of a public forum. 138 S. Ct. at 1885. A plurality of the Supreme Court held in *Burson* that a regulation of expressive activity outside polling places "bars speech in quintessential public forums." 504 U.S. at 196. *Mansky* did nothing to change this,

because it held only that the *inside* of a polling place "qualifies as a nonpublic forum" because it is "government-controlled property set aside for the sole purpose of voting." 138 S. Ct. at 1886. In so holding, *Mansky* expressly distinguished "the interior of the polling place" from "its environs," and reasoned that the government had "an interest more significant, not less, *within*" the polling place than outside it. *Id.* at 1887.

Because the Solicitation Definition unjustifiably prohibits such a broad swath of expression and expressive conduct in a public forum, whether Florida could validly proscribe Plaintiffs' own line-warming activities is largely beside the point. Under the overbreadth doctrine, litigants may "challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick*, 413 U.S. at 612. But regardless, the record shows that Plaintiffs' line-warming activities may not constitutionally be prohibited.

As explained above, *supra* Part II.A, Plaintiffs' activities are protected expression. Appellants argue that the Solicitation Definition is nevertheless valid as a "time, place, and manner restriction[]." GOP Br. 27–28. But "time, place, and manner" restrictions are subject to lesser scrutiny only if they are "content neutral"— that is, "'justified without reference to the content of the regulated speech.'" *Ward*

*v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984)). The paradigmatic example is *Ward*'s restriction on sound-amplification, which was justified by concerns about sound itself, regardless of the sound involved. *Id.* The Solicitation Definition is not content neutral in this way. The Definition is defined and justified by concerns about the "communicative content" of expression—that it might influence a voter in some respect—and is therefore content based. *Reed*, 576 U.S. at 163.

Alternatively, Appellants argue that the Solicitation Definition is subject only to the test for incidental restrictions on expressive conduct from *United States v. O'Brien*, 391 U.S. 367, 376 (1968). GOP Br. 27. But *O'Brien* requires a "sufficiently important governmental interest in regulating the *nonspeech* element" of expressive conduct to justify an incidental effect on expression. *O'Brien*, 391 U.S. at 376 (emphasis added). Again, the Solicitation Definition is specifically defined and justified by the communicative content of the expression it restricts—it does not merely incidentally affect that expression.

Appellants also argue that the Solicitation Definition is subject to "the *Anderson-Burdick* balancing test for election regulations." GOP Br. 30. But the Supreme Court has repeatedly considered restrictions on expression at polling places, and it has never once suggested that they are subject to *Anderson-Burdick*. *See Mansky*, 138 S. Ct. 1867; *Burson*, 504 U.S. 191. That makes sense. Even in the

electoral context, *Anderson-Burdick* does not apply to laws that "regulat[e] . . . pure speech" and "do[] not control the mechanics of the electoral process." *McIntyre v. Ohio Elecs. Comm'n*, 514 U.S. 334, 345 (1995). The Solicitation Definition does not concern how candidates qualify for the ballot or how votes are cast and counted—it concerns pure expression outside polling places. It "burdens core political speech," so it may be upheld "only if it is narrowly tailored to serve an overriding state interest." *Id.* at 347.

Finally, even if the area around a polling place were a nonpublic forum, the Solicitation Definition would still be unconstitutional as an unreasonable restriction. *See Mansky*, 138 S. Ct. at 1888. While "there is no requirement of narrow tailoring in a nonpublic forum, the State must be able to articulate some sensible basis for distinguishing what may come in from what must stay out." *Id.* In *Mansky*, the Court invalidated as unreasonable a prohibition on expressive apparel in polling places that provided insufficient guidance as to what was and was not prohibited. *Id.* at 1888-92. That same problem is present here: as explained above, *supra* Part II.B, the Solicitation Definition provides no meaningful guidance as to what sort of expressive conduct is or is not permitted in the buffer zone. Moreover, while *Mansky* stated that a sufficiently clear regulation to prohibit "partisan discord" within polling places would survive scrutiny, *id.* at 1891, the Solicitation Definition extends far more broadly in both space and subject matter, governing not only the polling place

41

but the area around it, and prohibiting not only partisan speech but also nonpartisan

speech that might influence a voter in any respect.

* * *

In sum, the Solicitation Definition restricts protected expression, and it does

so in a way that is both unconstitutionally vague and unconstitutionally overbroad.

If the Court concludes that Appellants have standing to challenge a judgment that

does not bind them, it should affirm the District Court's judgment enjoining the

Definition's enforcement.

### III.    The Court should not vacate the District Court's judgment regarding the Registration Disclaimer Provision.

Plaintiffs agree with Appellants that Senate Bill 524 ("SB524")—enacted

approximately one month after the District Court found the Registration Disclaimer

unconstitutional—moots Appellants' appeal of that provision. Accordingly,

Plaintiffs do not oppose Appellants' motion to dismiss the portions of these appeals

relating to the Disclaimer Provision.

But the Court should not vacate the District Court's judgment finding the

Registration Disclaimer unconstitutional. While Appellants rely on *United States v.*

*Munsingwear, Inc.*, 340 U.S. 36 (1950) to argue that the "normal" course is to vacate

the decision below whenever an appeal becomes moot, *see* GOP Br. 13-14, the

Supreme Court has since expressly rejected the notion that vacatur should be

assumed whenever mootness precludes further appellate review of a lower court

decision. *See U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, at 23-24 (1994); *see also Azar v. Garza*, 138 S. Ct. 1790, 1792 (2018) (per curiam) (explaining that because vacatur "is rooted in equity, the decision whether to vacate turns on the conditions and circumstances of the particular case").

Rather, *Bancorp* instructs that vacatur is appropriate only when (1) "mootness results from unilateral action of the party who prevailed below" or (2) "a party who seeks review of the merits of an adverse ruling . . . is frustrated [from doing so] by the vagaries of circumstance." 513 U.S. at 25. A judgment should therefore be vacated only when a controversy presented for review has become "moot due to circumstances *unattributable to any of the parties*" seeking vacatur. *Id.* at 23 (quotation marks and citation omitted) (emphasis added). And because vacatur is an equitable remedy, federal courts must also consider the public interest in deciding whether to afford the "extraordinary" remedy of vacatur. *Id.* at 26. In making this determination, the court should consider "[t]he public's interest in the preservation of precedent." *Hartford Cas. Ins. Co. v. Crum & Forster Specialty Ins. Co*. 828 F.3d 1331, 1337 (11th Cir. 2016). As this Circuit has explained, vacatur "disturb[s] the orderly operation of the federal judicial system" because "judicial precedents are presumptively correct and valuable to the legal community as a whole." *Id.* at 1334 (*citing Bancorp*, 513 U.S. at 26-27).

In seeking vacatur, Appellants ignore their own involvement in mooting this appeal.[9] Appellants argue that the "Florida legislature" alone is responsible. GOP Br. at 14. But the circumstances surrounding SB524's repeal of the Registration Disclaimer suggest that Appellants counseled the Legislature to repeal the provision when it became obvious that Defendants would lose on that provision by the end of the presentation of evidence at trial.

Where courts have vacated judgments following legislative repeal, they have often noted the lack of evidence that litigants were involved in the repeal. *See Nat'l Black Police Ass'n v. D.C.*, 108 F.3d 346, 354 (D.C. Cir. 1997) (noting the absence of evidence suggesting "an illegitimate motive" in legislative repeal); *see also Hall v. Louisiana*, 884 F.3d 546, 553 (5th Cir. 2018) (explaining "there is no evidence

_____

[9] Because the circumstances giving rise to mootness occurred after the close of trial evidence, Plaintiffs must rely on publicly available information to describe them. Appellate courts are "free to take judicial notice of subsequent developments in cases that are a matter of public record and are relevant to the appeal." *Rothenberg v. Security Management Co.*, 667 F.2d 958, 961 n.8 (11th Cir. 1982). Courts may take judicial notice of information on publicly available government websites, *see Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010); *R.S.B. Ventures, Inc. v. F.D.I.C.*, 514 F. App'x 853, 857 (11th Cir. 2013), and of documents such as the newspaper articles . . . for the limited purpose of determining which statements the documents contain (but not for determining the truth of those statements)," *U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 812 n. 4 (11th Cir. 2015) (affirming a district court's taking of judicial notice of "five Miami Herald articles, two advertisements in the Miami Herald" and other statements for the fact that the statements were made). But should this Court wish for the District Court to consider the circumstances giving rise to mootness in the first instance, it may properly remand for that purpose. *See Bancorp*, 513 U.S. at 29.

[the litigant] was the moving force behind the legislation"). *National Black Police Association* specifically cautioned courts against granting vacatur in "all cases" involving legislative repeal. 108 F.3d at 354. "As the Court underscored in *Bancorp,* vacatur is an equitable remedy and the record in particular cases may militate in favor of denying vacatur." *Id.*

This case is different. Appellants vigorously defended the Registration Disclaimer Provision for nearly a year, through motions to dismiss, extensive discovery, summary judgment, and a two-and-a-half-week trial. They did so even though the Provision was flagrantly unconstitutional: it compelled private organizations to speak a government-drafted message with which they disagreed, despite the obvious available alternative of the government speaking for itself, by adding the message to the government-drafted forms that the private organizations were already required to use. *See NIFLA*, 138 S. Ct. at 2371–76. Plaintiffs presented overwhelming evidence that the Registration Disclaimer forced them to deliver warnings to voters that they would otherwise never give, and that the government did not have a sufficient interest in forcing them to deliver such a warning. Doc. 665 at 189–19. Through all that time, the Legislature made no move to repeal the Disclaimer.

On February 26, 2022, Plaintiffs submitted their post-trial briefing. *See* Doc. 649. In it, Plaintiffs explained why the Registration Disclaimer was not the least-

restrictive means of delivering the warning, rendering it unconstitutional. As Plaintiffs explained, "[i]f Florida wanted to warn voters that Third-Party Voter Registration Organization may not turn in their forms on time and inform them of other ways to register, such as online . . . . Florida could have added that information to the form itself . . . ." Doc. 649 at 75.

Just four days later, Senator Hutson, the sponsor of SB524, filed a narrow amendment which repealed the Registration Disclaimer by modifying the warning in the precise way that Plaintiffs had suggested.[10] To Plaintiffs' knowledge, no legislator had previously raised this issue prior to the March 2 Amendment, even though by this point SB524 had been circulating for nearly five months, gone through multiple committees, seen a strike-all amendment, and had its first reading on the Senate Floor. The next day, Senator Hutson read his amendment on the Senate Floor, where he made clear the amendment was the result of working with the Secretary of State and Supervisors.[11]   As veteran Florida politics reporter Gary Fineout observed, the Hutson Amendment was "convenient timing," because "[t]hose who watched the trial have zeroed in on the disclaimer provision as the one

---

[10] The Amendment repealing the Registration Disclaimer was Amendment 203418, which was introduced March 2, 2022 and adopted the following day. *See* The Florida Senate, *CS/CS/SB 524: Election Administration: Amendments*, available at: https://www.flsenate.gov/Session/Bill/2022/524/?Tab=Amendments.

[11] The Florida Channel, *3/3/22 Senate Session Part 2* at 38:29-39:38, available at: https://thefloridachannel.org/videos/3-3-22-senate-session-part-2-2/.

part of last year's law (SB 90) . . . that seemed most in danger of getting struck down."[12]

When SB524 passed the Legislature a few days later, it was widely recognized as "a legislative victory" for the Governor, who had personally "proposed the special unit to tackle election crimes" that SB524 created.[13] That same day, the Governor's spokesperson explained the Governor's Office was "very excited" to see the bill come to fruition and thanked the Legislature for "delivering" on the Governor's goals.[14]

But the Legislature then delayed sending the bill to the Governor for signature for almost *seven weeks*. Only after the District Court's March 31 order holding the Registration Disclaimer Provision unconstitutional and permanently enjoining its enforcement and Appellants commencement of this appeal did the Legislature finally present the repeal to the Governor for signing.[15]

---

[12] Gary Fineout, Florida Playbook: *Another Skirmish Over Florida's Election Laws*, Politico, available at https://www.politico.com/newsletters/florida-playbook/2022/03/24/another-skirmish-over-floridas-election-laws-00019944.

[13] Gary Fineout, *Legislature gives DeSantis new election police to target voter fraud in Florida*, Politico, available at https://www.politico.com/news/2022/03/10/desantis-gets-florida-election-police-00015926

[14] *Id.*

[15] See The Florida Senate, *CS/CS/SB 524: Election Administration*: *Bill History*, available at: at https://www.flsenate.gov/Session/Bill/2022/524/?Tab=BillHistory.

Governor DeSantis then held a press conference at which Secretary of State Lee joined him, and he thanked her for her help in passing SB524.[16] Governor DeSantis specifically invoked the SB90 litigation and the District Court's ruling, stating that, while "we got dinged on this one provision," that he was confident that the rest would succeed on appeal.[17] He then signed SB524 into law, offering Secretary Lee the pen he used to sign. The Governor's words were clear to Plaintiffs: Appellants intentionally mooted the provision they believed they could not defend on appeal. But they did so only after waiting to see whether they would lose in the District Court, allowing the bill to hang in the balance in the interim.

Because Florida's repeal of the Registration Disclaimer Provision was no mere "happenstance," and Appellants are not mere bystanders who found themselves unable to appeal due the "vagaries of circumstance," *Bancorp*, 513 U.S. at 25, the equities weigh strongly against vacatur. Courts have not hesitated in denying vacatur in the face of similar cat-and-mouse tactics. *See, e.g.*, *Staley v. Harris County Texas*, 485 F.3d 305, 313 (5th Cir. 2007) (denying vacatur after county's "last-minute" act in removing an unconstitutional monument from public view mooted the case). This Court should do the same.

---

[16] WCTV News, *DeSantis Signs Elections Reform Bill* (recorded April 25, 2022), https://www.facebook.com/watch/live/?ref=watch_permalink&v= 1135135940364975.

[17] *Id.* at 7:09-8:00.

Even aside from the strange circumstances of the repeal, vacatur is not warranted. The District Court's decision on the Registration Disclaimer Provision provides guidance that is "valuable to the legal community as a whole . . . and should stand unless a court concludes that the public interest would be served by a vacatur." *Bancorp*, 513 U.S. at 26. Appellants have shown no compelling reason in favor of vacatur. While Appellants suggest the District Court's judgment should be vacated so that is does not have any "persuasive" effect elsewhere, GOP Br. 17, that fact weighs *against* vacatur in this matter. The purpose of vacatur is to prevent opinions from having a preclusive effect—not to prevent them from setting precedent. *See, e.g.*, *In re Smith v. State Farm Mut. Auto. Ins. Co.*, 964 F.2d 636, 638 (7th Cir. 1992); *Fund for Animals v. Mainella*, 335 F. Supp. 2d 19, 27 (D.D.C. 2004). Indeed, "the establishment of precedent argues against vacatur, not in favor of it." *Mahoney v. Babbit*, 113 F.3d 219, 223 (D.D.C. 1997).

## IV. The Court should reject the Governmental Defendants' undeveloped challenge to Plaintiffs' standing.

The State Appellants mount a drive-by challenge to Plaintiffs' standing, "[p]resum[ing]" that "each answering brief will address each group's standing to sue over each of the challenged provisions," without developing any argument that standing is lacking. Gov. Br. 2. Much of the 14-day trial was consumed with evidence relating to standing, and the District Court concluded based on a detailed assessment of the trial record that the *League* Plaintiffs have standing for each of the

49

claims on which it entered judgment. Doc. 665 at 138–46, 191–96. Appellants do not argue that any of the factual findings underlying that determination were clearly erroneous, nor do they identify any legal ruling relating to standing with which they disagree. While a lack of standing may not be waived, Appellants have abandoned any challenge to the District Court's standing determinations by failing to offer any argument in support of such a challenge in their opening brief, and they should not be permitted to offer such argument in their replies. *Timson v. Sampson*, 518 F.3d 870, 874 (11th Cir. 2008).

In any event, the *League* Plaintiffs have standing. The District Court correctly found that Plaintiffs Scoon and the League of Women Voters of Florida had standing to challenge the enforcement of the Solicitation Definition against the Bay County Supervisor Mark Andersen, because they previously engaged in line-warming activities within 150 feet of polling places and would continue to do so in the future but for SB90's effective prohibition on such activities. Doc. 665 at 138–40. Plaintiffs show legal injury "when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences." *Harrell v. The Florida Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010) (quoting *Pittman v. Cole*, 267 F.3d 1269, 1283 (11th Cir. 2001)). Where injury is "one of self-censorship, harm 'can be realized even without an actual prosecution,'" so long as, but for the challenged law, the plaintiff "would engage in speech arguably protected

by the First Amendment." *Wollschlaeger*, 848 F.3d at 1305 (quoting *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988)).

As Ms. Scoon testified, before SB90 she and other League members often provided voter support at polling places, including in Bay County, Florida, where Ms. Scoon lives. Doc. 513 at 33. While they "usually set up [their tables] outside the 150-foot buffer zone," Ms. Scoon and other League members cross into the buffer zone to support voters. *Id.* at 57–61. But because of SB90, Ms. Scoon and the League are "absolutely not going to [engage in this voter support] anymore because the interpretation of what the law means and providing assistance is so broad." *Id.* at 63. Ms. Scoon and the League are particularly concerned about accusations of illegality, including potential prosecution of their members. *Id.* at 63–64. As a result, they plan to forgo such activity altogether. As the District Court correctly found, this amounted to a self-censorship injury. Doc. 665 at 138–40.

Separately, the District Court also found that the League suffered a diversion of resources injury due to SB90, including from the Solicitation Definition. Doc. 665 at 141–42; *see also Arcia v. Florida Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014) (recognizing a diversion of organization resources, including the personnel and time, can serve as injury-in-fact). The District Court found that Ms. Scoon, and Ms. Nash, as Executive Director of the League, spent "many hours . . . researching the law, writing up information, guidelines, writing PowerPoints," and training

members on how to comply with the provision. Doc. 665 at 142 (citing testimony). Because this law affected the League's regular operations, this was "not time the League would have spent educating voters about [any] election law." *Id.* These resources and staff time took away from the League's other priorities, including redistricting and its Amendment 4 work. *See id.* On all these points, the District Court noted it found Ms. Scoon and Ms. Nash's testimony credible. *See id.*

As the District Court further found, these injuries were traceable to and redressable by Supervisor Mark Andersen, the local Supervisor in Bay County where Ms. Scoon resides, who is responsible for enforcing the statute. *Id.* at 140-43; *see also ACLU v. The Florida Bar*, 999 F.2d 1486, 1490 (11th Cir. 1993) ("[W]hen a plaintiff challenges the constitutionality of a rule of law, it is the state official designated to enforce that rule who is the proper defendant, even when that party has made no attempt to enforce the rule."). Under Florida law, Supervisors are responsible for designating "no-solicitation zones" at polling locations and are statutorily authorized to "take any reasonable action necessary to ensure order at the polling places, including . . . [within] the 150-foot zone surrounding the polling place." Fla. Stat. § 102.031(4)(a), (c). As the District Court explained, "Supervisor Andersen [did] not dispute this—indeed, he presented no evidence whatsoever at trial." Doc. 665 at 141.

Below, Defendants argued Plaintiffs' injuries arising from the Solicitation Definition were not redressable by *anyone* because some Supervisors, such as Supervisor White, testified that even before SB90, they maintained an absolute prohibition on contact with voters near polling places to "maintain order" at the polls. The record demonstrated, however, that not every Supervisor practiced this kind of blanket policy, such as in Bay County, where Ms. Scoon and other League members previously assisted voters before SB90. *See supra* at 32 n.8.

In any event, even if Supervisor Andersen attempted to enforce a blanket no-contact policy in the future, it still makes a significant difference to the League Plaintiffs whether their conduct constitutes prohibited "solicitation" and thus whether the Solicitation Definition is enjoined. If the League Plaintiffs' line-warming activities constitute unlawful "solicitation" under the Solicitation Definition, it is a criminal offense. *See* Fla. Stat. § 104.41. In contrast, the other provisions of Florida law that some Supervisors believe allow them to prohibit all contact with voters do not involve criminal liability in the first instance, but rather just permit Supervisors to maintain order at the polls. *Id.* § 102.031(1), (4)(d). It is one thing for Plaintiffs to engage in line-warming activities at the risk that a Supervisor may order them to stop; it is quite another to commit a crime and risk arrest. The potential for such liability is traceable to the Supervisors' enforcement of the Solicitation Definition, and it is redressable by an order enjoining the Supervisor

from doing so. *See, e.g.*, *Larson v. Valente,* 456 U.S. 228, 244, n. 15 (1982) ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury.").

## CONCLUSION

The Court should dismiss the appeal in No. 22-11143 for lack of appellate jurisdiction and deny Defendants' motion to vacate the District Court's judgment regarding the Registration Disclaimer Provision. If the Court concludes that it has jurisdiction over any part of the appeal, it should affirm.

Dated: August 10, 2022

Respectfully submitted,

*s/ David R. Fox*

Frederick S. Wermuth
KING, BLACKWELL, ZEHNDER
& WERMUTH, P.A.
P.O. Box 1631
Orlando, FL 32802-1631
Telephone: (407) 422-2472
fwermuth@kbzwlaw.com

Marc E. Elias
Elisabeth C. Frost
David R. Fox
Christina A. Ford
ELIAS LAW GROUP LLP
10 G Street NE, Suite 600
Washington, DC 20002
Telephone: (202) 968-4490
melias@elias.law
efrost@elias.law
dfox@elias.law
cford@elias.law

*Counsel to Plaintiffs-Appellees in No. 22-11143*

**CERTIFICATE OF COMPLIANCE**

This response complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains 12,950 words, excluding the parts that may be excluded. This response also complies with Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface, 14-point Times New Roman.

*s/ David R. Fox*