**Nos. 22-11133-GG; 22-11143-GG; 22-11144-GG; 22-11145-GG (Consolidated)**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT
—————————————————

LEAGUE OF WOMEN VOTERS OF FLORIDA, INC., ET AL.,
*Plaintiffs-Appellees*,

v.

FLORIDA SECRETARY OF STATE, ET AL.,
*Defendants-Appellants*.

—————————————————

On Appeal from the United States District Court
for the Northern District of Florida
Nos. 4:21-cv-242, 4:21-cv-186, 4:21-cv-187, 4:21-cv-201 (Walker, C.J.)

—————————————————

**BRIEF OF PLAINTIFFS-APPELLEES FLORIDA STATE CONFERENCE
OF BRANCHES AND YOUTH UNITS OF THE NAACP,
COMMON CAUSE, AND DISABILITY RIGHTS FLORIDA**

—————————————————

Morenike Fajana
Romane Paul
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006

P. Benjamin Duke
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, NY 10018
Tel: 212-841-1000
pbduke@cov.com

(Additional counsel listed on next page)

August 10, 2022

Amia L. Trigg
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street NW, Ste. 600
Washington, DC 20005

Michael A. Fletcher II
Dillon H. Grimm
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001

Ellen Y. Choi
COVINGTON & BURLING LLP
415 Mission Street
San Francisco, CA 94105

*Counsel for Florida NAACP Plaintiffs-Appellees*

## CERTIFICATE OF INTERESTED PARTIES

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1(a)(3), Plaintiffs-Appellees the Florida State Conference of Branches and Youth Units of the NAACP, Common Cause, and Disability Rights Florida ("Appellees"), through undersigned counsel, hereby submit this Certificate of Interested Persons and Corporate Disclosure Statement.

Appellees state that they have no parent corporations, nor have they issued shares or debt securities to the public. The organizations are not subsidiaries or affiliates of any publicly owned corporation, and no publicly held corporation holds ten percent of their stock.

I hereby certify that the disclosure of interested parties submitted by Appellants is complete and correct except the following Appellees' counsel listed on Appellants' disclosure of interested parties can be dropped:

1. Cavataro, Benjamin (no longer at Covington & Burling LLP)

Dated:  August 10, 2022

Respectfully submitted,

By:        */s/ P. Benjamin Duke*

P. Benjamin Duke
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, NY 10018
Tel: 212-841-1270
Fax:  202-662-6291
pbduke@cov.com

*Counsel for Florida NAACP
Appellees*

## STATEMENT REGARDING ADOPTION OF
## BRIEFS OF OTHER PARTIES

Pursuant to Federal Rule of Appellate Procedure 28(i), Appellees join the brief of the *League* Plaintiffs-Appellees in full.

## STATEMENT REGARDING ORAL ARGUMENT

The Court scheduled argument in this appeal for September 15, 2022. Appellees agree with the Court that this appeal merits argument. The appeal implicates the most vital of fundamental rights—the right to vote. The district court's opinion held that several provisions in SB90 infringe on this right.

# TABLE OF CONTENTS

INTRODUCTION ................................................................ 1

STATEMENT OF THE ISSUES.............................................. 4

STATEMENT OF THE CASE................................................. 4

I.     Prior Proceedings.................................................... 5

II.    Factual Background. ................................................ 6

      A.    Voters Cast VBM Ballots in Record Numbers During the "Safe, Secure, and Orderly" 2020 Elections. ................................. 6

      B.    Nonetheless, the Florida Legislature Rushed to Pass SB90, While Publicly Offering Conflicting Justifications. ........................... 7

      C.    The Legislature Knew that SB90 Disproportionately Affected Black Voters. ................................. 11

SUMMARY OF ARGUMENT ............................................ 13

STANDARD OF REVIEW ................................................. 14

ARGUMENT ................................................................ 15

I.     All Appellees Have Standing. ................................. 15

II.    The District Court's Intentional Discrimination Findings Are Well-Supported by the Trial Record. ........................ 17

      A.    Discriminatory Impact....................................... 19

            1.    Expert Statistical Analysis Supports the District Court's Finding of Disparate Impact. ................................. 21

                  a)    Drop Boxes ................................. 22

                  b)    Solicitation Provision ................................. 27

      B.    Historical Background....................................... 28

1.    The Scope of the District Court's "Historical Background" Analysis Was Relevant and Appropriate........... 30

2.    The District Court Properly Considered Socio-Economic Data and the Association of Black Voters with the Democratic Party in its Analyzing the Historical Background of SB90.................................................. 34

3.    The District Court Properly Considered Past Discriminatory Legislative Actions in its Analysis of the Historical Background of SB90................................. 39

4.    Florida's "Grotesque" Discriminatory Voting Practices Have Continued to Present Day................................. 40

C.    Sequence of Events ........................................................ 42

D.    Contemporary Statements of Legislators ........................... 44

E.    Foreseeability and Knowledge of the Disparate Impact ................... 45

F.    Less Discriminatory Alternatives........................................ 48

III.    The District Court's Section 3(c) Remedy Under the VRA Was Appropriate. ................................................................... 49

A.    The District Court Properly Applied the Principles in Shelby County. ....................................................................... 50

B.    Section 3(c) Relief Is Appropriate in This Case. ................ 52

CONCLUSION ..................................................................... 54

iv

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Askew v. City of Rome*,
  127 F.3d. 1355 (11th Cir. 1997) .........................................................19

*Bellitto v. Snipes*,
  935 F.3d 1192 (11th Cir. 2019) ...................................................21, 22

*Burrell v. Bd. of Trs. of Ga. Mil. Coll.*,
  125 F.3d 1390 (11th Cir. 1997) .........................................................17

*Burton v. City of Belle Glade*,
  178 F.3d 1175 (11th Cir. 1999) .........................................................30

*Clark v. Putnam Cnty.*,
  293 F.3d 1261 (11th Cir. 2002) .........................................................36

*Common Cause/Ga. v. Billups*,
  554 F.3d 1340 (11th Cir. 2009) .........................................................15

*Elston v. Talladega Cnty. Bd. of Educ.*,
  997 F.2d 1394 (11th Cir. 1993) .........................................................30

*Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.*,
  830 F.3d 1242 (11th Cir. 2016) .........................................................15

*Florida v. United States*,
  885 F. Supp. 299 (D.D.C. 2012)........................................................33

*\*Greater Birmingham Ministries v. Sec'y of State for State of Alabama*,
  992 F.3d 1299 (11th Cir. 2021) ..................................................*passim*

*Holton v. City of Thomasville Sch. Dist.*,
  425 F.3d 1325 (11th Cir. 2005) .........................................................14

*Jean v. Nelson*,
  711 F.2d 1455 (11th Cir. 1983), *on reh'g*, 727 F.2d 957 (11th Cir.
  1984), *aff'd*, 472 U.S. 846 (1985)......................................................20

*Jeffers v. Clinton*,
 740 F. Supp. 585 (E.D. Ark. 1990)...............................................51, 52

*League of United Latin Am. Citizens, Council No. 4434 v. Clements*,
 999 F.2d 831 (5th Cir. 1993) ..............................................................36

*Missouri State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*,
 894 F.3d 924 (8th Cir. 2018) ...............................................................22

*\*North Carolina NAACP v. McCrory*,
 831 F.3d 204 (4th Cir. 2016) ......................................................*passim*

*Nw. Austin Muni. Util. Dist. No. One v. Holder*,
 557 U.S. 193 (2009)...............................................................................50

*\*Perez v. Abbott*,
 253 F. Supp. 3d 864 (W.D. Tex. 2017) ...........................................18, 36, 38, 52

*Perez v. Abbott*,
 390 F. Supp. 3d 803 (W.D. Tex. 2019) ............................................51

*Renteria-Marin v. Ag-Mart Produce, Inc.*,
 537 F.3d 1321 (11th Cir. 2008) .........................................................14

*Rogers v. Lodge*,
 458 U.S. 613 (1982)........................................................................30, 35

*Rumsfeld v. FAIR*,
 547 U.S. 47 (2006).................................................................................15

*Shelby Cnty., Ala. v. Holder*,
 570 U.S. 529 (2013)........................................................................35, 49

*Sidman v. Travelers Casualty and Surety*,
 841 F.3d. 1197 (11th Cir. 2016) .........................................15, 35, 46

*South Carolina v. Katzenbach*,
 383 U.S. 301 (1966)........................................................................50, 52

*Thelma C. Raley, Inc. v. Kleppe*,
 867 F.2d 1326 (11th Cir. 1989) ...........................................................2

*Thornburg v. Gingles*,
 478 U.S. 30 (1986)........................................................................37, 38

*United States v. Ramirez-Chilel*,
    289 F.3d 744 (11th Cir. 2002) ............................................................46

*United States v. Armstrong*,
    517 U.S. 456 ...........................................................................................18

*United States v. Marengo County Comm'n*,
    731 F.2d 1546 (11th Cir. 1984) .................................................30, 35

\*Village of Arlington Heights v. Metropolitan Housing Development
    Corp.,
    429 U.S. 252 (1977)...................................................................*passim*

*Washington v. Davis*,
    426 U.S. 229 (1976)..........................................................13, 19, 20

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
    395 U.S. 100 (1969)...............................................................................15

## Statutes

52 U.S.C. § 10302(c) ........................................................................................49

Fla. Stat. § 97.0575(3)(a) .................................................................................1

Fla. Stat. § 101.69(2)...............................................................................4, 22

Fla. Stat. § 102.31(4)(a)-(b) ...........................................................................5

Voting Rights Act of 1965 ..............................................................*passim*

## Other Authorities

Fed. R. Civ. P. 52(a)........................................................................................14

Gov. DeSantis, Feb. 19, 2021, https://bit.ly/3S6fFx0.................................4

**INTRODUCTION**

After a two-week bench trial involving testimony from dozens of witnesses, and thousands of pages of evidence, the district court combed through the record and found that multiple provisions of Florida Senate Bill 90 (SB90) violate the Constitution and the Voting Rights Act of 1965 ("VRA"). Appellees here initially challenged two of these provisions: (1) the "Drop Box Provision," which severely curtails the availability of drop boxes to collect vote-by-mail (VBM) ballots; and (2) the "Solicitation Provision," which provides potential criminal penalties for providing assistance to voters within 150 feet of a polling place.[1] The district court correctly concluded that the Florida Legislature passed these provisions with the intent to discriminate against Black voters, and that they would in fact have a discriminatory impact.[2]

The court did not do so lightly: it gave the Legislature the benefit of every doubt. It analyzed extensive expert testimony, data, and other evidence demonstrating the impact of the Drop Box and Solicitation Provisions on Black voters. It scrutinized SB90's legislative history, contemporaneous statements by

---

[1] Appellees also challenged the "VBM Request Provision," but the court found that it was not enacted with an impermissible discriminatory intent. Op. at 133.

[2] The court found the same for the "Registration-Delivery Provision." (Fla. Stat. § 97.0575(3)(a)). This provision requires third-party voter registration organizations ("3VPROs") to deliver applications to the county where an applicant resides. Although the Florida NAACP Plaintiffs did not challenge this provision on intentional discrimination grounds, the district court addressed it along with the Drop-Box Provision and Solicitation Provision.

legislators, and evidence about SB90's foreseeable effects that the Legislature had before it. It parsed Florida's decades-long pattern of racially discriminatory voting restrictions to place SB90 in the appropriate historical context, detailing data showing the intertwining of partisanship and race, which has created conditions ripe for achieving partisan ends through racially discriminatory means. After all this, it carefully considered other possible non-racial explanations for the Legislature's actions. Only after diligently weighing all the circumstances did it reach its ultimate factual findings.

This Court should affirm. The district court faithfully applied the well-settled legal framework for intentional discrimination claims. Its factual findings—which Appellants face a "heavy burden" in challenging, *Thelma C. Raley, Inc. v. Kleppe*, 867 F.2d 1326, 1328 (11th Cir. 1989)—are amply supported in the trial record. It did not err, much less clearly err, in developing the foundation of factual findings that support its conclusions.

Appellants' arguments to the contrary miss the mark. The district court's opinion flatly refutes most of them. The district court did not "conflate[] partisanship with race." Brief for Secretary Byrd, Attorney General Moody, and Supervisors Hays and Doyle ("Br.") at 1. Rather, it carefully traced how the Legislature, to achieve partisan ends, knowingly sought to suppress Black voter

turnout.  Op. at 125-136.[3]  The district court did not "disregard[] the legislative presumption of good faith."  Br. at 1.  To the contrary, it emphasized the deference owed to the Legislature and rejected some aspects of Appellees' claims, while detailing how the specific facts drove its finding against the Legislature's presumed good faith.  Op. at 4-7.  Its intent analysis fills almost 100 pages of the court's decision, *id.* at 39-136, and it did not merely select "one statement from one legislator" as its "fulcrum."  Br. at 17.

Appellants' other critiques are equally simplistic and misdirected:  the district court's judicious recognition that some of the data and evidence before it was not decisive standing alone, *see* Br. at 1, 30, only underscores the reasonableness of the district court's conclusion that *all* of the evidence, taken together, validates its finding of intentional discrimination.  This factual finding should not be second-guessed.  As discussed further below, none of Appellants' arguments justify reversal here.

Finally, after finding intentional discrimination violations, the district court crafted a time-limited and narrow preclearance remedy under Section 3 of the Voting Rights Act.  The district court acknowledged that preclearance is a significant remedy and implicates federalism concerns, but it properly concluded that Florida's

---

[3] Citations to "Doc." are to the docket entries in Case No. 4:21-cv-186 (N.D. Fla.).
For all such citations, the page number refers to the page numbers in the ECF
headers.  The trial court decision ("Op.") is Doc. 665.

persistence in disenfranchising and discriminating against Black voters, including through SB90, made it appropriate here. This Court should also affirm on that point.

## STATEMENT OF THE ISSUES

1.  Did the district court clearly err in finding, based on a voluminous factual record including extensive fact-witness and expert trial testimony, that the Drop-Box and the Solicitation Provisions of SB90 had a discriminatory impact and were passed with discriminatory intent against Black Florida voters, in violation of the First, Fourteenth, and Fifteenth Amendments and the VRA?

2.  Did the district court reasonably conclude that a preclearance remedy under Section 3(c) of the VRA was warranted in light of the court's factual findings regarding the Florida Legislature's persistent pattern of targeting Black voters, including through SB90?

3.  Did the district court correctly conclude that the Solicitation Provision is unconstitutionally vague and overbroad in violation of the First Amendment?

## STATEMENT OF THE CASE

In the immediate aftermath of the "most successful election [] in the country," the Florida Legislature rushed to enact SB90. Gov. DeSantis, Feb. 19, 2021, https://bit.ly/3S6fFx0. Among other changes, the law (1) reduces the availability of drop boxes by tens of thousands of hours, *see* Fla. Stat. § 101.69(2); Doc. 608-6 at 87-88; and (2) discourages, with potential criminal penalties, nonpartisan organizations from providing voters waiting in line with food, water, and umbrellas.

*See* Fla. Stat. § 102.31(4)(a)-(b).  SB90 disproportionately impacts Black voters'

access to the franchise—as the Legislature well knew and fully intended.

## I.    Prior Proceedings

The day SB90 was passed, Appellees filed suit to enjoin the Drop Box

Provision and the Solicitation Provision for, *inter alia*, intentionally discriminating

against Black voters, and unduly burdening the right to vote, in violation of the First,

Fourteenth, and Fifteenth Amendments of the U.S. Constitution as well as Section 2

of the Voting Rights Act.  Appellees also sought to enjoin the enforcement of the

Solicitation Provision as unconstitutionally vague and overbroad, in violation of the

First Amendment.

After a 14-day bench trial with testimony from individual Florida voters,

nonpartisan organizations, legislators, Supervisors of Elections ("SOEs"), and

experts, the district court found that "to advance the Legislature's main goal of

favoring Republicans over Democrats, the Legislature enacted some of SB 90's

provisions with the intent to target Black voters because of their propensity to favor

Democratic candidates," in violation of the Fourteenth and Fifteenth Amendments

of the Constitution and Section 2 of the VRA.[4]  Op. at 135.  At trial, Appellants made

no effort to prove that the Legislature would have passed those provisions regardless

---

[4] In light of those conclusions, the district court did not reach some of Plaintiffs'
other claims regarding the Drop Box, Solicitation, and Registration-Delivery
Provisions.  *See* Op. at 244-45, 257.

of racial motivations.  Op. at 136.  As a result, the district court enjoined these provisions and required Florida to preclear any law or regulation governing drop boxes, "line warming"[5]  activities and third-party voter registration organizations. Op. at 281.

On May 6, 2022, this Court stayed the district court's opinion.

## II.    Factual Background

### A.    Voters Cast VBM Ballots in Record Numbers During the "Safe, Secure, and Orderly" 2020 Elections.

The 2020 elections were marked by a significant increase in the use of VBM ballots, particularly by Black voters.  Op. at 66-68.  In prior elections, white voters favored casting mail ballots more than Black voters.  During the 2016 General Election, about 29% of white voters cast VBM ballots, compared to 19% of Black voters.  Doc. 608-6 at 39.  Although more voters of all racial groups cast VBM ballots in the 2020 election, the uptick was particularly notable for Black voters, who more than *doubled* their rate of VBM usage. *Id*.; Tr. (Day 9) at 2580.  The percentage increase in white VBM ballots cast was less than half that of Black voters.  Op. at 66; Doc. 608-6 at 39.

Notwithstanding the overall record turnout, the 2020 elections in Florida were universally heralded as a success.  Op. at 68.  Laurel Lee, Florida's then-Secretary of State, proclaimed that Florida had run three "safe, secure, and orderly" elections

---

[5] The non-partisan provision of aid to those waiting in line to vote.  Op. 281.

in 2020. *Id.* The SOEs, who are responsible for election administration in their respective counties, agreed, praising the elections as secure and successful. *Id.* Florida legislators also initially joined the chorus: Representative Blaise Ingoglia declared that the 2020 election was a model for how future elections should be run, and Senator Dennis Baxley thanked Secretary Lee for running an exceptional election. *Id.*

### B. Nonetheless, the Florida Legislature Rushed to Pass SB90, While Publicly Offering Conflicting Justifications.

After singing the praises of the 2020 elections, Florida legislators suddenly changed their tune. They quickly turned to drafting SB90, a bill that contained provisions which curtailed Floridians' ability to participate in elections. Lake County's SOE, Alan Hays, who also served as Chairman of the Legislative Committee of the Florida Supervisors of Elections, an association of Florida's SOEs, told the Governmental Oversight and Accountability Committee that "nothing in this bill is on [the SOEs'] list of suggestions" of election changes for the legislature to consider.[6] Op. at 76-77. Neither the sponsor of SB90, nor the sponsor of its companion House Bill 7041, solicited the input of any SOEs before filing the bills, which one SOE lamented to legislators was "ironic as we are the subject matter experts who actually administer elections." Doc. 608-30, Tr. (Day 4) at 1270-1271.

---

[6] SOE Hays identified one exception to this statement: an SB90 provision that has not been challenged in this case. Op. at 76-77.

As the district court concluded, the proffered justifications for the bill—to ensure election integrity and security—were not plausible because the legislative record exposed conflicting and nonsensical justifications offered by supporters. One state Senator testified that the rationale for SB90 "was perhaps the most [elusive] answer we faced." Op. at 69, Tr. (Day 5) at 1517. At times, supporters suggested that the election reforms were designed to address fraud, Op. at 70; yet supporters and sponsors of the bill never identified any type of VBM fraud that SB90 might prevent. Op. at 72; Tr. (Day 5) at 1557. At other points, sponsors outright denied that addressing VBM fraud was the purpose of the bill. Op. at 71; Tr. (Day 6) at 1766.

Supporters also struggled to offer rational justifications for SB90's Solicitation and Drop Box Provisions. Supporters claimed that the purpose of the Solicitation Provision was to respect privacy. Op. at 75. However, Florida law had already banned solicitation before SB90. *Id.* Similarly, contradictory justifications for the Drop Box Provisions were floated: at one point, a sponsor argued that drop box tampering "is a regular phenomenon that happens," only to claim later that he had "never made the case against box tampering." Op. at 74. In addition, even though proponents claimed the Drop Box Provision was designed to "ensure the chain of custody of the ballot," the bill did nothing to address the chain of custody for the majority of VBM ballots—those deposited in mailboxes. *Id.* Pasco County

8

SOE Brian Corley told a reporter, "I'm literally befuddled as to why we would tweak a system that performed exceedingly well . . . The current Vote By Mail [] statutes . . . worked extremely well in . . . all of Florida."  Doc. 608-28; Tr. (Day 4) at 1271-72.

Notably, SB90 focused on changing VBM procedures, the very method that Black voters relied on in record numbers during the 2020 elections.  Op. at 69.  SOE Corley later added, "I have so much I want to say about the motives, intent and content of this election bill . . . ."  Op. at 78.  In private conversations, some supporters of SB90 admitted the legislation had a partisan motive, explaining that not making certain changes to the VBM system would "[p]ut[] at [r]isk all Republican" candidates.  Op. at 85.

The data presented at trial was also clear: "race and partisanship are inextricably intertwined; and that has been so in Florida throughout its history."  Op. at 48.  In recent elections, almost 90% of Black Florida voters favored Democratic presidential and gubernatorial candidates.  Op. at 49.  A minority of white Florida voters, on the other hand, favored Democratic candidates.  *Id*.  This extreme polarization "renders [Black] voters uniquely vulnerable to the inevitable tendency of elected officials to entrench themselves by targeting groups unlikely to vote for them."  Op. at 51 (*quoting North Carolina NAACP v. McCrory*, 831 F.3d 204, 214 (4th Cir. 2016)).  As even Appellants' expert conceded, "it would provide [a]

political advantage to the Republican Party in Florida if voting were to decrease among African-Americans." Op. at 50-51; Tr. (Day 12) at 3362. Given the strong correlation between race and partisanship, "it is easy to see how Republican Legislators . . . could be tempted to secure their own position by enacting laws targeting Black voters." Op. at 51-52.

Indeed, the court found a 20-year pattern of voting laws in which "Florida has repeatedly sought to make voting tougher for Black voters because of their propensity to favor Democratic candidates." Op. at 64. For example, in 2011, after Black voters used early in-person voting more than white voters during the 2008 and 2010 elections, the Florida Legislature passed HB 1355, which "surgically removed only those early voting days used disproportionately by Black voters." Op. at 60. Between 2001 and 2019, Florida conducted a series of voting roll purges that disproportionately impacted Black voters and other voters of color. Op. at 52-57. And most recently, in 2018, after Floridians voted to restore voting rights to individuals convicted of certain felonies, the Legislature passed SB 7066, which required payment of all fees owed to the state before voting rights could be restored. Op. at 63. That legislation affected more than double the percentage of potential Black voters as compared to white voters. Op. at 63-64.

### C. The Legislature Knew that SB90 Disproportionately Affected Black Voters.

Florida's long history of racial discrimination has created socioeconomic disparities between racial groups that persist to this day. Op. at 45. Non-Hispanic white Floridians outpace Black Floridians across almost all key variables of socioeconomic status. Op. at 45-46. White household income is 46.7% higher than Black household income. Tr. (Day 2) at 616. Black households are almost three times as likely to live below the poverty line. *Id*. at 598. Black Floridians are more likely to use public transportation, face longer commutes to work, work less flexible hours, and are more than twice as likely to lack access to their own vehicle. Tr. (Day 2) at 629-31, Op. at 104.

Placed in the context of the "calculus-of-voting framework," which "describes each voter's decision to turnout as a comparison of costs and benefits," these disparities show that Black Floridians face much higher costs of voting than white Floridians. Op. at 90. As a result, on average, Black voters in Florida are more affected by the increased transportation, time, and information costs that the Drop Box and Solicitation Provisions of SB90 impose.

As the district court found, legislators knew that the Drop Box and Solicitation Provisions would disparately burden Black voters. Op. at 90-112. Some legislators voiced this very concern to colleagues. Op. at 120. For example, during debate on the Senate Floor, Senator Berman pointedly asked Senator Baxley, SB90's sponsor,

"[a]re you aware that the restrictions in this legislation including those related to drop box and access to voter assistance will have a disparate impact on black voters?" Op. at 88, Doc. 461-98. In a moment of candor, instead of denying the disparate impact, Senator Baxley simply acknowledged that there would be "a learning curve." *Id*.

In addition, the Legislature specifically sought out data which showed that some provisions of SB90 would disproportionately burden Black voters. To supplement the election recap report that the Division of Elections provides after each election, the Legislature asked the Division of Elections and SOEs for more information about first-time VBM users and "[w]ho uses drop boxes." Op. at 117-120. This data revealed that SB90 would have a disparate impact on Black voters. Op. at 120.

Rigorous statistical analysis also confirmed the finding of disparate impact. Two separate renowned election administration experts separately conducted a series of statistical analyses, all of which led to the same "remarkably consistent" conclusion: the Drop Box and Solicitation Provisions would disproportionately impact Black voters. Op. at 103, 115.

In the face of this evidence, and less than a year after a widely praised election, the Florida Legislature proceeded to pass SB90 without the endorsement of the

Supervisors' association, and without allaying the legitimate concerns of its opponents. On May 6, 2021, Governor DeSantis signed it into law.

## SUMMARY OF ARGUMENT

The district court's ruling should be upheld. The court began its analysis with the principle that state legislatures are accorded deference in crafting voting laws—which, in substance, is a presumption of good faith. Op. at 4-5. Then, guided by the principles articulated by the Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), the district court engaged in the required "fact intensive examination of the record." *Greater Birmingham Ministries v. Sec'y of State for State of Alabama*, 992 F.3d 1299, 1322 (11th Cir. 2021) ("*GBM*").

No single factor or piece of evidence led the court to conclude that SB90 was intentionally discriminatory. Instead, the court appropriately looked at the "totality of the relevant facts." *Washington v. Davis*, 426 U.S. 229, 242 (1976). Taken together, those facts lead to an inescapable conclusion: some provisions of SB90 were passed to "target Black voters because of their propensity to favor Democratic candidates." Op. at 135. SB90 targeted drop boxes after Black voters used them at dramatically higher rates in 2020, and it curtailed drop box availability at the "specific times and days Black voters" most use them. Op. at 128. Similarly, voters of color tend to wait in longer lines to vote, and SB90 made it more painful to wait in those lines. Op. at 109-112. These efforts "[fit] neatly within" the Florida

Legislature's "pattern" of discriminating against Black voters. Op. at 128. And the Legislature was not just aware of these effects—it passed SB90 to achieve them. It knew about SB90's foreseeably disparate impact and was aware of less discriminatory alternatives. Yet it forged ahead. The district court's factual findings on these points are firmly grounded in the trial evidence, including witness testimony, expert evidence, and trial exhibits.

Finally, the district court appropriately imposed a preclearance remedy under Section 3(c) of the Voting Rights Act. Section 3(c) authorizes district courts to require jurisdictions to preclear changes to voting regulations after a finding of intentional discrimination. The district court imposed a narrowly tailored remedy limited to the three specific areas where it found intentional discrimination in the Legislature's passage of SB90: restrictions on drop boxes, line relief activities , and third party-voter registration organizations. Appellants' primary argument is that the district court misapplied *Shelby County*, yet they ignore (1) that the district court carefully analyzed *Shelby County*; and (2) the critical differences between preclearance under Sections 3 and 5 of the Voting Rights Act. This Court should affirm the imposition of Section 3(c) relief.

## STANDARD OF REVIEW

After a bench trial, this Court reviews a district court's conclusions of law *de novo* and its factual findings for clear error. *Renteria-Marin v. Ag-Mart Produce, Inc.*, 537 F.3d 1321, 1324 (11th Cir. 2008); Fed. R. Civ. P. 52(a). "Clear error is a

14

highly deferential standard of review," *Holton v. City of Thomasville Sch. Dist.*, 425 F.3d 1325, 1350 (11th Cir. 2005), and "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1254-55 (11th Cir. 2016). As the Supreme Court has explained, "[t]he authority of an appellate court, when reviewing the findings of a judge as well as those of a jury, is circumscribed by the deference it must give to decisions of the trier of the fact, who is usually in a superior position to appraise and weigh the evidence." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 123 (1969).

## ARGUMENT

### I.    All Appellees Have Standing.

Without citing any support, Appellants speculate that Appellees may not have established standing. Br. at 2. That is incorrect. The district court found that the Florida State Conference of Branches and Youth Units of the NAACP established standing for its challenges to SB90. Op. at 17-35. Nothing more is required. *See Rumsfeld v. FAIR*, 547 U.S. 47, 53 (2006) (only one party with standing is required). For standing purposes, the purported "slightness" of the burden alleged is immaterial: even an "identifiable trifle" is enough. *See Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009).

Specifically, the district court determined that the Florida NAACP has associational standing to challenge the Drop Box Provision through one of its

members, Ms. Scoon. Ms. Scoon testified that she had used an unmanned drop box for years. Op. at 24-25. The County Supervisor, however, removed the drop box because of SB90. *Id.* As a result, Ms. Scoon testified that she would need to change the way she voted. *Id.* at 25. The district court credited Ms. Scoon's testimony and further explained how an injunction would provide Ms. Scoon with relief. *Id*. at 25-26.

As to the Solicitation Provision, the district court correctly concluded that the Florida NAACP has standing, crediting the testimony of Cynthia Slater. Op. at 29. Ms. Slater testified that the Volusia County-Daytona Beach Branch of the Florida NAACP provided significant line relief activities before SB90 was passed but planned to cease those activities because of SB90. *Id.* at 30. This injury was traceable to the SOE in Volusia County, who is authorized to interpret the statute and had already interpreted the Solicitation Provision to ban the branch's line relief activities. *Id.* at 31. And the district court correctly concluded that an order prohibiting the Supervisor from enforcing the Solicitation Provision to prohibit line relief activities will redress this injury to the Volusia County-Daytona Beach Branch. *Id.* at 31.[7]

---

[7] Although it is not required for purposes of this appeal, Common Cause and Disability Rights Florida have also independently established standing. *See* Doc. 652 at 206-211, 652-1. Common Cause had to divert resources from its normal activities to educate voters about SB90's changes through new educational materials and the hiring of additional community organizers. Tr. (Day 2) at 544-559.

## II. The District Court's Intentional Discrimination Findings Are Well-Supported by the Trial Record.

The district court properly applied the presumption of good faith; but that presumption was overcome by voluminous record evidence proving that the Drop Box and Solicitation Provisions were passed to target Black voters. Appellants' contention to the contrary is wrong for several reasons. Br. at 17.

*First*, Appellants' contention is based, in large part, on the mere absence of the specific phrase "good faith" from the court's opinion. Br. at 17. But "a district court, writing after a bench trial, is not required to use 'magic words.'" *Burrell v. Bd. of Trs. of Ga. Mil. Coll.*, 125 F.3d 1390, 1395 (11th Cir. 1997). Instead, what matters is whether the district court, in substance, presumed that the Legislature acted in good faith and required Plaintiffs to present evidence overcoming that presumption.

*Second*, the district court's opinion is clear that it *did* apply the presumption. The opinion expressly states from the outset its foundational premise that "States enjoy considerable discretion in regulating their elections." Op. at 4. When analyzing voting laws, the district court cautioned, it "must use a gentle touch, recognizing the State's prerogative to make such laws." *Id.* at 4-5. And, pointing to

---

Disability Rights Florida also diverted resources as a result of SB90. *Id.* at 468-473; Tr. (Day 10) at 2733-36.

its prior rulings for the State in election cases, it noted that it had "long deferred to the State when evaluating its election regulations." *Id.* at 5.

*Finally*, the presumption is just that—a presumption. Appellants imply that the presumption provides the Florida Legislature with insurmountable deference. Not so. The presumption can be overcome by evidence that the Legislature engaged in intentional racial discrimination. *United States v. Armstrong*, 517 U.S. 456, 464. The *Arlington Heights* factors,[8] as supplemented by this Circuit's precedent, guide courts in reaching the "ultimate question": whether a "discriminatory intent has been proved in a given case." *Abbott*, 138 S. Ct. at 2324-25; *GBM*, 992 F.3d at 1319. Recognizing that "[it] must be careful not to focus on each fact in isolation," the court carefully weighed the facts in their totality. Op. at 41. Once Appellees had proven that SB90 had a discriminatory impact and that race was a motivating factor, the burden shifted to the Defendants "to show that the Legislature would have passed the law anyway." Op. at 40. But Defendants made no attempt to do so at trial. Op. at 135-36.

Further, to make out a claim under Section 2 of the VRA, Appellees must only prove that a law was passed with the intent to discriminate. *Askew v. City of Rome*,

---

[8] The factors are: "(1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; (5) the contemporary statements and actions of key legislators; (6) the foreseeability of the disparate impact; (7) knowledge of that impact, and (8) the availability of less discriminatory alternatives." *GBM*, 992 F.3d at 1321-22.

127 F.3d. 1355, 1373 (11th Cir. 1997). Where a facially neutral law is motivated even in part by race, it is "just as abhorrent, and just as unconstitutional[] as laws that expressly discriminate on the basis of race," and must enjoined under Section 2 of the VRA. *McCrory*, 831 F.3d at 220. The district court's factual findings along each of the guideposts from *Arlington Heights* are well-supported in the record and show that the Drop Box and Solicitation Provisions were passed with discriminatory intent.

## A.    Discriminatory Impact

Unrebutted factual evidence in the record firmly supports the district court's conclusion that the Drop Box and Solicitation Provisions will have a disparate impact on Black voters. Appellees presented multiple experts that relied on statistical evidence and the "calculus-of-voting framework," both of which the district court found credible, to reach a common conclusion: the provisions of SB90 at issue would "bear[] more heavily on one race than another." *Davis*, 426 U.S. at 242; *see* Op. 90-104, 109-113. That impact is material, as "[s]uppressing just 1% of Black voters . . . could easily swing an election." Op. at 51.

Appellants' argument conflates two different standards and misconstrues the magnitude of disparate impact that must be shown for this factor to weigh in favor of a court finding intentional discrimination. Appellants misguidedly argue that because the district court did not find that the discriminatory impacts are "so 'stark' that they reveal a pattern 'unexplainable on grounds other than race,'" the district

19

court erred in finding intentional discrimination. Br. at 30 (quoting *GBM*, 992 F.3d at 1322). However, "an invidious discriminatory purpose may [] be inferred *from the totality of the relevant facts*, including . . . that the law bears more heavily on one race than another." *Davis*, 426 U.S. at 242 (emphasis added). Although there are rare instances in which courts have found the discriminatory impact so stark as to make it unnecessary to consider other *Arlington Heights* factors, impact is generally "an important starting point" under the overall *Arlington Heights* analysis. *Arlington Heights*, 429 U.S. at 266. As this Court has explained, "[i]n cases . . . where a stark pattern of discrimination is not evident, the courts should consider circumstantial evidence." *Jean v. Nelson*, 711 F.2d 1455, 1485–86 (11th Cir. 1983), *on reh'g*, 727 F.2d 957 (11th Cir. 1984), *aff'd*, 472 U.S. 846 (1985). Appellees need not demonstrate that discriminatory impact *alone* establishes a finding of discriminatory intent. The evidence supports the district court's findings that the Drop Box and Solicitation Provisions of SB90 disparately impact Black voters, Op. at 90-116, and, in conjunction with other factors, weighed in favor of the court's ultimate conclusion that SB90 was passed with discriminatory intent.

After hearing from multiple experts, including two prominent election administration experts, the district court found that Black voters would be disparately impacted by the Drop Box and Solicitation Provisions of SB90. Op. at 90-103, 109-113. Appellants seek to divorce individual threads of evidence from

the larger "calculus-of-voting" framework which undergirds Appellees' experts' analysis and ignore that multiple distinct analyses lead to "remarkably consistent" conclusions. Op. at 103. In a bench trial, similar to this one, "the district court judge is . . . itself the finder of fact, and [the appellate court] owe[s] it the same deference in assessing the credibility of expert testimony that [it] would owe to a jury." *Bellitto v. Snipes*, 935 F.3d 1192, 1209 (11th Cir. 2019).

### 1. Expert Statistical Analysis Supports the District Court's Finding of Disparate Impact.

Appellees' experts substantiated the logical conclusions drawn from the "calculus-of-voting" framework and demographic and socioeconomic data with specific statistical evidence of voting patterns. Appellants quibble with these analyses but fail to rebut the reasonable conclusion to which they all lead. Indeed, Appellants themselves admit that Appellees' expert analysis suggests a "difference" in how Black and non-Black Floridians voted. Br. at 30.

Further, in a bench trial, a core function of the district court is to draw inferences from data. The factual findings it reaches after weighing and assessing data are reviewed for clear error. In *Bellitto*, for example, this Court deferred to the district court's weighing of competing expert evidence based on data: "[w]here the evidence reasonably could support multiple inferences, it is not our job to pick one inference over another or to otherwise second guess the district court's plausible factual findings and the inferences it has drawn from those facts." 935 F.3d 1192,

1207 (11th Cir. 2019). As in *Bellito*, here "the district court explained in detail and justified its analysis of the record evidence at length." *Id*.; *see also*, *e.g.*, *Missouri State Conf. of the NAACP v. Ferguson-Florissant Sch. Dist.*, 894 F.3d 924, 932-41 (8th Cir. 2018) (no clear error in district court's inferences drawn from voter-related data).

### a)    Drop Boxes

SB90 limits the availability, locations, and hours for voters to deposit their VBM ballots in drop boxes. The law imposes new requirements, including (i) a mandate that an employee of the SOE must continuously monitor each drop box in person while the drop box is in use, and (ii) a restriction that drop boxes, except for those at SOEs' offices, can only be available during the "county's early voting hours of operation." Op. 91-92; Fla. Stat. § 101.69(2)(a). According to unrebutted expert testimony, SB90's drop box restrictions will result in "one in four VBM drop boxes offered by SOEs in the 2020 General Election [being] curtailed in whole or in part," Doc. 608-6 at 86, ultimately depriving voters of "a minimal estimate [of] tens of thousands of hours" of drop box availability as compared to the 2020 General Election. Tr. (Day 9) at 2462-63. Therefore, SB90 imposes new costs on drop box voting and, as the district court concluded, "will burden voters who use drop boxes." Op. at 97. The reduced availability of drop boxes increases information, transportation, and time costs on voters. Doc. 608-6 at 92.

Appellees' expert, Dr. Herron, relied on lists of individuals who cast drop box ballots produced by five counties, and SB90's likely impact on the placement of drop boxes, to conduct three separate analyses of the relationship between race and drop box use. Op. at 98. All three analyses led to the same conclusion: Black voters are more likely to use drop boxes and will be disproportionately burdened by the new limitations that SB90 places on them.

Appellants' efforts to dispute Dr. Herron's conclusions are misguided in at least four respects:

*First*, though Dr. Herron's analysis was based on data from 46 counties in Florida, Appellants complain that it does not include data from Hillsborough and Duval counties. Br. at 31. However, as Dr. Herron explained in both his report and testimony, the state of Florida "does not . . . collect and maintain records on which voters in the state have used drop boxes in recent elections." Op. at 97; Doc. 608-1 at 45. As a result, he analyzed data from the 46 counties that produced data on the total counts of drop box ballots. Tr. (Day 8) at 2252. Dr. Herron did not artificially constrain or cherry-pick the data used in his analysis as Appellants seem to suggest: he simply used the *available* data. Further, Appellants provide no explanation why the omission of two counties from an analysis of 46 counties is significant or explain how it could change the conclusions of Dr. Herron's analysis.

Appellants also assert that the correlation between race and drop box usage in Dr. Herron's analysis was suggestive of disparate impact, but not statistically significant. Br. at 31. The court itself noted that this correlation was suggestive, but concluded that, when considered in conjunction with other analyses that had "remarkably consistent" results, and the entirety of the relevant expert opinions— which the court credited—Dr. Herron's analysis supported the finding that Black voters favor drop boxes more than other racial groups. Op. at 97, 103.

*Second*, Appellants seek to undermine the district court's reliance on another of Dr. Herron's analyses, which was based on the lists of individuals who used drop box ballots in Columbia, Santa Rosa, and Sarasota Counties, pointing out that in Santa Rosa County, the "[d]ata . . . showed that white voters favored drop boxes *more* than black voters—a conclusion that contradicts the district court's ultimate conclusion regarding drop boxes." Br. at 32. But Appellants ignore the balance of Dr. Herron's analysis: after a more complete study of the data to account for additional confounding variables such as age, Dr. Herron's analysis reveals a *positive and statistically significant* relationship between race and drop box usage, which the district court credited. In other words, Black voters in Florida used drop boxes more than white Florida voters during the 2020 elections. Doc. 608-1 at 56-57.

24

*Third*, Appellants criticize the district court for crediting Dr. Herron's analysis on the anticipated consequences of SB90's restrictions on drop box placements because the analysis supposedly did not account for the possibility of "Supervisors adding early voting sites or permanent branch offices." Br. at 33. But Appellants provide no evidence for this hypothetical universe of *possible* drop boxes—nor could they. The record shows that the addition of more early voting sites or permanent branch offices would "impose financial costs on [each] county," because "the county would have to have an elections[] office employee monitor the [drop box] in addition to staffing [the additional] early voting sites." Doc. 608-1 at 71. In fact, Broward County's SOE complained that SB90's Drop Box Provision "causes us to spend a lot more resources than we would have otherwise had to use." Tr. (Day 4) at 1200, 1202. Further, the district court found that this analysis "would hold true for drop boxes outside of early voting hours, where the universe of possible drop boxes is more limited," and focused on the resulting implications accordingly. Op. at 100.

Appellants also try, but fail, to undermine Dr. Smith's analysis, which led to the same conclusion as Dr. Herron's. Dr. Smith was able to match publicly available data provided by Columbia and Manatee Counties to analyze data regarding race, as well as the time-of-day voters used drop boxes. Op. at 102. The data show that Black voters are more likely to use drop boxes outside of early voting hours. Op. at

103. Contrary to Appellants' assertion, the results do not show that "white voters in Manatee County seemingly favored the use of drop boxes more than black voters." Br. at 34. Appellants base this assertion on raw numbers of drop box ballots cast, but fail to account for the proportion of Black and white voters affected. More importantly, Appellants do not refute the conclusion of Smith's analysis: Black voters would be disparately burdened by the Drop Box Provision because they more frequently used drop boxes outside of early voting hours than white voters.

Further, Dr. Smith affirmed his opinion notwithstanding the potential data-entry errors that Appellants raise in the data provided by Columbia County. Br. at 33. The errors affected only about 2% of the data, and did not affect Dr. Smith's ultimate conclusion, which the court credited, that Black voters in Columbia County were nearly nine percentage points more likely to cast VBM ballots than white voters, and that Black voters were more likely to return their ballots in a drop box— a conclusion that the district court found was consistent with the results of other analyses. Op. at 102, Doc. 608-6 at 98.

*Finally*, the conclusions reached by Drs. Herron and Smith are further substantiated by the undisputed demographic and socioeconomic data cited above. As the district court found, it logically follows that since Black Floridians disproportionately lack access to a vehicle and work jobs with inflexible schedules, Black voters will be more impacted than other racial groups by limited access to

drop boxes.  Op. at 97.  The district court's meticulous analysis considered and credited these analyses, which all indicate that SB90's limitation on drop box availability will disproportionately impact Black Florida voters.

### b)    Solicitation Provision

Appellants also claim the district court's conclusion that SB90's Solicitation Provision would disproportionately affect Black voters is flawed.  Again, Appellants again ignore multiple sources of evidence that the district court relied on, isolating only a few in an effort to criticize the court's logical conclusions.

*First*, Appellants completely ignore the "large body of peer-reviewed literature [that] concludes that Florida has, on average, longer lines than much of the country, and that minority voters are more likely to be affected by those long lines."  Op. at 109; Tr. (Day 9) at 2541-45 (Dr. Smith discussing Ansolabehere and Stewart studies of the 2006, 2008, 2012, and 2014 elections; Stein study published in the Political Research Quarterly in 2020; Lamb study of 2016 and 2018 elections; and Chen study).  Appellants rebutted neither the conclusions nor these studies at trial.

*Second*, Appellants criticize Dr. Smith's analysis of early voting data from Miami-Dade county, which indicated that in 2020, one in four Black voters had wait times of 30 minutes or more, compared to roughly three in 20 white voters.  Appellants argue that this evidence contradicts evidence from the county, which posted average wait times of less than 15 minutes at polling places during early

voting. Br. at 35; Op. at 110. But those two statements are not in conflict. An average wait time of 15 minutes necessarily means that some voters waited in line for *more* than 15 minutes. Further, the statements to which Appellants point are silent regarding the relative wait times of Black and white voters, which is the crux of the impact analysis. In addition, Dr. Smith's analysis is further corroborated by survey data, which included data from the 2020 election, that revealed that Black voters are more likely to report waiting in long lines. Tr. (Day 3) at 961. Appellants completely ignore this evidence.

*Finally*, Appellants argue that the district court's findings on the disparate impact of the Solicitation Provision are flawed because they connect long wait times with a disproportionate burden on Black voters. Br. at 34. The district court reasonably found, however, that discouraging line relief activities such as giving out food, water, or an umbrella, will affect voters who wait in line. And, as discussed above, Black voters tend to wait in line longer than white voters. As a result, it was reasonable for the court to infer that Black voters will be more burdened by SB90's restrictions on line relief activities than other groups.

**B.    Historical Background**

The district court found that the evidence presented at trial concerning SB90's historical background proved that SB90 fits into a specific pattern: "when Black voters tended to favor a form of voting, or when a change in the law opened more

opportunities for Black Floridians to vote, the Legislature has acted to restrict those opportunities." *See* Op. at 42-65. The court found that this pattern continues from the distant past to the present day, including recent instances involving the same legislators who championed SB90. *Id*. Appellants fundamentally misrepresent the historical discrimination inquiry under *Arlington Heights* and the district court's analysis of that factor, suggesting that the district court simply "concluded that 'Florida has a horrendous history of racial discrimination,'" and, thus, that this history "cuts against SB 90." Br. at 21 (quoting Op. at 64). But the court did not merely evaluate whether Florida had a discriminatory history and end its analysis there. Rather, it engaged in a targeted, fact-specific analysis demonstrating that SB90 fits a pattern of voting discrimination embedded in quite recent history.

Appellants aim four criticisms at the district court's analysis of the historical background factor: (1) the "historical background" factor should be concerned with the circumstances leading to the challenged law, rather than history; (2) the district court's discussion of socioeconomic data and the association of Black voters with the Democratic Party "proves little"; (3) the district court's discussion of statutory changes and past cases is "both selective and wrong"; and (4) the discussion of Florida's "grotesque" past is inconsistent with recent history. Br. at 21-24. For the reasons explained below, each of these arguments fails.

### 1. The Scope of the District Court's "Historical Background" Analysis Was Relevant and Appropriate.

The court properly analyzed the historical background factor of the *Arlington Heights* inquiry by examining past instances of discriminatory practices that closely mirror SB90. Nearly half a century of Supreme Court and Eleventh Circuit precedent establish that "[e]vidence of historical discrimination is relevant to drawing an inference of purposeful discrimination." *Rogers v. Lodge*, 458 U.S. 613, 625 (1982). Appellants' assertion that the "historical background" factor is concerned only with the circumstances leading to the challenged law, rather than history, is incorrect as a matter of law.

As this Court has explained, "[a] history of pervasive purposeful discrimination may provide strong circumstantial evidence that the present-day acts of elected officials are motivated by the same purpose, or by a desire to perpetuate the effects of that discrimination." *United States v. Marengo County Comm'n*, 731 F.2d 1546, 1567 (11th Cir. 1984). Indeed, this Court has "repeatedly recognized that evidence of '[t]he historical background of the decision' is relevant to the issue of discriminatory intent." *Burton v. City of Belle Glade*, 178 F.3d 1175, 1189 (11th Cir. 1999) (citing *Elston v. Talladega County Bd. of Educ.*, 997 F.2d 1394, 1406 (11th Cir. 1993) (holding that discriminatory intent may be established by, among other things, a history of discriminatory official actions)).

Appellants' contentions likewise find no support in this court's *GBM* ruling. Although Appellants are correct that this Court in *GBM* called for a focused inquiry, they are incorrect in suggesting that *GBM* rendered a state's history of discrimination irrelevant under *Arlington Heights*. Rather, in *GBM*, this Court emphasized that a state's discriminatory history cannot be the *dispositive* factor in a decision on a law's constitutionality: a state's history does not "ban[ ] its legislature from ever enacting otherwise constitutional laws about voting." *GBM*, 992 F.3d at 1325. In *GBM*, this Court found that plaintiffs had effectively failed to provide other factors relevant to discriminatory intent, instead relying on Alabama's general history of discrimination as evidence of discriminatory intent. With respect to the discriminatory impact in particular, this Court found the *GBM* plaintiffs "provide[d] no evidence that the Alabama legislators who supported the law intended the law to have a discriminatory impact or believed that the law would have such an effect." *Id.* at 1326. Here, by contrast, the district court engaged in a searching inquiry of all of the *Arlington Heights* factors, and found ample evidence of discriminatory intent. For example, the court found that the evidence "not only suggests that the Legislature had such knowledge, but also that it specifically sought it out." Op. at 116-117; *see also* Op. at 84-87 (citing Doc. 468-2 at 1), 120.

Appellants propose an interpretation whereby this Court would contradict Supreme Court precedent and effectively eliminate the separate "historical

discrimination" factor of the *Arlington Heights* analysis, collapsing it into the "sequence of events" factor. But, *Arlington Heights* makes clear that these are separate factors. 429 U.S. at 267. Indeed, Appellants' interpretation of *GBM* is directly contradicted by the opinion itself, where this Court explicitly acknowledges "historical background" and "sequence of events" as separate numbered factors of the *Arlington Heights* analysis, *id.* at 1321-22, and later analyzes each factor separately under distinct headings. *Id.* at 1322-23.

In line with this Court's own analysis and guidance in *GBM*, the district court's careful examination of history *was* a focused and limited inquiry; indeed, the court explicitly acknowledged the importance of this Court's admonition that a state's racist history "cannot ban 'its legislature from ever enacting otherwise constitutional laws about voting.'" Br. at 22; Op. at 44-45 (quoting *GBM*, 992 F.3d at 1299). Rather than consider Florida's history of discrimination generally, the district court narrowly focused its inquiry to consider policies and legislation that fall within a specific pattern in which in direct reaction to Black voter activity, laws or policies targeting Black voters' access to the polls were adopted. After weighing the evidence, the district court ultimately found that SB90 "fits neatly" into this pattern. Op. at 128.

Far from "taint[ing]" the State of Florida with "the old, outdated intentions of previous generations," Br. at 22, the district court focused its analysis on

discriminatory laws and practices from the past 20 years, including unrebutted evidence of discriminatory voting practices from as recent as 2019, some of which involve the same legislators responsible for SB90's passage. Appellants do not even attempt to engage with this evidence.

Notably absent from Appellants' brief is any discussion of HB 1355, which the district court explicitly stated was "most relevant" to its analysis of the historical discrimination factor. Op. at 127. HB 1355 reduced early voting days, effectively banning early voting on the Sunday before election day, as well as the first five days of the early voting period, all days that Black voters used "at rates nearly *double* those of White voters in 2008." Op. at 59-60 (quoting *Florida v. United States*, 885 F. Supp. 2d at 324); Doc. 608-6 at 10-12; Tr. (Day 3) at 944-47. As the district court explained, "HB 1355 surgically removed only those early voting days used disproportionately by Black voters." Op. at 60. The district court found that the circumstances behind the passage of HB 1355 mirrored those of SB90 so closely that the two effectively "are clones." Op. at 128.

33

**2.    The District Court Properly Considered Socio-Economic Data and the Association of Black Voters with the Democratic Party in its Analyzing the Historical Background of SB90.**

In its analysis of SB90's historical background, the district court properly looked to racial disparities in socioeconomic status as an indication of the lasting effect of Florida's discriminatory history, finding that "[o]ne way in which Florida's past remains relevant is through the socioeconomic disparities that it has created between racial groups." Op. at 45.  Appellants once again misrepresent the court's analysis, arguing that this socioeconomic data is irrelevant because "Plaintiffs alleged discrimination on account of race—not income." Br. at 22.

The district court relied on "socioeconomic data, registration data, and statistical data showing patterns of use by race for different modalities of voting" presented by Appellees. *See supra* Section II.A.  The court found that these are "not small disparities" and are "far too consistent to be coincidental." Op. at 48.  Rather, the undisputed data about racial disparities in Florida are "stark results of a political system that, for well over a century, has overrepresented White Floridians and underrepresented Black [] Floridians." Op. at 48.

As the district court observed, this data went "largely undisputed" by Appellants.  Op. at 46, n.16.  Unable to contradict this data or present meaningful data of their own, Appellants instead resort to mere conclusory assertions that such evidence is not important.  But weighing evidence is within the exclusive province

of the district court. *See Sidman*, 841 F.3d at 1201. By merely quibbling with the weight the district court accords to trial evidence in reaching its factual conclusions, Appellants fall far short of meeting the clearly erroneous standard of review.

Moreover, Appellants fail to provide any citation or support for their assertion that such evidence is not relevant to an inference of intentional discrimination. The law does not support them. For example, in *Rogers v. Lodge*, the Supreme Court approved of the district court's reliance on evidence of past discrimination that "contribute[d] to low black voter registration" and "prevented blacks from effectively participating in Democratic Party affairs and in primary elections." 458 U.S. at 624–25.[9] The Supreme Court specifically noted the district court's finding that the "depressed socio-economic status" of Black people in the county in the present day served as evidence of "the lingering effects of past discrimination" and upheld the district court's factual findings as well as the ultimate finding of intentional discrimination. *Id.* at 626; *see also Marengo Cnty. Comm'n*, 731 F.2d at 1568.

---

[9] The Supreme Court's decision in *Shelby County* three decades later does not change this. That decision was narrowly limited to the issue of whether the coverage formula, which was *exclusively* based on the racial discrimination present in the covered states in 1964, was outdated. *Shelby Cnty., Ala. v. Holder*, 570 U.S. 529, 557 (2013) ("Our decision in no way affects the permanent, nationwide ban on racial discrimination in voting found in § 2. We issue no holding on § 5 itself, only on the coverage formula."). Unlike the § 4 coverage inquiry, a state's history of discrimination is not a dispositive factor under the *Arlington Heights* intentional discrimination inquiry but is merely one form of circumstantial evidence considered to be probative of intent.

Appellants wrongly assert that the data showing the link between Black voters and the Democratic Party in Florida is irrelevant. As a matter of law, this correlation *is* relevant. Courts "recognize that even partisan affiliation may serve as a proxy for illegitimate racial considerations." *League of United Latin Am. Citizens, Council No. 4434 v. Clements,* 999 F.2d 831, 860 (5th Cir. 1993). When party affiliation is strongly linked to race, there is a danger that Legislatures will pass intentionally discriminatory laws against a particular race due to their affiliation with the opposing party. *See, e.g., Perez v. Abbott*, 253 F. Supp. 3d 864, 953 (W.D. Texas 2017) (finding that race can be intentionally "used as a proxy for political affiliation" to "dilute minority voting strength"). Targeting voters based on race violates equal protection principles even if the legislature does so for partisan ends. *McCrory*, 831 F.3d at 222-23 ("[I]ntentionally targeting a particular race's access to the franchise because its members vote for a particular party, in a predictable manner, constitutes discriminatory purpose. This is so even absent any evidence of race-based hatred and despite the obvious political dynamics."); *Clark v. Putnam Cnty.*, 293 F.3d 1261, 1271-72 (11th Cir. 2002) ("Incumbency protection achieved by using race as a proxy is evidence of racial gerrymandering.").

As Appellees established at trial, Florida's elections are deeply polarized on racial lines, *see* Tr. (Day 6) at 1757:8-25-1759:10; Doc. 608-25, meaning that "the race of voters correlates with the selection of a certain candidate or candidates."

36

*Thornburg v. Gingles*, 478 U.S. 30, 62 (1986); *see also id.* at 62 ("For purposes of §
2, the legal concept of racially polarized voting incorporates neither causation nor
intent. It means simply that the race of voters correlates with the selection of a
certain candidate or candidates; that is, it refers to the situation where different races
(or minority language groups) vote in blocs for different candidates.").[10]

As the district court noted, "Black voters are a key constituency for the Florida
Democratic Party. Between 2004 and 2020, Black voters favored Democratic
presidential and gubernatorial candidates at rates between 86% and 96%, or an
average of roughly 89.7%." Op. at 49; Tr. (Day 6) at 1788. On the other hand, only
approximately 38.6% of white voters cast their ballots for Democratic candidates.
Op. at 49. Secretary Lee's own records, of which the district court took judicial
notice, paint a similar picture: 78.75% of Black voters are registered Democrats,
whereas only 3.53% of Black voters are registered Republicans. Op. at 49 (citing
Doc. 568-1). Meanwhile, only 27.4% of white voters are registered Democrats.

This type of "polarization renders minority voters uniquely vulnerable to the
inevitable tendency of elected officials to entrench themselves by targeting groups
unlikely to vote for them." *McCrory*, 831 F.3d at 214 (citing *Gingles*, 478 U.S. 30).

---

[10] Appellants declare that the *Gingles* test "applies only to vote dilution cases." Br.
at 39. Neither the district court nor Appellees have attempted to apply the *Gingles*
test. Rather, Appellees reference the Supreme Court's explanation of the concept of
"racially polarized voting," a general concept that is not limited to vote dilution
cases.

Indeed, as the district court noted, Appellants' own expert conceded that "it would provide [a] political advantage to the Republican Party in Florida if voting were to decrease among African-Americans." Op. at 51. This vulnerability is only exacerbated in Florida due to the closeness of elections: "Suppressing just 1% of Black voters—or 19,381 voters—would, on average, suppress 17,443 Democratic votes, and thus could easily swing an election." Op. at 51.

Ultimately, the district court, acting in its capacity as the factfinder, found that the record "suggests that, in the past 20 years, Florida's legislators and cabinet officials have given into that temptation several times—targeting Black voters because of their affiliation with the Democratic party." Op. at 52. Appellants cannot simply replace the court's findings of fact with their own after failing to rebut the testimony offered by Appellees' experts and other evidence at trial. Appellants have failed to establish (or even argue) that the court's findings on this matter constitute clear error.

In short, the district court did not "conflate" race with partisanship. Instead, the court found that Florida's Legislature has repeatedly passed laws targeting Black voters. *Cf. Perez*, 253 F. Supp. 3d at 948 ("Plaintiffs do not argue that partisan motivation favoring Republicans is automatically racially discriminatory motivation against minorities, who generally vote Democratic. Rather, they argue that Defendants intentionally discriminated on the basis of race to gain partisan

advantage and protect incumbents, and that this constitutes racially discriminatory purpose."). Whether or not it does so purely out of racial animus or merely to gain a political advantage is irrelevant; in either case, the Legislature is passing laws that intentionally discriminate against Black voters.[11]

### 3. The District Court Properly Considered Past Discriminatory Legislative Actions in its Analysis of the Historical Background of SB90.

In connection with the historical background factor, the district court analyzed numerous instances of past discrimination in voting, ranging from previous decades to the present day, examining how these instances parallel SB90 and properly finding that they constitute an ongoing pattern of which SB90 is a part. As the court observed, "[o]nce is an accident, twice is a coincidence, three times is a pattern." Op. at 64. While Appellants deride the district court's discussion of history as "selective," they only address the court's discussion of voter roll purging, failing to engage with the unrebutted evidence of discrimination in, for example, early voting, Op. at 58-61, which played a key role in the court's analysis.

---

[11] Notably, Appellants never defended SB90 on the ground that it was enacted for partisan rather than racial reasons. With good reason. Seeking to disadvantage voters solely for partisan reasons is not a legitimate state interest under the *Anderson-Burdick* framework, which is another claim that Plaintiffs raised. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 204 (2008); NAACP Compl. at 47-49. Indeed, even if the district court had erred in its racial discrimination finding (which it did not), a remand would be necessary to address these other claims.

Appellants also argue that "there's nothing to suggest that Florida's efforts over the *last decade* were either flawed or improper." Br. at 23. This is simply false. The district court noted, as reported by Dr. Burch, that "[t]he evidence suggests that canceled voter registrations still disproportionately affect African Americans, *including the thousands purged between 2018 and 2019*." Op. at 57 (quoting Doc. 467-6 at 16–17) (emphasis added).

Lastly, Appellants confusingly assert that the evidence of the Florida Legislature's habit of passing a discriminatory law and then, after costly litigation and widespread public outrage, backing away from it, somehow cuts *against* the notion that SB90 was enacted with discriminatory intent. Br. at 23. To the contrary, this evidence establishes a clear pattern wherein Florida legislators have repeatedly attempted to pass discriminatory legislation only to back away from these laws when faced with adverse publicity and costly litigation. The district court did not err in drawing reasonable inferences as to the impetus for SB90 from that historical record here.

### 4. Florida's "Grotesque" Discriminatory Voting Practices Have Continued to the Present Day.

The court properly found that Florida's discriminatory voting practices have continued to the present day and, indeed, focused the majority of its analysis on discrimination occurring in the past two decades, including numerous instances from the past few years. *See* Op. at 52-65.

Instead of acknowledging or engaging with this evidence of the numerous discriminatory policies and legislation in Florida's recent history, which they were unable to rebut at trial, Appellants attempt to distract from the issue with irrelevant information: that a handful of Black people in Florida have held public office in the past 30 years and that President Obama won in the state. Br. at 23. Although this may establish that Florida does not have laws barring Black people from holding office, it is irrelevant to the intent of the Florida Legislature in passing SB90.

In attempting to reframe the question as whether Black voters are completely unable to access the franchise, Appellants mischaracterize both the scope and purpose of the *Arlington Heights* inquiry. Rather than engage with the unrebutted evidence that Black voters continue to face higher costs of voting and have been disenfranchised by intentional actions of the Florida Legislature, Appellants address a strawman argument that is not legally relevant under *Arlington Heights*, was never made by Appellees at trial, and was not considered in the district court's opinion.

Appellants failed to rebut any of this evidence or expert testimony and the district court found it credible. The wealth of unrebutted expert and other evidence presented by Plaintiffs at trial stands in stark contrast to the feebleness of the expert testimony presented by Appellants. As the district court explained, it did not strike the testimony of Appellants' expert (although it was a "close call") but found that

41

"his conclusions are not reliable" and his methodologies were not accepted in the field.  Op. at 43, fn. 14.

### C.    Sequence of Events

The Florida Legislature passed SB90 after the 2020 election, which was widely regarded as secure and successful.  Notably, after then-President Trump and then-Governor Scott alleged that fraud occurred in the 2018 election, the Legislature did not prioritize efforts to reform the election code.  Op. at 70.  However, after VBM use among Black voters doubled in 2020, from 20% to 40%, significantly outpacing the increases in usage among other demographic groups, the Legislature specifically focused SB90's election reforms on restricting VBM access, the very method that Black voters had successfully used in the 2020 election.  Op. at 128.

Publicly, the bill's proponents struggled to develop cogent justifications for the bill.  The court found the most common justification—that SB90 was passed to instill voter confidence by ensuring election integrity and security—was not credible.  Floridians had high confidence in the outcome of the 2020 election.  In fact, the court relied on data concluding that Floridians were among the highest in the nation in terms of voter confidence.  Op. at 70.

Other conflicting rationales for the bill also support the district court's rejection of the State's proffered justifications.  Representative Ingoglia admitted that he saw no issues with election integrity.  Op. at 72.  Senator Baxley admitted that he had no evidence of fraud involving drop boxes or any widespread fraud

42

involving VBM ballots. Op. at 70-71. Senator Farmer testified that the Legislature was never presented with an example of any type of VBM fraud that SB90 might prevent. Op. at 72. In fact, proponents rejected an amendment that would have criminalized Florida's only reported election fraud scheme in the 2020 election, which involved sham candidates. Op. at 71-72. Proponents also claimed that SB90's drop box provisions sought to ensure the chain of custody over ballots, while doing nothing to secure the chain of custody for the greater number of ballots sent through the U.S. Postal Service. Op. at 74-75. Even Appellants' own witness, Mr. Ramba, described the discrepancy as "ridiculous." Op. at 75; Tr. (Day 11) at 3105.

In addition, SOEs, the elected officials charged with actually administering elections, were united in opposition to SB90 throughout its consideration and expressed their opposition to the Legislature. For example, Supervisor Hays told the Senate Governmental Oversight and Accountability Committee that the only provision that the Supervisors supported in the entire bill is one that is unrelated to this litigation. Op. at 76-77. Senator Farmer and Representative Thompson testified that multiple SOEs told the Legislature they opposed the bill's passage, with the former remarking that he had "never seen 67 different counties' elected officials agree on anything" before their unanimous opposition to SB90. Op. at 76. SOEs were able to get the Legislature to back down on a number of particularly egregious provisions but did not support even the final iteration of the bill. In fact, the SOEs'

43

legislative priorities moving forward largely involve repealing some of SB90's provisions.  Op. at 78.[12]

### D.     Contemporary Statements of Legislators

The district court's finding that contemporary statements by legislators supported an inference of intentional discrimination is also supported by substantial evidence in the trial record.  Appellants argue that the district court flouted the guidance of *GBM,* which "rejects the relevance of statements from single legislators," by relying on one statement by Senator Baxley in evaluating this factor. Br. at 30.  This mischaracterizes both *GBM* and the court's evaluation of those statements.  In *GBM*, this Court criticized the use of statements regarding "a different bill on a different topic unrelated" to the challenged law.  *GBM*, 992 F.3d at 1324-25.  Here, the court relied on statements about SB90.  And when discussing the actions and statements of some individual legislators, the court expressly noted that actions of individual Senators "cannot tell this Court much about *the Legislature's* motivations."  Op. at 88.

Even after placing those statements in the appropriate context, the court was persuaded that the aim of SB90 was to create electoral advantage for Republicans,

---

[12] Further highlighting the district court's even-handed evaluation of the evidence, the district court found that the evidence presented regarding the procedural and substantive departure factor of the *Arlington Heights* analysis did not "strongly weigh one way or the other." Op. at 83.  Discussion of that factor has therefore, been omitted here.

and the Legislature, using race as a proxy for partisanship, targeted Black voters to achieve that end. Op. at 98. In addition to Senator Baxley's statement about a "learning curve" which revealed that legislators were aware of the disparate impact that provisions of SB90 would create (*infra* Section II.E), the court considered a text conversation in which Senator Gruters complained that if the Legislature abandoned a provision of SB90 it would "put[] at risk" all Republican candidates. Op. at 85. As this text conversation revealed, legislators sought to use restrictions in SB90 as a vehicle to curb Democratic voters participating in elections and create a partisan advantage for Republicans. And indeed, suppressing even 1% of the Black vote would, on average, suppress over 17,000 Democratic votes. Op. at 51. The court found this to be the only credible reason for passing SB90 in light of the multitude of conflicting and nonsensical publicly-stated justifications for the bill. Op. at 86.

### E. Foreseeability and Knowledge of the Disparate Impact

The district court found that, not only did the Legislature foresee SB90's disparate impact, but it had actual knowledge of the impact. Op. at 116. This finding is supported by the record, which shows that the Legislature asked for, and received, voter demographic information; "the same demographic information that [the district court] had before it [at trial]—possibly even more information." Op. at 116-119. Legislator testimony also revealed awareness of the disparate impact. Op. at 120-21.

First, the court's conclusion was based on Director Maria Matthews' testimony that (1) after every election, the Division of Elections provides the Legislature with an election recap report that includes voter registration and voting history data, and (2) after the 2020 elections the Legislature specifically requested more information, including data regarding first-time VBM users and "who uses drop boxes," which included demographic data.  Op. at 117-118; Tr. (Day 13) at 3409.  Appellants assert that the court's conclusion was erroneously based on the demeanor, but not the words, of Division of Elections Director Maria Matthews.  Br. at 36.  Contrary to Appellants' assertion, the district court did not err in making a credibility determination regarding Director Matthew's attempt to renege on this testimony.  Credibility determinations are the province of the factfinder because they "observe[] the testimony and [are] thus in a better position than a reviewing court to assess the credibility of witnesses."  *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002).  Accordingly, appellate courts "will not ordinarily review the factfinder's determination of credibility."  *Sidman*, 841 F.3d at 1201.

Second, the district court relied on testimony from several legislators that corroborated its conclusion that, while considering SB90, the Legislature had demographic data before it that showed SB90 would have a disparate impact. Tellingly, when asked if he was aware that restrictions in SB90 would have a disparate impact on Black voters, Senator Baxley responded: "Now to look at

patterns of use and say, well, you may have to go about it a little different way. There's a learning curve." Op. at 88; Doc. 461-98 at 100. As the district court noted, this response "acknowledges, (a) he has looked at data showing Black voters use drop boxes in ways SB90 restricts, and (b) he knows that this data shows Black voters will be impacted by SB90." Op. at 88-89. The court's findings were further informed by Senator Farmer, who testified that he was in possession of detailed statistical evidence about the rates at which different races utilize third party voter registration organizations to sign up to vote. Op. at 119. The court noted that "[t]he Legislature could only have obtained this information from the Division of Elections" because it is not publicly available. Op. at 119. Senator Farmer also testified that he was "presented with evidence and statistics and studies that showed that people of color and minorities were going to be impacted by [certain] provisions [of SB90] more than White voters," and that he relayed his concerns to his Senate colleagues. Op. at 120; Tr. (Day 5) at 1528. Thus, the district court's conclusion that the Legislature was aware of the disparate impact was supported by ample record evidence and cannot plausibly qualify as clear error.

## F.    Less Discriminatory Alternatives

The district court's finding that there were less discriminatory alternatives is also amply supported by the trial record.  In fact, the record reflects that the Legislature rejected a number of these alternatives when they were offered as amendments.

Proponents claimed that the Drop Box Provision was necessary to prevent tampering and to ensure chain of custody of the ballot.  Op. at 123.  The Legislature considered several amendments that would have allowed it to pursue these goals without restricting drop box availability.  For example, Senator Brandes, Senator Powell, and Representative Joseph all offered amendments permitting 24/7 drop boxes with video surveillance.  Op. at 123-24.  Appellants failed to provide any evidence at trial that in-person monitoring of drop boxes would render them more secure than video monitoring, which some SOEs had already implemented.  Further, Senators Jones and Powell offered amendments to the Drop Box Provision that would have allowed drop boxes outside of early voting hours.  *Id*. at 124.  They were rejected even though cutting the use of drop boxes outside of early voting hours neither prevents tampering nor ensures chain of custody.

Proponents claimed that the Solicitation Provision was necessary to prevent political solicitation at the polls.  However, political solicitation was already prohibited by law, so maintaining the status quo was a less discriminatory

48

alternative.  Op. at 124-25.  Additionally, legislators offered amendments to SB90 that would permit civic organizations to continue their line relief efforts, which were rejected even though Representative Ingoglia stated that the bill's proponents "never said that any non-profit organization is trying to influence voters."  *See* Op. at 125.

Appellants argue that concessions made by the bill's proponents along the way show that the court's finding that there were less discriminatory alternatives is erroneous.  Br. at 37-38.  They do not.  The fact that earlier iterations of the bill contained even more flagrantly discriminatory provisions has no bearing on whether less discriminatory alternatives to the final bill existed.  As the court aptly observed: "Convincing someone to smash your windows in place of burning down your house is a victory, but it doesn't mean you wanted your windows smashed."  Op. at 78.

## III.    The District Court's Section 3(c) Remedy Under the VRA Was Appropriate.

Section 3(c) of the Voting Rights Act ("VRA") gives district courts the authority to "bail in" jurisdictions and require them to preclear subsequent changes to voting regulations upon finding intentional discrimination in violation of the U.S. Constitution.  52 U.S.C. § 10302(c).  In this case, after thoroughly examining the evidence of intentional discrimination at trial, the district court granted Section 3(c) relief for a limited period of ten years and narrowly tailored it to three specific areas that were tainted by SB90: restrictions on drop boxes, restrictions on line relief

activities, and restrictions on 3PVROs.  This grant of Section (3)(c) relief was proper and should be upheld.

### A.  The District Court Properly Applied the Principles in *Shelby County.*

Appellants claim that the district court's grant of the Section 3(c) relief is unconstitutional because it allegedly failed to apply the "exceptional conditions" standard in *Shelby County v. Holder*, 570 U.S. 529 (2013).  Br. at 41–42.  Appellants did not properly preserve this argument below and even if it were properly preserved here, it is without merit and should be rejected by this Court.

Nevertheless, Appellants are wrong to suggest that the district court did not follow *Shelby County*.  In *Shelby County,* the Supreme Court held that it is unconstitutional to use the coverage formula in Section 4(b) of the VRA to determine which jurisdictions are subject to the preclearance requirement of Section 5 of the VRA.  The Court noted that the Section 5 preclearance regime was "an uncommon exercise of congressional power," but that "exceptional conditions can justify legislative measures not otherwise appropriate."  *Id.* at 535, 454 (quoting *South Carolina v. Katzenbach*, 383 U.S. 301, 334 (1966)).  Because the Section 4(b) coverage formula focused "on decades-old data relevant to decades-old problems, rather than current data reflecting current needs," *id.* at 553, the Court held it was no longer able to justify subjecting the jurisdictions at issue to Section 5 preclearance, *id.* at 557.

As the district court correctly observed, Section 3(c) differs from Section 5 in several important respects, such that it does not implicate the same federalism and equal sovereignty concerns raised in *Shelby County*. First and most importantly, Section 3(c) relief directly addresses the *Shelby County* Court's concern regarding Section 4(b) that the coverage formula was not "sufficiently related to the problem that it targets" to justify "disparate geographic coverage." *See id.* at 550–51. Section 3(c) requires a court to find intentional discrimination in a specific region before imposing the bail-in relief there. Second, while Section 5 was intended to be temporary, Section 3(c) is a permanent provision of the VRA. Third, unlike Section 5, which suspends "all changes to state election law—however innocuous—until they have been precleared by federal authorities in Washington, D.C.," Section 3(c) allows courts to tailor the bail-in relief to specific violations (as the district court did here). *Id.* at 544 (quoting *Nw. Austin Muni. Util. Dist. No. One v. Holder*, 557 U.S. 193, 202 (2009)). Finally, unlike Section 5, which imposes the burden of proof on the subject jurisdictions to demonstrate that their changes to voting regulations are not discriminatory, Section 3(c) requires a party to first prove that the jurisdiction engaged in intentional discrimination before the bail-in relief can even be considered.

Appellants' claim that the district court should have applied an "exceptional conditions" test under *Shelby County* is incorrect. The *Shelby County* Court

explicitly did *not* rule on the constitutionality of Section 5 or consider any other provision in the VRA, including Section 3(c). *See id.* at 557. Because Section 3(c) does not implicate the same concerns raised in *Shelby County*, there is no basis to read an additional "exceptional conditions" standard into that provision of the statute.

**B.    Section 3(c) Relief is Appropriate in This Case.**

Even if Appellants were correct that the district court should have applied an "exceptional conditions" test—which they are not—the district court has already engaged in an equivalent analysis to show that bail-in relief is warranted here.   Since the Supreme Court has never addressed a case involving Section 3(c) relief and there is a dearth of circuit court authority on when Section 3(c) relief should be imposed, the district court reasonably drew guidance from *Jeffers v. Clinton*, 740 F. Supp. 585 (E.D. Ark. 1990), which remains the most thorough and substantial judicial analysis of Section 3.  *See also Perez v. Abbott*, 390 F. Supp. 3d 803, 818 (W.D. Tex. 2019) (applying *Jeffers* factors).  In fact, Appellants themselves relied on *Jeffers* and *Perez* in their post-trial brief.  Doc. 648 at 65.

Applying the *Jeffers* factors, the district court found that "Florida has repeatedly, recently, and persistently acted to deny Black Floridians access to the franchise."  Op. at 277.  The court also concluded that "violations are likely to recur, because political developments, if anything, make recurrence more likely."  *Id.*

The district court's analysis did not end there. It further looked to the Supreme Court's rationale in *Katzenbach* for upholding the preclearance regime rather than enforcing the Fifteenth Amendment on a case-by-case basis. Op. at 277-78. As the district court observed, this litigation has been expensive and has taken more than a year to litigate. Further, the Florida Legislature has shown it will "change tactics in the face of unfavorable rulings," as evidenced by SB524.[13] *Id*. Appellants try to paint SB524 as a positive development that is blocked by the bail-in relief, Br. at 43, yet neglect to mention the additional barriers SB524 introduced, including restrictions on where drop boxes may be placed. For these reasons, the district court found it appropriate to grant bail-in relief in this case.

Rather than engage with the district court's reasoning, Appellants contend that Section 3(c) relief is inappropriate here "under any standard." Br. at 43. Appellants go on to claim that SB90 "is not the kind of law that could trigger preclearance" because "Plaintiffs didn't challenge most of the bill, only two groups even alleged intentional discrimination, and the district court *rejected* many of those allegations." *Id.* Appellants provide no legal support for this argument, nor does it provide any basis to override the district court's carefully considered findings. Appellants also argue that the district court should have followed the Fourth Circuit in *McCrory* and

---

[13] SB 524, which was passed on March 9, 2022 and signed by Governor DeSantis on April 25, was subject to the district court's Section 3(c) relief. However, due to this Court's order to stay the district court's order pending appeal, SB 524 has since gone into effect.

concluded that bail-in relief was unnecessary in light of the court's injunction. Br. at 43. Yet *McCrory* denied bail-in relief without engaging in any analysis. *See N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 214 (4th Cir. 2016).

Finally, Appellants' claim that the district court's reasoning would somehow make bail-in relief "the norm" in voting rights cases is both hyperbolic and irrelevant. Section 3(c) is only triggered by violations of Fourteenth and Fifteenth Amendment protections against intentional racial discrimination in voting. This is rightly what the district court found here and its imposition of relief under Section 3(c) was reasonable and well within the court's discretion.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's opinion.

Dated: August 10, 2022

Respectfully submitted,

By:  */s/ P. Benjamin Duke*

Morenike Fajana
Romane Paul
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
Tel: 212-965-2200
mfajana@naacpldf.org
rpaul@naacpldf.org

P. Benjamin Duke
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, NY 10018
Tel: 212-841-1000
pbduke@cov.com

Michael A. Fletcher II
Dillon H. Grimm
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001
mfletcher@cov.com
dgrimm@cov.com

Amia L. Trigg
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street NW, Ste. 600
Washington, DC 20005
atrigg@naacpldf.org

Ellen Y. Choi
COVINGTON & BURLING LLP
415 Mission Street
San Francisco, CA 94105
echoi@cov.com

*Counsel for Florida NAACP Plaintiffs-Appellees*

55

## CERTIFICATE OF COMPLIANCE WITH
## TYPE-VOLUME LIMITATION, TYPEFACE
## REQUIREMENTS  AND TYPE STYLE REQUIREMENTS

1.      This response complies with the type-volume limitation of Fed. R. App.

P. 32(a)(7)(B) because, excluding the parts of the brief exempted by Fed. R. App. P.

32(f), it contains 12,895 words.

2.      This response complies with the typeface requirements of Fed. R. App.

P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it

has been prepared in proportionally-spaced typeface, using Microsoft Word, in

Times New Roman 14-point font.


Dated:  August 10, 2022


*/s/ P. Benjamin Duke*
P. Benjamin Duke
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, NY 10018
Tel: 212-841-1000
pbduke@cov.com

*Counsel for Florida NAACP*
*Plaintiffs-Appellees*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 10, 2022, I caused the foregoing document to be electronically filed with the United States Court of Appeals for the Eleventh Circuit using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to counsel of record.

*/s/ P. Benjamin Duke*
P. Benjamin Duke
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, NY 10018
Tel: 212-841-1000
pbduke@cov.com

*Counsel for Florida NAACP*
*Plaintiffs-Appellees*

57