Nos. 22-11133-GG, 22-11143-GG, 22-11144-GG, 22-11145-GG (consolidated)

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

LEAGUE OF WOMEN VOTERS OF FLORIDA, INC., et al.,

*Plaintiffs-Appellees,*

v.

FLORIDA SECRETARY OF STATE, et al.,

*Defendants-Appellants.*

Appeal from the U.S. District Court for the Northern District of Florida,
Nos. 4:21-cv-242, 4:21-cv-186, 4:21-cv-187, 4:21-cv-201 (Walker, C.J.)

## APPELLANTS' REPLY BRIEF FOR SECRETARY BYRD, ATTORNEY GENERAL MOODY, AND SUPERVISORS HAYS AND DOYLE

Mohammad O. Jazil
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 South Monroe Street, Suite 500
Tallahassee, FL 32301
(850) 274-1690

*Lead Counsel for Secretary Byrd*

Andy Bardos
GRAYROBINSON, P.A.
301 South Bronough Street,
Suite 600
Tallahassee, FL 32301
(850) 577-9090

*Lead Counsel for Supervisors Hays and Doyle*

Henry C. Whitaker
FLORIDA ATTORNEY
GENERAL OFFICE
PL-01 The Capitol
Tallahassee, FL 3300
(850) 414-3300

*Lead Counsel for Attorney General Moody*

No. 22-11133, *Harriet Tubman Freedom Fighters, Corp. v. Fla. Sec'y of State*
No. 22-11143, *League of Women Voters of Fla. v. Fla. Sec'y of State*
No. 22-11144, *Fla. State Conf. of Branches & Youth Units of NAACP v. Fla. Sec'y of State*
No. 22-11145, *Fla. Rising Together v. Fla. Sec'y of State*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Per Circuit Rule 26.1, Appellants certify that the CIP contained in their initial motion, as modified by their subsequent CIPs and the other parties' CIPs on the docket, are complete.

Dated: August 31, 2022

 */s/ Mohammad O. Jazil*
Counsel for Secretary Byrd

 */s/ Henry C. Whitaker*
Counsel for Attorney General Moody

 */s/ Andy Bardos*
Counsel for Supervisors Hays & Doyle

# TABLE OF CONTENTS

Certificate of Interested Persons and Corporate Disclosure Statement .... C1 of 1

Table of Contents.....................................................................................i

Table of Authorities ..............................................................................ii

Statement Regarding Adoption of Briefs of Other Parties.................................vii

Introduction & Summary of Argument....................................................1

Argument .................................................................................................1

    I.  The district court failed to accord the presumption of legislative good faith ...............................................................................................1

    II.  The Plaintiffs again conflate partisanship with race ...........................6

    III.  The Florida Secretary of State has standing to appeal the adverse decision concerning the Solicitation Provision ...........................7

    IV.  Deference has its limits, and the Plaintiffs can't ignore the record on appeal ...........................................................................................9

    V.  Section 3(c) preclearance is inappropriate ..........................................13

    VI.  No remand is necessary .......................................................................17

Conclusion ..............................................................................................19

Certificate of Compliance .......................................................................22

Certificate of Service ..............................................................................22

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez,*

    138 S. Ct. 2305 (2018) ............................................................... 1,4-5

*Amstar Corp. v. Domino's Pizza, Inc.,*

    615 F.2d 252 (5th Cir. 1980) ....................................................... 10

*Anderson v. Celebrezze,*

    460 U.S. 780 (1983) .................................................................. 18-19

*Aransas Project v. Shaw,*

    775 F.3d 641 (5th Cir. 2014) ................................................. 10, 18

*Arlington Heights v. Metropolitan Housing Development Corp.,*

    429 U.S. 252 (1977) ..................................................................... 2-3

*Brnovich v. DNC,*

    141 S. Ct. 2321 (2021) .............................................................. 6, 9

*Burdick v. Takushi,*

    504 U.S. 428 (1992) .................................................................. 18-19

*Bush v. Gore,*

    531 U.S. 98 (2000) ........................................................................ 8

*Crawford v. Marion County Election Board,*

    553 U.S. 181 (2008) ................................................................. 6, 19

*Conway School District v. Wilhoit,*

    854 F. Supp. 1430 (E.D. Ark. 1994) ............................................................13

*County of Volusia v. DeSantis,*

    302 So. 3d 1001 (Fla. 1st DCA 2020) ..........................................................8

*Diamond v. Charles,*

    476 U.S. 54 (1986) .........................................................................................7

*Easley v. Cromartie,*

    532 U.S. 234 (2001) ......................................................................................4

*Fenner v. General Motors Corp.,*

    657 F.2d 647 (5th Cir. Unit B June 1981) ...................................................10

*Fletcher v. Peck,*

    10 U.S. (6 Cranch) 87 (1810) .......................................................................5

*\*Greater Birmingham Ministries v. Secretary of Alabama,*

    992 F.3d 1299 (11th Cir. 2021) ........................................................ 2, 12, 18

*Hi-Tech Pharmaceuticals, Inc. v. HBS International Corp.,*

    910 F.3d 1186 (11th Cir. 2018) ...................................................................17

*Hughey v. JMS Development Corp.,*

    78 F.3d 1523 (11th Cir. 1996) .......................................................................9

*Hunter v. Underwood,*

    471 U.S. 222 (1985) ......................................................................................2

*Jacobson v. Fla. Secretary of State,*

    974 F.3d 1236 (11th Cir. 2020) .......................................................... 6, 8, 19

*Jeffers v. Clinton,*

    740 F. Supp. 585 (E.D. Ark. 1990) ...................................................... 14-15

*LaCroix v. Town of Fort Myers Beach,*

    38 F.4th 941 (11th Cir. 2022) ...................................................................17

*\*League of Women Voters of Fla., Inc. v. Florida Secretary of State,*

    32 F.4th 1363 (11th Cir. 2022) ........................................................... 1, 3, 7

*Maine v. Taylor,*

    477 U.S. 131 (1986) .......................................................................................9

*Miller v. Johnson,*

    515 U.S. 900 (1995) .................................................................................. 4-5

*North Carolina State Conference of NAACP v. McCrory,*

    831 F.3d 204 (4th Cir. 2016) .....................................................................14

*Palmer v. Thompson,*

    403 U.S. 217 (1971) .......................................................................................2

*People First of Alabama v. Merrill,*

    815 F. App'x 505 (11th Cir. 2020) ..............................................................8

*Perez v. Abbott,*

    390 F. Supp. 3d 803 (W.D. Tex. 2019) ................................................. 13-14

*Personnel Administrator of Massachusetts v. Feeney,*

 422 U.S. 256 (1979) ........................................................................ 6

*Road & Highway Builders, LLC v. United States,*

 702 F.3d 1365 (Fed. Cir. 2012) ...................................................... 5

*Rucho v. Common Cause,*

 139 S. Ct. 2484 (2019) .................................................................... 6

*Scott v. Harris,*

 550 U.S. 372 (2007) ................................................................ 17-18

*Shaw v. Reno,*

 509 U.S. 630 (1993) ........................................................................ 7

*\*Shelby County v. Holder,*

 570 U.S. 529 (2013) .................................................................. 3, 15

*Virginia House of Delegates v. Bethune-Hill,*

 139 S. Ct. 1945 (2019) ................................................................ 6, 8

*Veasey v. Abbott,*

 888 F.3d 792 (5th Cir. 2018) ................................................... 13, 16

*United States v. Crawford,*

 407 F.3d 1174 (11th Cir. 2005) ...................................................... 9

*United States v. Newman,*

 614 F.3d 1232 (11th Cir. 2010) ...................................................... 9

**Statutes**

Fla. Stat. §97.012 ...................................................................................8

Fla. Stat. §106.23 ..................................................................................8

**Other Sources**

CS/CS/CS/SB 90, Fla. House of Reps., https://bit.ly/3R3R1vA

     (last visited Aug. 25, 2022) ...........................................................11

*Presumption*, Black's Law Dictionary (11th ed. 2019) ...............................4

## STATEMENT REGARDING ADOPTION OF
## BRIEFS OF OTHER PARTIES

The Secretary joins the Reply Brief of the Intervenor-Defendant-Appellants Republican National Committee and National Republican Senatorial Committee in full. The Supervisors join that brief on the Solicitation Provision issue. The Attorney General joins that brief on the *Munsingwear* vacatur issue.

## INTRODUCTION & SUMMARY OF ARGUMENT

The Plaintiffs are wrong. They are wrong in suggesting that the district court accorded the legislative presumption of good faith. They are wrong in again conflating partisanship with race. They are wrong in claiming that the State can't defend the constitutionality of one of its own statutes. They are wrong in asking for deference to the district court when that court itself called the evidence of discriminatory impact "limited," "unclear," "not necessarily representative," and "not statistically significant." Op.97-98, 100-12.[1] They are wrong about the record in obvious ways. They are wrong that section 3(c) preclearance is warranted in this case. And they are wrong in asking for a remand—twelve times across their various answer briefs and those of the supporting *amici*—when the law and the facts point only toward reversal.

## ARGUMENT

### I.     The district court failed to accord the presumption of legislative good faith.

"The Supreme Court has instructed that when a court assesses whether a duly enacted statute is tainted by discriminatory intent, 'the good faith of the state legislature must be presumed.'" *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1373 (11th Cir. 2022) (quoting *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018)). The "eight-

---

[1] All "Doc." citations refer to the docket entries for *League of Women Voters of Florida, Inc. v. Byrd*, No. 4:21-cv-186-MW-MAF (N.D. Fla.). All "Op." citations refer to the district court's final order, Doc. 665. Exhibits entered into evidence begin with "Exh."

factor" test for discriminatory intent is infused with this presumption. *Id.* (citing *Greater Birmingham Ministries v. Sec'y of Ala.*, 992 F.3d 1299, 1322 (11th Cir. 2021)). *Greater Birmingham* specifically cited and then used the presumption to rein in an "unlimited" and unfocused "look-back to past discrimination." 992 F.3d 1299, 1325 (11th Cir. 2021). *Greater Birmingham*'s discussion of the remaining intent factors also made clear that each factor remains firmly moored to the presumption of legislative good faith. *Id.* at 1322 (requiring a "clear" or "stark" pattern of "discriminatory impact" for an impact to become determinative); *id.* at 1323 (limiting the relevance of sponsor's statements to the "law at issue"); *id.* at 1324 (explaining that it "stretches logic to deem a sponsor's 'intent'" to reflect "*the* legally dispositive intent of the entire body" (emphasis in the original)); *id.* at 1326-27 (deferring to the "valid neutral justifications" for the law over suspicions of race-based intent because "no black legislators" voted for the law); *id.* at 1327 (declining to infer foreseeability and knowledge of an impact because of an "enforcement delay"); *id.* at 1328 (refusing to find that the legislature failed to consider alternatives where it "did not include the alternative option that Plaintiffs would have preferred").[2]

---

[2] *Greater Birmingham* is entirely consistent with *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). As an initial matter, *Arlington Heights* concerned the intent of a local board. As "we move from an examination" of local boards "to a body the size of the" Florida Legislature, or the Alabama Legislature as in *Greater Birmingham*, divining intent becomes more "problematic." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985); *see also Palmer v. Thompson*, 403 U.S. 217, 225 (1971) (same). And *Arlington Heights* merely set forth the categories of "evidentiary source[s]" that help determine circumstantial evidence of discriminatory intent; it did not consider or

Contrast *Greater Birmingham* with Chief Judge Walker's order. The order's historical assessment begins "immediately after the Civil War," marches "through past acts of 'terrorism' and 'racial violence' that occurred during the early and mid-1900s," and ends with criticism of "the Supreme Court for suggesting that '[o]ur country has changed' since the Voting Rights Act was enacted in 1965." *League of Women Voters*, 32 F.4th at 1373 (quoting *Shelby Cnty. v. Holder*, 570 U.S. 529, 557 (2013)). Among other things, the district court's intent analysis ignores exculpatory statements made by *proponents* of SB90 during the legislative debate in favor of assumptions and inferences drawn from the testimony of legislative *opponents* at trial. State Int. Br. at 17, 19. It distorts one statement by Senator Baxley to find an invidious purpose and then smears the entire Florida Legislature with that distortion. *Id.* at 18. It relies on the State election director's "face and body" (over Zoom) to conclude that the legislature targeted Black voters but ignores her words. *Id.* at 19. It strains to find a discriminatory impact on Black voters through the Plaintiffs' incomplete and limited studies but ignores stacks of complaints that triggered the need for reform. *Id.* at 8, 25. And it cites cases that found *no* intentional discrimination to support a finding of intentional discrimination. *Id.* at 23. The district court thus presumed bad faith—not good faith.

Still, the NAACP Plaintiffs claim that it's "clear" that the district court "*did* apply the presumption" of good faith because it recognized the "State's prerogative to make

---

discuss the quantum of proof needed to overcome the presumption of good faith. *See* 429 U.S. at 266-71. *Greater Birmingham* did.

[election] laws." NAACP Br. at 17 (emphasis added). The Florida Rising Plaintiffs agree. FRT Br. at 17. The United States adds that the presumption of good faith is nothing more than a statement about who bears the burden of proof and that the district court properly placed that burden with the Plaintiffs. USA Br. at 21-23.

But the presumption of good faith is not the same as the power to enact laws or regulate elections. Courts can acknowledge that a legislature has the power to pass a law but nevertheless presume that the legislature acted in bad faith. That's precisely what the district court did here—and did so in error. *See Abbott*, 138 S. Ct. at 2324.

Nor is the presumption of good faith the same as the burden of proof at trial. A "presumption" is a "legal inference or assumption that a fact exists," which in this case is the Florida Legislature's good faith. *Presumption*, Black's Law Dictionary (11th ed. 2019). The "burden of proof" is a "party's duty to prove a disputed assertion or charge," here, the Plaintiffs' burden of proving the Florida Legislature's invidious intent. *Id.* The two are fundamentally different. *Id.*; *see also* Fed. R. Evid. 301.

In practice, as shown by *Greater Birmingham*, the presumption of good faith is like a weight placed on a scale that was previously in equipoise.  As each of the eight factors for discriminatory intent is considered, the Plaintiffs must overcome the weight that tilts the balance in favor of the State. True, this makes the Plaintiffs' task difficult, but that is as it should be. Courts must "exercise *extraordinary caution* in adjudicating claims that a State has" enacted a facially neutral law "on the basis of race," *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (quoting *Miller v. Johnson*, 515 U.S. 900,  916 (1995)) (emphasis

4

added), for our tradition has long recognized that questions concerning the improper motives of those enacting a law present "a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative." *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 131 (1810) (Marshall, C.J.). Courts cannot—as the Plaintiffs argue—apply the presumption but then remain free to choose from among a range of inferences. *See* NAACP Br. at 21; FRT Br. at 38.

Finally, the United States is wrong in saying that the Supreme Court treats the presumption of good faith the same as the burden of proof. The Supreme Court explained in *Miller v. Johnson* that the legal "principles" governing intentional discrimination claims—including "the presumption of good faith that must be accorded legislative enactment"—affect more than "the plaintiff's burden of proof at trial." 515 U.S. at 916. The Court reiterated in *Abbott* that the "allocation of the burden of proof *and* the presumption of legislative good faith *are* not changed by a finding of past discrimination," before holding that one law passed by a legislature did not have to overcome the taint of another law passed by that same legislature. 138 S. Ct. at 2324-25 (emphasis added). *Miller* and *Abbott* thus stand for more than just the proposition that the Plaintiffs have the burden of proof, as the United States suggests. USA Br. at 22. They imposed a higher burden on the Plaintiffs when considering the historical-background and sequence-of-events factor for intentional discrimination. *Cf. Rd. & Highway Builders, LLC v. United States*, 702 F.3d 1365, 1368-69 (Fed. Cir. 2012) (requiring,

albeit in a different context, that the presumption of governmental good faith must be overcome by "clear and convincing evidence").

In sum, the district court failed to apply the legislative presumption of good faith. It drew *negative* inferences wherever possible in its 288-page opinion without first explaining how or whether the presumption of good faith was overcome.

## II.   The Plaintiffs again conflate partisanship with race.

At a more granular level, the continuing use of partisan affiliation as a proxy for race is an error. "[P]artisan motives are not the same as racial motives." *Brnovich v. DNC*, 141 S. Ct. 2321 (2021). Unlike racial motives, partisan motives don't automatically run afoul of the Constitution. *See, e.g.*, *Rucho v. Common Cause*, 139 S. Ct. 2484, 2508 (2019); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 204 (2008); *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1264 (11th Cir. 2020). And race and partisanship don't neatly overlap. Even the district court recognized this when analyzing partisanship and Hispanic voters in Florida, Op.50, though it did conflate Democrats with Black voters. *Id.* at 51. Yet the Plaintiffs continue tangling partisanship with race. NAACP Br. at 36; FRT Br. at 20.

Stripped to its essence, the Plaintiffs are asking for a rule that holds legislatures liable for unconstitutional racial discrimination when they act "because of" *partisanship* and "in spite of" race. That, of course, isn't the law. The Supreme Court has held that unconstitutional racial discrimination occurs only when a legislature acts "because of," and "not in spite of," *race. Personnel Adm'r of Mass. v. Feeney*, 422 U.S. 256, 279 (1979).

Worse yet, the Plaintiffs' preferred party-is-race rule would treat racial groups as monoliths. "It [would] reinforce[] the perception that members of the same racial group—regardless of their age, education, economic status, or the community in which they live—think alike, share the same political interests, and will prefer the same candidates at the polls." *Shaw v. Reno*, 509 U.S. 630, 647 (1993).

Even so, partisanship was not the motivation behind SB 90. The proponents of SB 90 thought that it was good policy, and concerns about fraud, uniformity, and improving voter confidence don't constitute an invidious purpose to discriminate against Black voters—or any other voters.

### III. The Florida Secretary of State has standing to appeal the adverse decision concerning the Solicitation Provision.

The League Plaintiffs (joined by the others) also argue that the State lacks standing to defend the constitutionality of its Solicitation Provision. League Br. at 13-15. The Plaintiffs made a similar argument at the stay stage that the stay panel did not address; the panel simply proceeded to a discussion of the State's "substantial argument" that this provision "passes constitutional muster." *League of Women Voters*, 32 F.4th at 1374. This is for good reason.

A State is injured when a federal court blocks "statutes enacted by representatives of its people," *Hand v. Scott*, 888 F.3d 1206, 1214 (11th Cir. 2018) (citation omitted), so the State always "has standing to defend the constitutionality of its statute[s]." *Diamond v. Charles*, 476 U.S. 54, 62 (1986). And here, Secretary Byrd represents the State's

7

interests. He is the State's "chief election officer." Fla. Stat. §97.012(1). The State charges him with "maintaining uniformity" in state elections, *id.*; Fla. Stat. §106.23(2)—something the district court's ten-counties-only injunction violates, *see Bush v. Gore*, 531 U.S. 98, 104-06 (2000). In fact, this Court has recognized that the Secretary is an appropriate *Ex parte Young* defendant—meaning he stands in for the State—even when the challenged election law is administered by county supervisors. *See Jacobson*, 974 F.3d at 1256. The State courts have said the same. *See Cnty. of Volusia v. DeSantis*, 302 So. 3d 1001, 1005-07 (Fla. 1st DCA 2020) (holding that the Secretary is the "proper defendant" even though the specific duties at issue concern the Supervisors of Elections, in part, because the Secretary must maintain "uniformity" in election laws).

Contrary to the League Plaintiffs' argument, this case is thus nothing like *Virginia House of Delegates v. Bethune-Hill*, where only one chamber of Virginia's *legislative* branch tried to appeal an adverse decision against the State. *Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1951 (2019). Florida's executive branch is appealing here. And unlike the Virginia House of Delegates that "never indicated in the District Court that it was appearing" "to represent the State's interests," the Florida's Secretary of State has been doing just that since the inception of all four lawsuits over SB90. *Id.* at 1252.

Indeed, the Supreme Court implicitly rejected the Plaintiffs' standing argument in *People First of Alabama v. Merrill*. There, the district court enjoined "only three counties" from enforcing a certain election law. 815 F. App'x 505, 511 (11th Cir. 2020) (Rosenbaum & Jill Pryor, JJ., concurring). Because only the State appealed, there was

"uncertain[ty]" about whether "the proper parties ha[d] appealed." *Id.* at 516 (Grant, J., concurring). After this Court denied a stay, Alabama asked the Supreme Court to grant one, and the plaintiffs again challenged Alabama's standing. *See* Stay Response 13-17, bit.ly/37HgmdZ. Alabama defended its appellate standing, explaining that "'a State'— whether directly enjoined or not—'clearly has a legitimate interest in the continued enforceability of its own statutes.'" Stay App. 5, bit.ly/38uqkPS (quoting *Maine v. Taylor*, 477 U.S. 131, 137 (1986)). The Supreme Court ruled for Alabama. 141 S. Ct. at 190.

So too here. The State of Florida, through its Secretary of State, clearly has standing to appeal any adverse ruling keeping the State from enforcing a provision of its elections code. And even if it didn't, the Intervenors' standing is sufficient. *Brnovich*, 141 S. Ct. at 2336 (requiring only one appellant to have standing).

## IV. Deference has its limits, and the Plaintiffs can't ignore the record on appeal.

The NAACP and Florida Rising Plaintiffs nevertheless refuse to engage with the State's factor-by-factor critique of the discriminatory intent finding. They instead spend the bulk of their briefs summarizing the district court's 288-page order and ask this Court to defer to the district court's factual findings and legal conclusions. But deference has its limits. *See United States v. Crawford*, 407 F.3d 1174, 1177 (11th Cir. 2005). Errors of law are accorded no deference. *See Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1528-29 (11th Cir. 1996). Nor are inferences based on missing data, incomplete data, or flawed data. *See, e.g., United States v. Newman*, 614 F.3d 1232, 1238 (11th Cir. 2010)

9

(factual findings cannot be based on speculation); *Fenner v. Gen. Motors Corp.*, 657 F.2d 647, 651 (5th Cir. Unit B June 1981) (inferences must be reasonable); *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252 (5th Cir. 1980) (court of appeals can "take into account the District Court's lack of personal attention to factual findings" where they were "developed by one of the parties and mechanically adopted by the judge"); *see also Aransas Project v. Shaw*, 775 F.3d 641, 658 (5th Cir. 2014) (holding that appellate courts are not bound when "a court's factual finding rests on an erroneous view of the law" (cleaned up)).

And in asking for deference, the Plaintiffs misstate the record. Among other things, they say that:

- "[T]he Florida Legislature rushed to enact SB90." NAACP Br. at 4; *see also* FRT Br. at 25.
- The Florida House introduced a strike-all amendment "hours before final passage." FRT Br. at 9.
- "Defendants invoked legislative privilege to bar Plaintiffs from calling the legislative sponsors." FRT Br. at 13.
- Text messages between Senator Gruters and Representative Ingoglia evidence partisan motivation behind SB 90. NAACP Br. at 9, 45 (referencing Op.85).
- Senator Baxley knew of and admitted SB 90's alleged disparate impact on Black Floridians. NAACP Br. at 12 ("In a moment of candor, instead of denying the disparate impact, Senator Baxley simply acknowledged that there would be 'a learning curve.'"); FRT Br. at 38 ("Sen. Baxley understood the drop box restrictions would harm Black voters" "is the most logical interpretation.").

These statements are gross misrepresentations or blatant inaccuracies.

Start with the NAACP and Florida Rising Plaintiffs' descriptions of the legislative process. Contrary to their aversions, the process was not rushed. NAACP Br. at 4l; FRT Br. at 25. In fact, the lifecycle of SB 90 spanned more calendar days than the 2021 Florida Legislative Session itself. While the session lasted only fifty-nine days—from March 2, 2021 to April 30, 2021—SB 90's lifecycle spanned eighty-five days—from when SB 90 was introduced during pre-session legislative workshopping on February 3, 2021 to when it was ultimately passed by the legislature on April 29, 2021. During that time, the legislature spent more than twenty-six hours workshopping, discussing, questioning, debating, and ultimately, passing SB 90. Doc.648-1. All told, the process cannot be described as rushed.

The Florida Rising Plaintiffs' statement that the House strike-all amendment was introduced "hours before final passage" is also inaccurate. FRT Br. at 9. It was introduced *days* before final passage. To be specific, the strike-all was introduced around 1:45 a.m. on April 27, 2021, and was adopted by the House around 6:00 p.m. that evening—after hours of discussing the strike-all *and* considering over one-dozen Democrat-introduced proposed amendments to the strike-all. *See* CS/CS/CS/SB 90, Fla. House of Reps., https://bit.ly/3R3R1vA (last visited Aug. 25, 2022) (strike-all barcode 107453). The next day, the House passed SB 90 as amended. *Id.* The Senate further amended SB 90, and the House passed the final version after 9:00 p.m. on April 29, 2021. *Id.*

11

Nor did "Defendants invoke[] legislative privilege to bar Plaintiffs from calling the legislative sponsors." FRT Br. at 13. Third parties to the case—individual legislators and the Governor's office—did. Doc.313 at 5. More fundamentally, contrary to the Florida Rising Plaintiffs' suggestion, it flouts common sense and constitutional law to suggest that the Secretary *must* rely on individual legislators to waive the legislative privilege and then call on them to testify in order to defend a facially neutral law. And even if the legislators had testified, their testimony would have been marginally relevant. *See, e.g.*, *Greater Birmingham*, 992 F.3d at 1324 (expressing skepticism about gleaning discriminatory intent from statements from legislators); State Int. Br. at 29-30 (collecting cases).

The NAACP Plaintiffs' statements about two legislators' text messages don't fare any better. According to the NAACP Plaintiffs, the conversation showed that SB 90 "had a partisan motive." NAACP Br. at 9 (referencing Op.85). But, in truth, the opposite is the case. The conversation shows that Senator Gruters was upset that the House *rejected* a provision—requiring vote-by-mail ballots to be renewed every election cycle—that he believed would have benefited Republicans. Doc.468-2. If anything, the conversation shows that the Republican-controlled House was *not* motivated by partisan advantage. The district court made this same mistake. Op.85.

And the NAACP and Florida Rising Plaintiffs omit Senator Baxley's full comments on SB 90's alleged disparate impact. NAACP Br. at 12; FRT Br, at 38. Both claim that Senator Baxley knew of and didn't deny SB 90's alleged disparate impact.

12

Then they quote only a portion of his statements on the matter. Here is the full context and quotation: Senator Berman asked Senator Baxley, "Are you aware that the restrictions in this legislation including those related to drop box and access to voter assistance will have a disparate impact on black voters?" Doc.461-98 at 100. To which Senator Baxley responded—with the Plaintiffs' omissions italicized—"*I really have a hard time hearing somebody even say that. There is nothing in this bill that disenfranchises anyone.* Now to look at patterns of use and say, well, you may have to go about it a little different way. There's a learning curve. I think we have tremendous access. Compared to many states across the country, we have amazing access. It's just a matter of helping people understand how they utilize that access." *Id.* (emphasis added).

The Plaintiffs' factual inaccuracies and record misrepresentations undercut their arguments. And they reveal the dearth of evidence from which the district court chose to fashion its findings.

## V.    Section 3(c) preclearance is inappropriate.

Even if this Court somehow affirms the intentional discrimination finding, it should still reverse the preclearance remedy. Preclearance, after all, is not "automatically" available once a court finds violations of the Fourteenth or Fifteenth Amendments. *Perez v. Abbott*, 390 F. Supp. 3d 803, 818 (W.D. Tex. 2019). This drastic remedy is "rarely used." *Veasey v. Abbott*, 888 F.3d 792, 804 (5th Cir. 2018) (citation omitted). It has always been reserved for cases of "systematic" discrimination. *Conway Sch. Dist. v. Wilhoit*, 854 F. Supp. 1430, 1442 (E.D. Ark. 1994) (citation omitted). And it

has never been available when an ordinary "injunction" would do. *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 241 (4th Cir. 2016).

Like the district court, the Plaintiffs claim that preclearance is warranted under the multi-factor balancing test from *Jeffers*, a decades-old decision from the Eastern District of Arkansas. But even that test is satisfied here. All six *Jeffers* factors weigh firmly against preclearance:

**1-2.** The district court pointed to *no* prior violations of the Fourteenth or Fifteenth Amendments by Florida, let alone "persistent," "repeated," and "recent" ones. *Jeffers v. Clinton*, 740 F. Supp. 585, 601 (E.D. Ark. 1990). The district court's "20 year" history of supposed Republican-led discrimination against Black Floridians covers the governorship of now-Democrat Charlie Crist. Op.275-76. It discusses issues that the enjoined provisions of SB90 do not regulate (like list maintenance, the length of in-person early voting, and felon voting). Op.52-65. And it admits that no court held that any of these incidents amounted to intentional racial discrimination (and several courts rejected that claim). Op.52-65. These *non-findings* of intentional discrimination, it should go without saying, do not prove a recent history of repeated intentional discrimination. *Perez*, 390 F. Supp. 3d at 820.

**3.** Even if they were probative, the district court's examples would not be "prevented, in the future, by preclearance." *Jeffers*, 740 F. Supp. at 601. The district court put Florida in preclearance for laws governing "3PVROs, drop boxes, or 'line warming' activities." Op.288. This remedy would have covered only one of the district court's

14

examples, and that law (which imposed various regulations on 3PVROs) was never found to be intentionally racially discriminatory. Op.61-62.

**4.** The district court's examples are even more irrelevant because, as the Plaintiffs concede, they have "already been remedied." *Jeffers*, 740 F. Supp. at 601; *see* NAACP/FR-Opp.14. The district court admitted that its injunction remedies any violations in this case. Op.277. And it acknowledged that injunctions would be sufficient in the future when it highlighted Florida's past compliance. Op.7 n.4.

**5-6.** The Plaintiffs hardly defend the district court's sole basis for predicting that Florida will engage in racial discrimination in the future: that Florida's governor and legislative majority (like a plurality of Florida's registered voters) are Republicans. Op.277. That evidence-free prediction is offensive, confuses partisan motives with racial motives, and would justify preclearance whenever Republicans are in power.

Separately, and as emphasized in the initial brief, *Jeffers* is not the test; *Shelby County* is. Though *Shelby County* did not involve section 3(c), it involved preclearance; and like section 4 of the Voting Rights Act, section 3(c) is a trigger for preclearance. Those triggers must be carefully guarded, according to *Shelby County*, because preclearance is a drastic remedy that offends basic principles of federalism and equal sovereignty. 570 U.S. at 542-45. It can be justified only by a finding of "exceptional conditions" akin to 1965, when Black turnout was abysmal, literacy tests were common, and southern States were circumventing injunctions. *Id.* at 545-48. The costs of preclearance—and the need to justify them with exceptional circumstances—do not disappear when the State's

federal overseer is the Northern District of Florida, rather than the Justice Department or the U.S. District Court for the District of Columbia.

*Shelby County*'s "exceptional conditions" are not present here. The district court found none. While it certainly cited *Shelby County*, it did not apply that precedent's exceptional-conditions test. The Plaintiffs do not identify any exceptional conditions either. They do not dispute that Florida has never been subject to statewide preclearance, that Florida makes it easy to vote, or that Black Floridians register and vote at rates above many Democrat-run States. *See* Mot. to Stay at 2, 10-11. Further cutting against preclearance, Florida has a history of *winning* lawsuits alleging racial discrimination, Op.52-65, and nearly all of SB90 was unchallenged or upheld in this case. The claim that SB90 was motivated by racial discrimination is so weak that only two groups of Plaintiffs raised it.

That the issue was not extensively briefed below is an indictment of the district court, not the State. As the court observed, *both* sides treated section 3(c) "as an afterthought" in their post-trial briefs, Op.270—understandably, as they were focused on liability. After finding liability, courts usually "orde[r] the commencement of a VRA section 3(c) preclearance bail-in hearing." *Veasey*, 888 F.3d at 798. The State was thus blindsided when the district court imposed preclearance in its post-trial opinion, especially after the court had ordered supplemental briefing on seemingly every topic *but* preclearance. Docs.471, 542, 543, 554, 630, 636, 657, 659.

16

The Florida Rising Plaintiffs' argument that the Secretary waived his section 3(c) preclearance arguments is also unconvincing. FRT Br. at 59. "When a district court resolves an issue, the losing party can challenge it." *Hi-Tech Pharms., Inc. v. HBS Int'l Corp.*, 910 F.3d 1186, 1193-94 (11th Cir. 2018) (quoting *United States v. Clariot*, 655 F.3d 550, 556 (6th Cir. 2011)). And here, the district court decided to apply *Jeffers* and not *Shelby County*, Op.273-75, and expressly rejected the Secretary's argument (in a written summation) that section 3(c) is constitutionally suspect, Op.279-80. Thus, the Secretary gets to challenge those decisions on appeal. The Florida Rising Plaintiffs' reliance on a footnote in *LaCroix v. Town of Fort Myers Beach*, 38 F.4th 941, 947 n.1 (11th Cir. 2022), doesn't require a contrary result. *LaCroix* said that a party on appeal waived an argument by making the argument only fleetingly in a footnote in its answer brief. *Id.* It added, for good measure, that the district court did not address the party's argument either. *Id.* That's clearly not the case here.

Preclearance was and remains an improper remedy under the right standard (*Shelby County*) and the wrong standard (*Jeffers*). There's neither a record of "exceptional conditions" nor a multi-factor tilt in favor of preclearance.

## VI.    No remand is necessary.

Finally, the twelve references to remand are for an obvious reason: the Plaintiffs and their *amici* recognize that the district court erred. Take for instance the United States' brief that "takes no position" on "the propriety of Section 3(c) relief" but says that "this Court may wish to remand the question" back to Chief Judge Walker so that

17

he can "specify the unconstitutional conduct on which this relief was premised" and "conform the preclearance remedy to the statutory language" that he ignored. USA Br. at 26. The United States also recognizes that the intent analysis is flawed—at the very least—because the district court relied on cases where no discriminatory intent was found to support its conclusion of discriminatory intent *and* provided an overexuberant historical analysis. USA Br. at 19, 26. But no remand is necessary.

As explained in the initial briefs and the State's *amici* briefs, the errors in the district court's intent analysis are so fundamental and so pervasive that no remand for further explanation will do. *See, e.g.*, *Shaw*, 775 F.3d at 658 ("[W]hen the record permits only one resolution of the factual issue after the correct law is applied, remand is unnecessary."). And the evidence is already before this Court. The record before this Court includes the *entire* legislative record—including the State's forty-minute video excerpt (Doc.626 (Exh. 1604))—that can be viewed on appeal. *See generally Scott v. Harris*, 550 U.S. 372, 380-81 (2007). The testimony of experts, their reports, and their cross examination is also before this Court; no credibility determinations are needed to assess the flaws there.

As for the *Anderson/Burdick*[3] claims, they too don't require a remand. *Anderson/Burdick* is a balancing test that asks courts to "weigh 'the character and magnitude of the asserted injury to the right" to vote "that the plaintiff seeks to

---

[3] *See generally Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992).

vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,'" considering "'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). But it's not a constitutional catch-all. That test requires courts to first "identify a burden before [they] can weigh it." *Crawford*, 553 U.S. at 205 (Scalia, J., concurring); *see also Jacobson*, 974 F.3d at 1261. Once a court identifies a burden on the right to vote, the court "consider[s] the laws and their reasonably foreseeable effect on *voters generally*," not on a subset of the electorate, *Crawford*, 553 U.S. at 206 (Scalia, J., concurring), "weighing the burden of a nondiscriminatory voting law upon each voter and concomitantly requiring exceptions for vulnerable voters would effectively turn back decades of equal-protection jurisprudence." *Id.* at 207.

Here, the Plaintiffs tried but couldn't point to a specific burden on the right to vote because of the "limited," "unclear," "not necessarily representative," and "not statistically significant" evidence. Op.97-98, 100-12. They couldn't do so for a subset of voters—Black, Hispanic, or younger voters when trying to prove their discriminatory intent claims—let alone for voters generally. So the trouble for the Plaintiffs' *Anderson/Burdick* claim is simple: they provided nothing for the district court to weigh. A remand won't change that.

## CONCLUSION

SB 90 is a facially neutral law passed against the backdrop of a raucous election cycle. Even SB 90's opponents acknowledged during the legislative proceedings—

though not during the judicial proceedings—that the law made appropriate changes to Florida's election code. State Int. Br. at 38. Even after these changes, it remains easy to both to register and to vote in Florida. Yet the district court enjoined portions of the same law and used it as the basis to trigger an extraordinary remedy that's itself constitutionally suspect. *See* Honest Elections Project Br. at 4-22; Foundation for Government Accountability Br. at 11-15. For the foregoing reasons, and those in the initial briefs, this Court should reverse.

Respectfully submitted,

/s/ *Mohammad O. Jazil*
Mohammad O. Jazil
Gary V. Perko
Michael Beato
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 South Monroe Street, Suite 500
Tallahassee, FL 32301
(850) 274-1690 / (540) 341-8809 (fax)
mjazil@holtzmanvogel.com
gperko@holtzmanvogel.com
mbeato@holtzmanvogel.com

Phillip M. Gordon
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
15405 John Marshall Hwy
Haymarket, VA 20169
(540) 341-8808 / (540) 341-8809 (fax)
pgordon@holtzmanvogel.com

Bradley R. McVay
  *General Counsel*
Ashley E. Davis
  *Deputy General Counsel*
William Chappell
  *Assistant General Counsel*
FLORIDA DEPARTMENT OF STATE
R.A. Gray Building Suite 100
500 South Bronough Street
Tallahassee, Florida 32399-0250
(850) 245-6536 / (850) 245-6127 (fax)
brad.mcvay@dos.myflorida.com
ashley.davis@dos.myflorida.com
David.chappell@dos.myflorida.com

*Counsel for Secretary Byrd*

/s/ *Henry C. Whitaker*
Henry C. Whitaker
  *Solicitor General*
Daniel W. Bell
  *Chief Deputy Solicitor General*
Bilal Ahmed Faruqui
  *Senior Assistant Attorney General*
Karen Ann Brodeen
  *Special Counsel*
William Edward Chorba
  *Senior Assistant Attorney General*
William Henry Stafford, III
  *Senior Assistant Attorney General*
FLORIDA ATTORNEY GENERAL OFFICE
PL-01 The Capitol
Tallahassee, FL 32399
(850) 414-3300
henry.whitaker@myfloridalegal.com
daniel.bell@myfloridalegal.com
bilal.faruqui@myfloridalegal.com
karen.brodeen@myfloridalegal.com
william.chorba@myfloridalegal.com
william.stafford@myfloridalegal.com

*Counsel for Attorney General Moody*

*/s/ Andy Bardos*
Andy Bardos
GRAYROBINSON, P.A.
301 South Bronough Street, Suite 600
Tallahassee, FL 32301
(850) 577-9090
(850) 577-3311 (fax)
andy.bardos@gray-robinson.com

*Counsel for Supervisors Hays and Doyle*


## CERTIFICATE OF COMPLIANCE

This brief contains 5,152 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) because it's prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Garamond font.

Dated: August 31, 2022                    */s/ Mohammad O. Jazil*


## CERTIFICATE OF SERVICE

I e-filed this brief on ECF, which will email everyone requiring notice.

Dated: August 31, 2022                    */s/ Mohammad O. Jazil*