In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-11143

_____

LEAGUE OF WOMEN VOTERS OF FLORIDA INC., et al.,

Plaintiffs-Appellees,

*versus*

FLORIDA SECRETARY OF STATE, et al.,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 4:21-cv-00186-MW-MAF

_____

Before William Pryor, Chief Judge, Wilson, Jordan, Jill Pryor, Newsom, Branch, Grant, Luck, Lagoa, and Brasher, Circuit Judges.*

BY THE COURT:

A petition for rehearing having been filed and a member of this Court in active service having requested a poll on whether this appeal should be reheard by the Court sitting en banc, and a majority of the judges in active service on this Court having voted against granting rehearing en banc, IT IS ORDERED that this appeal will not be reheard en banc.

---

* Judges Rosenbaum and Abudu recused themselves and did not participate in the en banc poll.

WILLIAM PRYOR, Chief Judge, and GRANT and BRASHER, Circuit Judges, respecting the denial of rehearing en banc:

In 2021, in the aftermath of a presidential election conducted during a pandemic and marked by partisan rancor, Florida enacted several election reforms—especially for voting by mail—with broad legislative support. That legislation, S.B. 90, passed by large majorities of 77 to 40 votes in the Florida House of Representatives and 23 to 17 votes in the Florida Senate. *See S.B. 90*, FLA. SENATE, https://perma.cc/U2YB-3J4M. Each House member represented approximately 156,000 individuals, *see 2010 House District Summary Statistics*, FLA. SENATE, https://perma.cc/TY82-F5ST, and each Senator 470,000, *see 2010 Senate District Summary Statistics*, FLA. SENATE, https://perma.cc/3V6M-ZGJ4. By census measures, the legislators who voted for S.B. 90 represented over 12 million Floridians. The governor signed it into law.

A year later, a single district judge refused to afford those elected officials a presumption of legislative good faith and instead found that three provisions were enacted with an intent to discriminate against black voters in violation of the Fourteenth and Fifteenth Amendments and section 2 of the Voting Rights Act. A panel of this Court stayed that injunction, and another panel, after full briefing and oral argument, reversed most of it as based on clearly erroneous findings of fact and misapplications of settled law. *See League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905 (11th Cir. 2023). The Court has since voted to deny rehearing en banc.

What are the supposedly racist provisions that the district judge enjoined officials from enforcing? They are unremarkable, race-neutral policies designed to bolster election security, maintain order at the polls, and ensure that voter registration forms are delivered on time. One provision requires election officials to monitor drop boxes in person and imposes standard hours for availability that correspond with early-voting hours. FLA. STAT. § 101.69(2)(a). Another provision prohibits the solicitation of voters within 150 feet of a polling place or drop box and proscribes "any activity with the intent to influence or effect of influencing a voter." *Id.* § 102.031(4)(a)–(b). We determined that the second half of that clause—proscribing activity "with the . . . effect of influencing a voter"—was void for vagueness. *See League of Women Voters*, 66 F.4th at 946–48. A third provision requires third-party organizations that collect voter registration forms to deliver them to local election officials within 14 days of receipt and before the registration deadline. FLA. STAT. § 97.0575(3)(a). The Florida Legislature considered input from a wide array of experts and citizens before enacting the provisions of S.B. 90—indeed, most were suggested by the county supervisors of elections. *League of Women Voters*, 66 F.4th at 919.

Three of our colleagues register a histrionic dissent from the denial of rehearing en banc. They accuse the panel of having disregarded historical evidence of discrimination beginning in the Civil War era and argue that we insufficiently weighed the lingering effects of a "political and economic culture disadvantaging one race over the other." Dissent at 7. They suggest that we ignored

evidence of pretext in the legislators' justifications. Dissent at 8–11. And they complain that we failed to defer to the district judge's factual findings, especially his analysis of statistical evidence. Dissent at 11–12. These criticisms are meritless.

### A. Distant vs. Recent Historical Background

The dissent accuses the panel of effectively prohibiting consideration of historical evidence when evaluating a legislature's discriminatory intent. Not true. We did not hold that historical evidence is "irrelevant." *See* Dissent at 7. We instead applied settled precedent that courts must not allow "the old, outdated intentions of previous generations to taint Florida's legislative action forevermore," and that we must "look at the precise circumstances surrounding the passing of the law in question." *League of Women Voters*, 66 F.4th at 923 (alterations adopted) (citations and internal quotation marks omitted). Past discrimination is relevant, but historical background is but "one evidentiary source" and not to be overweighed. *Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018) (citation and internal quotation marks omitted). We acknowledge that laws affect people differently across political and socioeconomic lines. *See* Dissent at 7. But that fact does not make *every* historical event that contributed to disparities among racial groups relevant to an analysis of discriminatory intent on the part of a *particular* legislature.

We faithfully applied controlling precedent when evaluating the effect of historical discrimination on present-day legislative intent. *Cf. Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977); *Greater Birmingham Ministries v. Sec'y of State for Ala.*,

992 F.3d 1299 (11th Cir. 2021). We gave little weight to distant history—from the Civil War era into the last century—because the Supreme Court has made clear that it offers little insight into the mindset of a legislature in 2021 other than in the manner of "original sin." *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality opinion) (explaining that it is impermissible to unilaterally "condemn governmental action" by treating historical acts as "original sin"), *superseded in part by statute*, Voting Rights Act Amendments of 1982, Pub. L. No. 97-205, 96 Stat. 131. We gave greater weight to recent history, which is inherently more probative.

The record reveals a stark lack of evidence of discriminatory intent of the *present* Florida Legislature. To the contrary, recent history shows that, as Florida has become increasingly racially diverse, its elections have become increasingly open and accessible. *See League of Women Voters*, 66 F.4th at 919. And in each of three modern judicial decisions that the district court cited as pertaining to allegedly racially motivated laws, federal courts either ruled that the laws were *not* proved to be enacted with discriminatory intent or never reached the question. *Id.* at 922. The district court did not even *attempt* to independently apply the relevant legal tests to those laws: instead, it cursorily declared that "[o]nce is an accident, twice is a coincidence, [and] three times is a pattern." *Id.*

The dissent cites the recent decision in *Allen v. Milligan* as approving the use of historical evidence to prove discriminatory intent. 143 S. Ct. 1487 (2023). But that decision involved section 2 of the Voting Rights Act, which "turns on the presence of

discriminatory *effects*, not discriminatory *intent*." *Id.* at 1507 (emphasis added). *Allen* cited the "extensive history of repugnant racial and voting-related discrimination" in Alabama as relevant to whether the political process today is "equally open" to minority voters. *Id.* at 1506 (citation and internal quotation marks omitted). But relying on distant history to prove that black voters are still *affected* by unequal access to the political process is different from relying on that history to establish that present-day legislators acted with discriminatory *intent*. To be sure, when a law has a disparate racial impact, that impact is relevant to an analysis of discriminatory intent, but disparate impact is a standalone factor distinct from historical background under *Arlington Heights*. *See Greater Birmingham*, 992 F.3d at 1322.

### B. The Absence of Legislative Pretext

The dissent also accuses the panel of improperly dismissing the district judge's finding that the Florida legislators' justifications for S.B. 90 were a pretext for racist intent. But the legislators' justifications—election security and preventing voter fraud—were presumptively lawful and credible, and the district court clearly erred by finding otherwise. The sponsors and supporters of S.B. 90 repeatedly asserted that they were motivated by concerns of electoral integrity. The proponents were "consistent in their messaging" about the need to assure voters that the process remained "safe and secure" in the face of then-prominent allegations of voter fraud. *League of Women Voters*, 66 F.4th at 926.

Under settled precedent, evidence of existing voter fraud is unnecessary for legislation that aims to prevent future fraud. *See Greater Birmingham*, 992 F.3d at 1334 ("[T]he Supreme Court has already held that deterring voter fraud is a legitimate policy on which to enact an election law, even in the absence of any record evidence of voter fraud." (citing *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 192–97 (2008))). So even if voter fraud had never occurred in Florida, the legislators' stated justification of preventing future fraud would be presumptively lawful. But the record before the district court contained undisputed evidence that "vote-by-mail fraud[] *has* plagued Florida elections in the past." *See League of Women Voters*, 66 F.4th at 925 (emphasis added). So the record did not support a finding that the legislators' justifications were pretextual. Indeed, the record established "that supporters of S.B. 90 sought to prevent the type of fraud that had been observed in Florida and other jurisdictions through this legislation." *Id*.

### C. The District Judge's Clearly Erroneous Factual Findings

Finally, the dissent criticizes the panel for improperly re-weighing statistical evidence cited by the district court. But if anything, findings based on statistical evidence lend themselves best to appellate review. When a factfinder reviews eyewitness testimony, the judge who personally observes the testimony is in a better position than an appellate judge to assess credibility. By contrast, mathematical facts are empirically provable and the best statistical analyses are replicable. If a district judge found that two plus two equals ten, we would lose no sleep over reversing for clear error,

even if the judge relied on the testimony of a college mathematics professor. *See, e.g., Miles v. M.N.C. Corp.*, 750 F.2d 867, 872–73 (11th Cir. 1985) (rejecting district court findings on statistical evidence); *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1276–78 (11th Cir. 2000) (same). And reversing in such an instance would certainly not be "usurp[ing] the authority" of the district court to "weigh the merits of the expert testimony." Dissent at 12.

The district judge's factual findings were clearly erroneous because they relied on fatally flawed statistical analysis; both the underlying data and the inferences drawn therefrom were irredeemably defective. Not even an expert can draw reliable population-level conclusions by analyzing a sample that is materially unrepresentative. Yet the district judge relied on expert analyses of small, unrepresentative samples of voting behavior to draw broad inferences about the relationship between race and the effect of the challenged S.B. 90 provisions. *See League of Women Voters*, 66 F.4th at 933. For example, to "prove" the supposed relationship between race and drop-box usage, one expert relied on data drawn predominantly from Sarasota County, where black voters made up 3.24 percent of the population compared to the statewide average of 13 percent. But places where black residents make up an especially high or low percentage of the population tend, as a descriptive matter, to differ according to other metrics, such as wealth and population density. Those disparities may well give rise to differences in voter behavior. And the unrepresentativeness of the sample is only one of several problems we identified with that expert's analysis and the district judge's assessment of it. The combined

flaws established that the district court clearly erred by relying on that evidence.

To be sure, our precedents rightly require deference to a district judge's factual findings. But review for clear error is not a rubber stamp. We must *ensure* that the district judge did not clearly err and fail to accord the elected representatives of the people of Florida a presumption of legislative good faith. That review requires a close look at the underlying evidence without blinders. We could not perform our duty as an appellate court otherwise.

The Court made the right decision by denying rehearing en banc. Based on this record and controlling precedents, the district court erred, and it was not a close question.

WILSON, Circuit Judge, dissenting from the denial of rehearing en banc, joined by JILL PRYOR, Circuit Judge, and joined as to Part II by JORDAN, Circuit Judge:

One-hundred and fifty-three years ago, in 1870, President Grant hopefully remarked that ratification of the Fifteenth Amendment to the Constitution of the United States would "complete[] the greatest civil change and constitute[] the most important event that has occurred since the nation came into life."[1] Nearly one hundred years later, a similar sentiment would be expressed by Chairman of the United States Commission on Civil Rights, and President of the University of Notre Dame, The Reverend Theodore M. Hesburgh. Reflecting upon the passage of the Voting Rights Act of 1965, he hailed it as the "most successful civil rights law in the nation's history" and "one of the most important legislative enactments of all time."[2]

This case demonstrates that nearly sixty years later, despite the promise of the Reconstruction Amendments and the successes

---

[1] Ulysses S. Grant, Special Message to the Senate and House of Representatives (Mar. 30, 1870), https://www.presidency.ucsb.edu/documents/special-message-1360.

[2] Editorial, *Enlarging the Electorate*, New York Times (June 21, 1970), https://www.nytimes.com/1970/06/21/archives/enlarging-the-electorate.html; *Hearings on Extensions of the Voting Rights Act before the Subcomm. on Civil and Constitutional Rights of the H. Comm. on the Judiciary*, 94th Cong. 2 (Mar. 6, 1975) (statement of Reverend Theodore M. Hesburgh, C.S.C.), https://archives.nd.edu/Hesburgh/UDIS-H2-08-04.pdf [hereinafter, Hesburgh Statement].

of the Voting Rights Act, the struggle to purge our democracy of discrimination on the basis of race continues.  In this case, plaintiffs challenge several provisions of Florida Senate Bill 90 (S.B. 90) because they allege S.B. 90 was enacted with the intent to discriminate against voters of color.  The district court conducted a two-week bench trial, heard from forty-two witnesses, received thousands of pages of documentary evidence, and ultimately issued a 288-page opinion finding that multiple provisions of S.B. 90 violated the Constitution and laws of the United States.  Of relevance here, the district court enjoined three provisions because it found they were passed with the intent to discriminate against Black voters.

On review of that order, a divided panel of this court reversed.  *League of Women Voters of Fla. v. Fla. Sec'y of State*, 66 F.4th 905, 919 (11th Cir. 2023).  Incredibly, the panel opinion rejected nearly all of the district court's factual findings.  This, despite our deferential clear error standard of review for factual findings, which asks whether the district court's findings are simply "plausible in light of the entire record."  *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349 (2021).

Concluding that so much of a thorough, careful district court opinion fails clear error review should raise eyebrows.  Unfortunately, it is not all that surprising.  In recent years, this court has picked up a troubling habit of too easily overriding district court factual findings.  *See Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 828 (11th Cir. 2022) (en banc) (Jordan, J.,

dissenting) (collecting cases). More concerning, however, is the panel opinion's narrowing of the holistic, multi-factor *Arlington Heights*[3] inquiry for evaluating claims of intentional discrimination. The panel opinion's application of several key factors narrows the scope of the inquiry under *Arlington Heights* and impermissibly increases the difficulty for civil rights plaintiffs seeking the protections guaranteed to them by our Constitution. This result is not compelled by our precedents, and if it were, it would warrant our en banc consideration because it is contrary to the Supreme Court's recent guidance.

The panel opinion thus puts this court's imprimatur on a law that a federal district judge already concluded intentionally targeted millions of Black Floridians' rights to vote. This imposition on the right of Floridians to vote their conscience in free elections is itself an issue of "exceptional importance" warranting rehearing under our rules. Fed. R. App. P. 35(a). But as a precedent in this circuit, the panel opinion threatens to hamper the ability of millions of Americans in three states to vindicate their rights under the Fourteenth and Fifteenth Amendments to the Constitution. In my view, these errors must be corrected. Accordingly, I dissent from this court's refusal to rehear this case en banc.

*    *    *

Before addressing my concerns in greater detail, some background information on the challenged provisions is necessary. The

---

[3] *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977).

challenged law, S.B. 90, is a wide-ranging update to Florida's voting laws. The three provisions still relevant in this appeal are the drop-box provision, the solicitation provision, and the registration-delivery provision. First, the drop-box provision generally heightens the requirements for county Supervisors of Elections to operate ballot drop-boxes by restricting the hours that the boxes may be available and by requiring that they be monitored in-person when available. Fla. Stat. § 101.69(2)(a). Second, in Florida, you may not "solicit" voters within 150 feet of a polling place. *Id.* § 102.031(4)(a). The solicitation provision broadens the statutory definition of the word "solicit" to mean "engaging in any activity with the intent to influence or effect of influencing a voter."[4] *Id.* § 102.031(4)(b). Third, the registration-delivery provision imposes rules and requirements on organizations that collect voter registration forms and submit them on registrants' behalf. *Id.* § 97.0575(3)(a).

After evaluating all the evidence, the district court concluded that each of these provisions increased the burdens on voting or those assisting others with voting, and that this was done with the intent to target Black Florida voters. With this background in mind, I turn to my concerns about the panel opinion's reasoning.

---

[4] This provision was also enjoined by the district court on First Amendment grounds for being unduly vague. The panel opinion held the first portion of the definition including conduct done with the "intent to influence a voter" was not vague but held that the latter portion dealing with the "effect of influencing a voter" was vague. *League of Women Voters*, 66 F.4th at 946–47.

## I.

Of the panel's errors, the misapplication of the *Arlington Heights* factors has the widest-reaching impact and is the strongest justification for en banc review, and so I begin there.

To prove a case of vote denial under the Fifteenth Amendment, or a violation of the Equal Protection Clause of the Fourteenth Amendment, our precedents require the plaintiff to show both discriminatory intent *and* effect. *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021). To evaluate whether a law was passed with discriminatory intent, we consider the multi-factor test established in the Supreme Court's *Arlington Heights* decision. 429 U.S. at 266–68. The Supreme Court identified six non-exhaustive factors to consider, and we have added two for ourselves:

> (1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; . . . (5) the contemporary statements and actions of key legislators[;] . . . (6) the foreseeability of the disparate impact; (7) knowledge of that impact[;] and (8) the availability of less discriminatory alternatives.

*League of Women Voters*, 66 F.4th at 922 (alterations in original) (quoting *Greater Birmingham*, 992 F.3d at 1322). These factors reflect a "sensitive inquiry" considering all "circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. Thus, properly construed, the *Arlington Heights* inquiry

requires a holistic evaluation, without overreliance or under-reliance on any single factor. *See Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018) (noting "historical background" is but "one evidentiary source" and not to be overweighed). Indeed, that is exactly what the district court did in this case as it recognized our admonition that "[t]he *Arlington Heights* factors require a fact intensive examination of the record." *League of Women Voters of Fla. v. Lee*, 595 F. Supp. 3d 1042, 1077 (N.D. Fla. 2022) (alteration in original) (quoting *Greater Birmingham*, 922 F.3d at 1322 n.33).

Of particular concern is the panel opinion's treatment of the historical background evidence under the second factor and its treatment of the legislative-statements evidence under both the sequence-of-events and contemporary-statements factors. I address each in turn.

*A.*

With regard to historical evidence, this court has cautioned that there is some "danger" in "allowing the old, outdated intentions" of the past to "taint" a government's present efforts. *Greater Birmingham*, 992 F.3d at 1325. Nonetheless, the Supreme Court has explained that the "historical background" of a government action is probative of discriminatory intent, "particularly if it reveals a series of official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 267. This commonsense notion reflects that past actions taken with discriminatory intent are probative of whether the government in the present day is acting pursuant to a pattern of racial discrimination.

In this case, the panel opinion faulted the district court for considering Florida's storied post-Reconstruction history of discriminating against voters of color. *League of Women Voters*, 66 F.4th at 923. It rejected the district court's careful explanation of how this history of discriminatory laws working hand-in-hand with mob violence to suppress Black Floridians' rights to vote is evinced in present-day disparities in socioeconomic and political data. *Id.*

By the panel opinion's telling, this history was irrelevant to the issue of whether S.B. 90 was today enacted with discriminatory intent. This cannot be the case. While it may be that "outdated" discriminatory intentions are of little probative weight in the present, in my view, those intentions must *actually be* outdated and abandoned before we can cast them out as evidence. Where, as here, the district court has carefully noted how a long history of intentional racial discrimination has produced a political and economic culture disadvantaging one race over the other and finds that this culture both persists into the present day and motivates present-day government actors, it is foolhardy to reject evidence of that discriminatory past simply due to the passage of time.

Further, outright rejection of this evidence is inconsistent with the holistic and "sensitive" inquiry required under *Arlington Heights*. It defies the Supreme Court's instruction to consider all "circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 492 U.S. at 266. In a case decided just this term, the Supreme Court reaffirmed the viability of assessing a government's history of discriminatory actions. *See Allen v. Milligan*, 143

S. Ct. 1487, 1506 (2023) (approving the district court's consideration of "Alabama's extensive history of repugnant racial and voting-related discrimination").[5]  It is easy to see how a history of discrimination, when evinced in present-day data, is relevant not just to the "historical background" factor, but also to the consideration of both the foreseeability of a disparate impact and the government's knowledge of that impact (factors 6 and 7).  The Fifteenth Amendment attacks not only the "simple-minded modes of discrimination," but also the more subtle "sophisticated" ones as well.  *See Lane v. Wilson*, 307 U.S. 268, 275 (1939).  When a present-day state government enacts a law that is neutral on its face, it is very much relevant whether or not the "neutral" criteria it purports to utilize are in fact built upon a history of past racial discrimination.  Simply put, our Constitution does not require us to overlook the truth that this nation's history of discrimination is still reflected in the present.

*B.*

My other primary area of concern is the panel opinion's evaluation of the evidence reflecting the legislature's non-discriminatory justifications for S.B. 90.  Under our construction of the *Arlington Heights* inquiry, both the sequence of events leading up to the passage of the challenged law and the contemporary statements of key legislators are relevant factors for assessing the legislature's intent.  *Greater Birmingham*, 992 F.3d at 1322.  Though we have cautioned that courts should be careful when extrapolating a collective

---

[5] Except there, unlike here, the Court declined to "disturb the District Court's careful factual findings" that were subject to clear error review.  *See id.*

body's intent from the intent of its individual members, we have nonetheless recognized that these factors encompass some of the most direct evidence of the legislature's intent. *See id.* at 1322, 1324.

Here, the district court, after considering all the evidence, concluded that the legislators' justifications for S.B. 90 were often "conflicting." 595 F. Supp. 3d at 1089. It determined that the primary proffered justification, fraud, was unsupported by the evidence. Indeed, it noted that one of the key proponents of S.B. 90 at times disavowed fraud as a justification for S.B. 90. *Id.* at 1089–90. The panel opinion holds that the district court erred by "implicitly requiring evidence of voter fraud in Florida" to justify S.B. 90. *League of Women Voters*, 66 F.4th at 925.

I recognize the Supreme Court's instruction that, even in the absence of documented cases of voter fraud, the states retain a legitimate interest in guarding against future cases of voter fraud prophylactically. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality); *Brnovich*, 141 S. Ct. at 2348. In *Greater Birmingham*, applying *Crawford*'s teachings, we held that the government defendant was not required to produce evidence of voter fraud in order to rely upon prophylactic concerns about fraud to justify the state law. 992 F.3d at 1334. What we did *not* hold in *Greater Birmingham* was that the district court was disallowed from considering the lack of evidence of voter fraud as part of its holistic evaluation of the credibility of the proffered justifications. Neither *Crawford* nor *Brnovich* prohibits considering the lack of voter fraud evidence in this way either. Rather, all three cases stand for the

unremarkable proposition that the burden for proving intentional discrimination rests on the plaintiff and that the state is not required to produce proof in order to invoke its legitimate interests.

It is one thing to hold, as those cases do, that the state government has a legitimate interest in preventing voter fraud, regardless of actual evidence of fraud.  But the panel's rule goes further than that.  It blocks consideration of the lack of evidence of voter fraud when assessing the credibility and motivations of the legislature as part of the holistic and "sensitive" *Arlington Heights* inquiry. Further, this narrower rule is unsupported by our case law and is, in my view, wrong.  A state may have many legitimate interests, but if the state was not actually, as a factual matter, motivated by those interests, the *Arlington Heights* inquiry may take that into consideration when determining if the legislature's true motivation was racial discrimination.  Here, it was this type of analysis that the district court engaged in.  The shifting, contradictory, and conflicting explanations offered by the key legislators in the time leading up to the passage of S.B. 90 convinced the district court that the legislature was actually motivated by something else.  Namely, it concluded, a desire to aid the Republican Party by targeting the voting rights of Black Floridians.  595 F. Supp. 3d at 1097–98, 1117.

Our case law should not require district courts to accept, without scrutiny, talismanic invocations of voter fraud.  It is common sense that when a party says it did something for one reason, but that reason is unsupported by the facts and the party is constantly providing shifting, contradictory alternative explanations,

the district court may draw the inference that the party did not really act for that reason. The Supreme Court's guidance on this topic, permissive towards the state as it may be, does not require us to naively accept every invocation of voter fraud that is proffered regardless of its factual support.

## II.

I turn now to a more basic error of the panel's opinion: its willingness to override the detailed factual findings of the district court. When reviewing factual findings, we should reverse them only if we conclude they are clearly erroneous. *Brnovich*, 141 S. Ct. at 2348–49. "If the district court's view of the evidence is *plausible* in light of the entire record, an appellate court may not reverse even if it is convinced that it would have weighed the evidence differently in the first instance." *Id*. at 2349 (emphasis added). Although not the only place where this occurs, the panel opinion's error is most acutely seen in its evaluation of the statistical analysis under the disparate impact factor of *Arlington Heights*. *League of Women Voters*, 66 F.4th at 933–38. The plaintiffs put on two experts in statistical analysis to address the impact each of the challenged provisions of S.B. 90 has on voters of color. The defendants failed to put on any rebuttal expert evidence for these issues and in some places barely conducted cross-examination of the plaintiffs' experts.

The panel opinion concludes that the district court clearly erred because the statistics that it relied on were "fatally flawed." *League of Women Voters*, 66 F.4th at 941. I disagree with the panel opinion's assessment of the statistical evidence and do not believe

that some of the mathematical premises it relies upon necessarily lead to the conclusions that the panel opinion draws.  But it is immaterial what I, or the panel opinion, think about mathematical principles.  In this situation, the experts testified and submitted reports into evidence before the district court.  The experts were available both for cross-examination on the substance of their analyses and on the methods and procedures that led to those analyses.  The district court was best situated to consider any defects in this evidence and to consider what weight, if any, to give it.  In this case, it elected to largely credit the plaintiffs' experts on the impact of the challenged laws and to find that the laws disparately impacted voters of color.

In concluding otherwise, the panel opinion necessarily usurped the authority to weigh the merits of the expert testimony.  The authority to weigh the evidence and make factual findings rightfully belongs to the district court as the court of original jurisdiction.  *See Brnovich*, 141 S. Ct. at 2349.  There will of course be cases where the district court's factual findings or conclusions are objectively wrong, and it abuses the authority entrusted to it.  In such cases, even our deferential standard of review, of course, does not require us to accept patently, objectively false findings.  By my reading, the panel opinion obviously disagrees with the plaintiffs' experts and perhaps would have given them much less weight than the district court did.  But "an appellate court may not reverse even if it is convinced that it would have weighed the evidence differently in the first instance."  *Id.*  When we reach down into the factual record and erroneously override the district court's factual

findings, we disrupt the balance of powers between trial courts and appellate courts established by Congress. As Judge Jordan mentioned in a recent case, this court has gotten into a bad habit of casting aside our clear error standard of review in certain cases. *See Adams*, 57 F.4th at 828 (Jordan, J., dissenting). It is far past time that we restore some discipline to our consideration of district court factual findings.

### III.

We take cases en banc when necessary to "secure or maintain uniformity" of our decisions, or when the case presents a "question of exceptional importance." Fed. R. App. P. 35(a). In recent months, we have taken en banc cases addressing whether a single text-message is sufficient to confer Article III standing[6] and the intricacies of federal pesticide law.[7] We have also used our en banc procedures to rescue the government from its own deliberate waiver of important arguments.[8]

While these cases were certainly important in their own way, so is this case. There are just over 14 million active, registered voters in the State of Florida.[9] Thirteen percent, or 1.8 million, are

---

[6] *Drazen v. Pinto*, 74 F.4th 1336 (11th Cir. 2023) (en banc).

[7] *Carson v. Monsanto*, 72 F.4th 1261 (11th Cir. 2023) (en banc).

[8] *United States v. Campbell*, 26 F.4th 860 (11th Cir. 2022) (en banc); *see id.* at 922 (Newsom, J., dissenting).

[9] *See* Fla. Div. of Elections, *Voter Registration - By Party Affiliation*, https://dos.myflorida.com/elections/data-statistics/voter-registration-

Black.[10]  The federal district court in this case thus concluded that
the challenged provisions of S.B. 90 were enacted with the intent
to discriminate against 1.8 million Americans because of their race.
While our nation has taken great strides towards racial equality and
equal access to the vote, future progress depends on our present
efforts, for "[l]asting gains will not be made without persistent ef-
forts to eradicate totally voting injustices."[11]  The errors in the panel
opinion's reasoning set our jurisprudence back.  They hamper the
ability of voters to seek the protections promised them by our Con-
stitution.  There can be no question that this case presented issues
of exceptional importance for our court.  We should have reheard
this case en banc, and accordingly, I dissent from our refusal to do
so.

---

statistics/voter-registration-reports/voter-registration-by-party-affiliation/
(last visited August 29, 2023).

[10] Susan A. MacManus, *Florida's Changing Electorate*, James Madison Inst. (Fall
2018), https://jamesmadison.org/floridas-changing-electorate-more-racially-
ethnically-and-age-diverse/.

[11] Hesburgh Statement, *supra* note 2, at 12–13.